List of Exhibits

(Process and Pleadings State Court Case 3AN-14-08418CI)

List #1

1.    Complaint

2.    Summons

3.    Summons

4.    Motion to Compel Arbitration

5.    Opposition to Motion to Compel Arbitration

6.    Order Granting Motion to Compel Arbitration

7.    First Amended Complaint

8.    Motion to Confirm Arbitration Award & Order Confirming Award

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

**MYSTERY RANCH, LLC and
JACK BARRETT,**

               **Plaintiffs,**

    **vs.**

**BOB GROSS and
RB ENTERPRISES, LLC,**

               **Defendants.**

COPY
Original Received

AUG 0 1 2014

Clerk of the Trial Courts

**CASE NO.: 3AN-14-** 14-8418 **CI**

## COMPLAINT

COME NOW the Plaintiffs, Mystery Ranch, LLC and Jack Barrett, by and through counsel, Paul D. Stockler, for their cause of action against Defendants, Bob Gross and RB Enterprises, LLC, complain and allege as follows:

## PARTIES

1.    Plaintiff, Mystery Ranch, LLC, is limited liability corporation with its principal place of business in Alaska. Mystery Ranch, LLC was owned at the time, and still is, by Jack and Dawn Barrett.

2.    Plaintiff, Jack Barrett, is a resident of Anchorage, Alaska and is in all ways competent to bring this action.

3.    Upon information and belief, defendants, Bob and Melodie Gross, are residents of Anchorage, Alaska and duly subject to the laws of the State of Alaska.

4.    Upon information and belief, defendant, RB Enterprises, LLC, is a limited

Law Office of Paul D. Stockler
737 W. 5th Avenue, Suite 205
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

liability corporation with its principal place of business in Alaska.   RB Enterprises, LLC was owned at the time, and still is, by Bob and Melodie Gross.

## JURISDICTION / VENUE

5.    Jurisdiction is proper under AS 22.10.020.  With the principal places of business and residences of the parties being Anchorage, Alaska, venue is proper.

## GENERAL ALLEGATIONS

6.    Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

7.    On December 15, 2011, IT, LLC acquired the Inlet Tower Property.  The sole purpose of IT, LLC was to serve as the holding company for the Inlet Tower asset.

8.    IT, LLC was owned at the time, and still is, by Mystery Ranch, LLC and RB Enterprises, LLC.  Mystery Ranch, LLC was owned at the time, and still is, by Jack and Dawn Barrett.  RB Enterprises, LLC was owned at the time, and still is, by Bob and Melodie Gross.

9.    Meritage Management Company, LLC whose ownership at the time of creation was Jack Barrett and Bob Gross, was created for the sole purpose of serving as the operating company for IT, LLC.

10.    On July 23, 2012, Mr. Gross changed the State records for the operating company Meritage Management Company, LLC.  Mr. Barrett learned of this when it was discovered by his CPA in January 2014.

11.    Mr. Barrett received a copy of an email dated May 28th from Mr. Gross

Mystery Ranch, LLC  v.  Bob Gross
Complaint

3AN-14-_____ CI
Page 2 of 22

Law Office of Paul D. Stockler
737 W. 5th Avenue, Suite 205
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Exhibit 1 -- Page 2 of 22

to Eric Havelock of AHFC regarding a change of management structure for the Inlet Tower Property by IT, LLC.  Until Mr. Havelock forwarded this email to him, Mr. Barrett had been unaware of this and had not agreed to the change.

12.     In July 2012, Mr. Gross had unilaterally reported to the State of Alaska a change in the ownership of Meritage Management Company, LLC.

13.     The reported change in ownership consisted of Meritage Management Company, LLC, which had until that time been owned 50% by Mr. Barrett personally and 50% by Mr. Gross personally, going to Mystery Ranch, LLC, which was owned by Mr. Barrett 50% and his wife Dawn 50%, and RB Enterprises, LLC, which was owned by Bob Gross 95% and Melodie Gross 5%.

14.     This change in ownership created the potential risk of Meritage Management Company, LLC being treated as a "C" Corp rather than an "S" Corp.

15.     Mr. Barrett never consented in any way to transfer his personal ownership of Meritage Management Company, LLC to Mystery Ranch, LLC.

16.     Mr. Gross' 2012 filing with the State of Alaska was false and fraudulent and a breach of his fiduciary duty and a Class A misdemeanor under Alaska law.

17.     Mr. Barrett has since filed corrective paperwork with the State of Alaska regarding this ownership issue and has had his accountants working on the IRS entity change issues.

18.     Prior to the acquisition of the Inlet Tower Property, Mr. Barrett and Mr. Gross were advised by their Tax Planner/CPA to create this entity structure and to designate Meritage Management Company, LLC as an "S" Corp election for its duties

Law Office of Paul D. Stockler
737 W. 5th Avenue, Suite 205
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross
Complaint

3AN-14-_____ CI
Page 3 of 22

Exhibit 1 -- Page 3 of 22

of the partners jointly operating the Inlet Tower Property.

19.    When Mr. Gross reported the ownership transfer from Mr. Barrett to Mystery Ranch, LLC and from himself to RB Enterprises, LLC, without Mr. Barrett's consent, he inadvertently may have changed the entity's tax structure.    The entity's designation from inception was as an "S" Corp and its taxes were filed under the "S" Corp election.

20.    Since this change of ownership was never agreed to, Mr. Barrett has been investigating the legal and tax consequences of Mr. Gross' actions.    At a minimum, as a "C" Corp the entity could face a double taxation scenario, which would make no sense for any of its interests.    The advantage according to Mr. Gross, as he stated to the accountants in an email, was that he believed that under a "C" Corp he would pay no personal income tax for his room, food and beverage expenses, all benefits of which were not authorized by Mr. Barrett.

21.    According to Eric Havelock's email referenced above, Mr. Gross then transferred all Meritage Management Company, LLC's employees and assets to IT, LLC to be utilized in this new operating scenario which he presented to Mr. Havelock.

22.    This was also done without Mr. Barrett's consent.

23.    Mr. Gross mentioned in his email that Meritage Management Company, LLC was "assisting" him in the management of the Inlet Tower Property, when in fact Meritage Management Company, LLC and its layers of management were managing the day-to-day operations of the property.

24.    By changing the ownership structure and then transferring management

Law Office of Paul D. Stockler
737 W. 5th Avenue, Suite 205
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

to IT, LLC, Mr. Gross effectively seized/stole assets which were originally owned by Mr. Barrett personally.

25.   Meritage Management Company, LLC's assets, 50% of which were originally owned by Mr. Barrett personally and 50% of which were originally owned by Mr. Gross personally, were placed without consent under Mr. Gross' sole control.

26.   The assets Mr. Gross seized control of were personal assets.  Not the assets of Mystery Ranch, LLC.  Not the assets of RB Enterprises, LLC.  And not the assets of IT, LLC.

27.   Mr. Gross did not have any authorization to act on Mr. Barrett's behalf. Neither did Mr. Gross have any authority to act on behalf of Meritage Management Company, LLC or IT, LLC's behalf to seize the assets by IT, LLC or to change the management structure of the organization for the management of the project or for any other reason.

28.   From a tax standpoint, every time there is a distribution of assets, it is considered a sale at the corporate level, and as such is taxed at the corporate level. In addition, if the corporation is taxed as a "C" corporation, the distributions are taxed as dividends received at the owners' level.  Hence, double taxation.

29.   Since May 20, 2014, Mr. Barrett has been locked out of the books and records, he has made repeated requests to review the Meritage Management Company, LLC and IT, LLC, Tower Property Construction as well as any other related party transactions, books and records as is required by the Operating Agreement.  All such requests have been denied by Mr. Gross.

Law Office of Paul D. Stockler
737 W. 5th Avenue, Suite 205
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross
Complaint

3AN-14-_____ CI
Page 5 of 22

Exhibit 1 -- Page 5 of 22

30.   Mr. Barrett does not have access to the accounting system, the office, the current balance sheet, or any other material financial information so he is unsure as to what the current asset value is on the Meritage Management Company, LLC books at this time.

31.   However, Meritage Management Company, LLC assets are being used by IT, LLC without Mr. Barrett's permission or consent.  Neither is there any form of sales agreement from Meritage Management Company, LLC to IT, LLC.

32.   Additionally, it is against the IT, LLC operating agreement for IT, LLC to be merged with another company without 100% agreement of the members, which was never obtained by Mr. Gross.

33.   The new entity structure also needed AHFC approval which was never obtained by Mr. Gross.

34.   In September 2012, Mr. Gross went to Northrim Bank and changed the account name of the Operating Account and in the process had Mr. Barrett removed as a signer from the Meritage Management Company, LLC operating account.  This was done without Mr. Barrett's knowledge or consent.

35.   In September 2012, Mr. Gross and Mr. Barrett made an "S" Corp election for Meritage Management Company, LLC.

36.   In September 2012, the 2011 tax return for Meritage Management Company, LLC was filed as an "S" Corporation and signed by Mr. Gross.

37.   In January 2013, all employees/vendors were given W-2/1099 statements from Meritage Management Company, LLC for year-end 2012 and all third

Law Office of Paul D. Stockler
737 W. 5th Avenue, Suite 205
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross
Complaint

3AN-14-_____ CI
Page 6 of 22

Exhibit 1 -- Page 6 of 22

party vendors were provided W-9 forms from Meritage Management Company, LLC. These contained an "S" Corp election.

38.     In September 2013, Meritage Management Company, LLC filed its 2012 return as an "S" Corp.  This return was signed by Mr. Gross.

39.     In late January 2014, bookkeeper Dawni Haines, from LPD Bookkeeping and Jeff Cunningham, COO, verified that W-2's were sent to all employees from Meritage Management Company, LLC.

40.     In January of 2014, third party vendors were again given W-9 forms for Meritage Management Company, LLC where an "S" Corp election was noted.

41.     In May 2014, Mr. Gross claimed that Meritage Management Company, LLC was not really an "S" Corp, but rather a "C" Corp in an email as his justification as to why he should not have a W-2 issued to him for his 2012 and 2013 room and board.

42.     Mr. Gross made this claim due to the changes he made to the ownership structure of Meritage Management Company, LLC.

43.     Mr. Gross claims that the change in the ownership structure resulted in a termination of the "S" Corp election. However, In September 2013, Meritage Management Company, LLC filed its 2012 return as an "S" Corp.  This return was signed by Mr. Gross.

44.     This claim was made in spite of the 2012 and 2013 tax returns being filed as an "S" Corp.

45.     In May 2014, Mr. Gross accused Mr. Barrett of being reckless in an effort to  justify  his  actions  to  change  the  operations/management  from  Meritage

Law Office of Paul D. Stockler
737 W. 5th Avenue, Suite 205
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross
Complaint

3AN-14-_____ CI
Page 7 of 22

Exhibit 1 -- Page 7 of 22

Management Company, LLC to IT, LLC. This action and subsequent actions by Mr. Gross were made in an attempt to cover-up his breach of fiduciary duties, his thefts, his use of corporate assets for personal gain as well as other reasons to be proven during discovery. Mr. Barrett was never involved in the day to day check writing or disbursement of funds. In fact, Mr. Barrett cannot recall one check that he ever signed for IT, LLC or Meritage Management Company, LLC.

46.    The accusation was made in spite of the fact that Jeff Cunningham ran the day-to-day operations and Mr. Barrett had been out of Alaska for the better part of two 2 years.

47.    Mr. Gross offers no evidence to substantiate his claim that Mr. Barrett was "reckless".

48.    Mr. Gross sent Mr. Barrett a six page letter in which he stated that he knew that Mr. Barrett would not agree to an operating agreement change for Meritage Management Company, LLC wherein Mr. Gross is given unilateral control of operations in complete contrast to the origination of how the asset and operations would be held in entities and joint ownership and management of the day-to-day operating decisions and control.

49.    Mr. Gross then, as Manager of IT, LLC, unilaterally terminated the oral agreement that Meritage Management Company, LLC had with IT, LLC. This was done to allow Mr. Gross to manage the Inlet Tower Property through IT, LLC without Mr. Barrett's consent or agreement.

50.    Mr. Gross' actions were driven, as stated in his various correspondence

Law Office of Paul D. Stockler
737 W. 5th Avenue, Suite 205
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross
Complaint

3AN-14-_____ CI
Page 8 of 22

Exhibit 1 -- Page 8 of 22

to Mr. Barrett, their COO, and their CPA, by his desire not to claim compensation for rooms, meals, and gratuity, which was paid by the company and not reported, as personal income and which is a breach of his fiduciary duty and a theft from his partner.

51.    Additionally, Mr. Gross did not want to have to document his expenses because there were expenses of a personal nature which were not approved by Mr. Barrett or their COO and which were not in compliance with their CPA, the IRS, or the AHFC 2nd Loan Agreement which essentially bifurcates profits from being made again which is a breach of his fiduciary duty and a theft from his partner.

52.    It was later discovered that one of the night auditors who had quit in 2012 had done so because of Mr. Gross' unethical accounting and misreporting of daily/evening food and beverage expense allocation.

53.    Mr. Barrett consulted with a tax attorney, who concurred with their CPA and differed with Mr. Gross' assessment.

54.    Mr. Gross was upset with Mr. Barrett for seeking the consultation with a tax attorney.

55.    On May 28, 2014, Mr. Barrett met with AHFC to discuss the foregoing issues.   It was requested that Bob and Melodie Gross be removed from their management duties as soon as possible and that a third party be brought in to manage the project while third party tax consultants conducted a complete financial audit of all books and records including Mr. Gross' companies which were providing services at the project without Mr. Barrett's consent.

Law Office of Paul D. Stockler
737 W. 5th Avenue, Suite 205
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross
Complaint

3AN-14-_____ CI
Page 9 of 22

Exhibit 1 -- Page 9 of 22

56.     On June 10, 2014, Mr. Barrett received an email from Eric Havelock (referenced above) in which he shared an attachment of a letter that Bob had sent without Mr. Barrett's knowledge.  The letter stated that effective May 20, 2014 the Inlet Tower Property would be managed through IT, LLC.   Mr. Gross claimed that this would be a more efficient way to manage the Inlet Tower Property and that Meritage Management Company, LLC will no longer be used.

57.     Since Mr. Barrett does not have access to the books and records, he is uncertain as to how the "merger" of Meritage Management Company, LLC and IT, LLC has been recorded and what tax consequences have been created.

58.     In addition to disagreeing with the new form of management structure, Mr. Barrett takes serious issue with Mr. Gross' managing of loan compliance which has resulted in their loan with AHFC being in default.

59.     On June 17, 2014, Glen Turner sent an email stating that once BDO's engagement letter was received, they will approve the extension of audited financials until September15, 2014.

60.     On June 18, 2014, Mr. Gross' attorney was provided with a list of items and a request that those items be delivered by June 26, 2014.  The list contained the following items:

1)   In 2012 and 2013 was Inlet towers operated through Meritage Management Company as an S corp?

2)   Were the 2012 taxes filed for Meritage Management Company as an S corp; when were they filed and please provide a copy of that return.

Law Office of Paul D. Stockler
737 W. 5th Avenue, Suite 205
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross
Complaint

3AN-14-_____ CI
Page 10 of 22

Exhibit 1 -- Page 10 of 22

3) Were W-2's sent to all employees from Meritage Management Co., LLC for 2012 and 2013?  Were the 941 tax forms submitted under Meritage Management Company?

4) Did Bob change any of the companies from an S corp to a C corp and please provide all documents in support of any such changes.

5) If any changes have been made from an S corp to a C corp please provide copies of all monthly payroll tax payments; quarterly filings and any income tax filings.

6) Has the transfer of management changed from Meritage Management Company to IT, LLC?  Please provide copies of any agreements changing this arrangement and please provide the creation, ownership and corporate documents and all books of IT, LLC.

7) Have any e mails or letters been sent to AHFC that Inlet Towers will be managed through IT, LLC and not Meritage Management Company?  If so please provide copies of any and all emails or letters.

8) Please provide copies of all leases for units 1509, 1510 and 1511. Please provide copies of all checks made for payments of those units. If payment has not been paid please provide all tax documents revealing this as income and any taxes paid.  Please provide all rent rolls provided to AHFC listing or which fail to list units 1509, 1510 and 1511.

9) Please provide a full accounting of the build out and all improvements of units 1509, 1510 and 1511 and how they were paid.

10) Please provide the immediate return of Jeff's computer with all the files that were on his computer as of May 20, 2014 and any hard drive copies that have been made.

11) A complete copy of quick books for all the operating and managing entities including historical back up copies from Year End 2012 and 2013.

12) Return a set of working keys to the office and all file cabinets and storage units to my client.

13) Provide all Administrative Passwords for all software, bank accounts and any other business accounts for IT, LLC and Meritage Management Company.

Law Office of Paul D. Stockler
737 W. 5th Avenue, Suite 205
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross
Complaint

3AN-14-_____ CI
Page 11 of 22

Exhibit 1 -- Page 11 of 22

Law Office of Paul D. Stockler
737 W. 5th Avenue, Suite 205
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

14) Jeff Cunningham be issued his normal pay check from Meritage Management Company as scheduled this Friday.

Mr. Gross refused to provide the contents of the list above by the deadline his attorney agreed to and, to this date, nothing has been received.

61.     On June 19, 2014, Mr. Barrett received a telephone call from Ms. Linda Owens from the IRS informing him that he needed to immediately address the outstanding IRS payroll tax liability for Meritage Management Company, LLC of approximately $28,000.00 for 2013 and 2014.  Ms. Owens did not mention the over-due balance for 2012 which is anticipated to be approximately $22,000.00.

62.     On June 23, 2014, AHFC provided a letter that IT, LLC had an extension until September 15, 2014.  This letter did not address the whole plan submitted by Mr. Barrett or reference Meritage Management Company, LLC that has all of the revenue, expenses, AR, AP, and employee compensation of the Inlet Tower project.

63.     On June 24, 2014, Mr. Barrett received an email from LPD Bookkeeping which stated that Mr. Gross was going back to 2012 and deleting the Quick Book reconciliations and re-doing them.  The email stated:

> "This morning around 11 am Bob Gross contacted me regarding reconciliations of checking accounts for Inlet Towers General Accounts.  I informed him that I was busy at the time and could he get back with me later in the day.  He wanted to understand why the cleared amount matched the bank statement, but the Ending Balance wasn't the same as QuickBooks register.  I explained that checks could have been entered in after the reconciliation was done, which would then change the Ending Balance in QuickBooks.
>
> Around 12:30 his bookkeeper called and we discussed past reconciliations.  He informed me that all of my reports looked accurate.  Since he was backing out the past reconciliations, he found that they had come upon a discrepancy of a large amount and if I knew what would have caused it.  I had him explain to me what they were doing.  He

Mystery Ranch, LLC  v.  Bob Gross
Complaint

3AN-14-_____ CI
Page 12 of 22

Exhibit 1 -- Page 12 of 22

explained that they were deleting the past reconciliations and re-doing them as far back as January 2012. I told them if there was an error it would have been in recent changes to the account or something was deleted that shouldn't have been.

I am unsure why they would need to back out all the reconciliations since they agreed with the bank each month. We have copies here in the office of these reports if you need to review them. Chris Hickenlooper"

64.    Mr. Gross did not follow the proper procedure to merge the various companies called for on the first loan agreement and were a substantial breach of the loan agreement.

65.    Mr. Gross is keeping earnings at a net loss in order to not pay AHFC its share of the net profit to pay down the second loan, circumventing paying personal income tax, IRS payroll taxes due, State ESC, and return any form of capital and or profit to his partner Mr. Barrett.

66.    On June 26, 2014, Mr. Gross failed to provide the responses to the list of items given to his attorney.

67.    On June 30, 2014, Mr. Barrett was informed that Swalling & Associates were questioning employees about financial processes. This appears to be audit work of Meritage Management Company, LLC which was not approved by Mr. Barrett or AHFC.

68.    Mr. Barrett was also informed that Mr. Gross is accelerating the process to change all of the Inlet Tower Property management software which poses a risk of all historical records being lost.

### COUNT I
### (Breach of Operating Agreement)

Law Office of Paul D. Stockler
737 W. 5th Avenue, Suite 205
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC v. Bob Gross                                    3AN-14-_____ CI
Complaint                                                         Page 13 of 22

Exhibit 1 -- Page 13 of 22

69.    Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

70.    Upon information and belief, RB Enterprises and Gross breached the Operating Agreement.

71.    Upon information and belief, RB Enterprises and Gross breached the Operating Agreement by, among other things, engaging in what can be properly described as mismanagement and misappropriation, as more fully described above.

72.    RB Enterprises and Gross also breached the Operating Agreement by, among other things, causing IT, LLC. (1) to engage in related-party transactions that were fraudulent and/or not for reasonable value; (2) to pay expenses that were not related to the businesses; (3) to enter into or undertake other transactions and transfers that were unrelated to the businesses and/or did not provide reasonable value to the businesses; and (4) to enter into joint ventures with third-parties without the knowledge and consent of the other members of the LLC; (5) The Company shall pay all costs and expenses of the Company, including in connection with all Projects, as **approved by the Members** (bold added), which may include, but are not limited to... portions omitted.

73.    RB Enterprises and Gross breaches of the Operating Agreement, including paying expenses without member approval, have denied Plaintiffs the benefit of the Operating Agreement, entitle Plaintiffs to injunctive relief, and have damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

## COUNT II
### (Operating Agreement - Implied Covenant of Good Faith and Fair Dealing)

Mystery Ranch, LLC  v.  Bob Gross
Complaint

3AN-14-_____ CI
Page 14 of 22

Exhibit 1 -- Page 14 of 22

Law Office of Paul D. Stockler
737 W. 5th Avenue, Suite 205
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

74.    Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

75.    There is covenant of good faith and fair dealing implied in the Operating Agreement.

76.    RB Enterprises and Gross breached the covenant of good faith and fair dealing implied in the Operating Agreement by, among other things, engaging in what can be properly described as mismanagement and misappropriation, as more fully described above.

77.    RB Enterprises and Gross breaches of the covenant of good faith and fair dealing implied in the operating Agreement have denied Plaintiffs the benefit of the Operating Agreement and have damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

78.    RB Enterprises and Gross breaches of the covenant of good faith and fair dealing were done intentionally and with reckless disregard for the rights of Plaintiffs and entitle Plaintiffs to punitive and exemplary damages in an amount to be established at trial.

**COUNT  III**
**(Breach of Fiduciary Duties - Common Law and AS 10.50.135)**

79.    Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

80.    As the manager of IT, LLC. Gross owed fiduciary duties to act with care, honesty, and with loyalty to, and exercise good business judgment for, Plaintiffs, and he breached those duties.

Law Office of Paul D. Stockler
737 W. 5th Avenue, Suite 205
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross
Complaint

3AN-14-_____ CI
Page 15 of 22

Exhibit 1 -- Page 15 of 22

81.     Further, RB Enterprises and Gross engaged in conduct that can be properly described as mismanagement and misappropriation, as more fully described above.

82.     All related party transactions that were not specifically approved by the other members to the LLC, are void under AS 10.50.140.

83.     RB Enterprises and Gross breaches of fiduciary duties to Plaintiffs have damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

84.     RB Enterprises and Gross breaches of fiduciary duties were done intentionally and with reckless disregard for the rights of Plaintiffs and entitle Plaintiffs to punitive and exemplary damages in an amount to be established at trial.

## COUNT IV
### (Breach of Duty of Good Faith)

85.     Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

86.     As the manager of IT, LLC, Gross owed Plaintiffs a duty to act in good faith and deal fairly, and Gross breached that duty.

87.     Further, RB Enterprises and Gross engaged in conduct that can be properly described as mismanagement and misappropriation, as more fully described above.

88.     RB Enterprises and Gross breaches of the duty to act in good faith to Plaintiffs have damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

Law Office of Paul D. Stockler
737 W. 5th Avenue, Suite 205
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross
Complaint

3AN-14-_____ CI
Page 16 of 22

Exhibit 1 -- Page 16 of 22

89.     RB Enterprises and Gross breaches of the covenant of good faith and fair dealing were done intentionally and with reckless disregard for the rights of Plaintiffs and entitle Plaintiffs to punitive and exemplary damages in an amount to be established at trial.

**COUNT V**
**(Intentional Spoliation of Evidence)**

90.     Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

91.     Gross had an obligation, both as the managing member of a limited liability company and as a fiduciary, to maintain and preserve the business records.

92.     Gross has intentionally destroyed or altered records belonging to IT, LLC and Meritage Management in an effort to both cover up his improper conduct and to make it difficult for the Plaintiffs to bring claims against them.

93.     RB Enterprises and Gross either altered, erased or "scrubbed" data from computers or operating systems in an effort to both cover up his improper conduct and to make it difficult for Plaintiffs to bring claims against them.

94.     The above described conduct  has damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

95.     The conduct of RB Enterprises and Gross was done intentionally and with reckless disregard for the rights of Plaintiffs and entitles Plaintiffs to punitive and exemplary damages in an amount to be established at trial.

**COUNT  VI**
**(Operating Agreement - Implied Covenant of Good Faith and Fair Dealing)**

Law Office of Paul D. Stockler
737 W. 5th Avenue, Suite 205
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross
Complaint

3AN-14-_____ CI
Page 17 of 22

Exhibit 1 -- Page 17 of 22

96.    Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

97.    There is a covenant of good faith and fair dealing implied in the Operating Agreement.

98.    RB Enterprises and Gross breached the operating agreement and the covenant of good faith and fair dealing implied in the Agreement by, among other things, denying plaintiffs "the full, exclusive and unrestricted use and possession" of the Business Offices including changing all locks and passwords.

99.    RB Enterprises and Gross breach of the operating agreement and the covenant of good faith and fair dealing implied in the Operating Agreement has denied Mystery Ranch, LLC the benefit of the Operating Agreement and has damaged plaintiffs in an amount to be proven at trial.

100.    RB Enterprises and Gross breaches were done intentionally and with reckless disregard for the rights of Plaintiffs and entitle Plaintiffs to punitive and exemplary damages in an amount to be established at trial.

## COUNT VII
### (Theft and Conversion)

101.    Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

102.    RB Enterprises and Gross  have wrongfully and intentionally denied Plaintiffs possession of personal property, including without limitation business records, files, and computers. RB Enterprises and Gross has withheld and reviewed files on the computer Meritage Management purchased for Jeff Cunningham. This

Law Office of Paul D. Stockler
737 W. 5th Avenue, Suite 205
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross
Complaint

3AN-14-_____ CI
Page 18 of 22

Exhibit 1 -- Page 18 of 22

conversion and theft also gave Gross access to proprietary information on other projects and business ventures.

103.   RB Enterprises and Gross conversion of property has damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

104.   RB Enterprises and Gross conversion of property was done intentionally and with reckless disregard for the rights of Plaintiffs and entitles Plaintiffs to punitive and exemplary damages in an amount to be established at trial.

### COUNT VIII
### (Unfair Trade Practices Act)

105.   Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

106.   RB Enterprises and Gross used related-party agreements, entered into fraudulent and/or misleading transactions in whole or in part and constitute "unfair or deceptive acts or practices" prohibited under AS 45.50.471.  As just one example, RB Enterprises and Bob Gross took three units at Inlet Tower and converted them to one "Managers Unit" at the corporate entities expense.  This managers unit was not approved by the partners and Gross has refused any access to the unit, how the construction and furnishings were paid for, he's refused to pay fair market rent on the units  he's refused to count this as income, he's deprived the corporate structure of fair market rent on all 3 of the units since this was never agreed to and he has lied and misrepresented these units to AHFC on the rent rolls as AHFC would not have approved the use of these units as restrictive rent units for their required percentage qualifications.

Mystery Ranch, LLC  v.  Bob Gross
Complaint

3AN-14-_____ CI
Page 19 of 22

Exhibit 1 -- Page 19 of 22

Law Office of Paul D. Stockler
737 W. 5th Avenue, Suite 205
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

107.   The unfair and deceptive acts have damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial, and entitle Plaintiffs to an award of treble damages, punitive damages, and full actual attorney's fees under the Act.

### COUNT IX
### (Misrepresentation)

108.   Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

109.   RB Enterprises and Gross misrepresented, negligently or intentionally, the terms of the agreements and the amounts due thereunder, including invoices  of unsupported services and expenses. As another example, RB Enterprises and Gross took 3 units at Inlet Tower and converted them to one "Managers Unit" at the corporate entities expense. He's refused any access to the unit, how the construction and furnishings were paid for, he's refused to pay fair market rent on his units  he's refused to count this as income, he's deprived the corporate structure of fair market rent on at least 2 of the units since this was never agreed to and he has lied and misrepresented these units to AHFC on the rent rolls as AHFC would not have approved the use of these units in this fashion for their percentage qualifications.

110.   RB Enterprises and Gross made misrepresentations, negligently or intentionally, in causing  expenses unrelated or of no benefit to IT, LLC or Meritage Management .

111.   The misrepresentation have damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

Exhibit 1 -- Page 20 of 22

Law Office of Paul D. Stockler
737 W. 5th Avenue, Suite 205
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Law Office of Paul D. Stockler
737 W. 5th Avenue, Suite 205
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

### COUNT X
### (Fraudulent Conveyance - AS 34.40.010)

112.   Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

113.   RB Enterprises and Gross caused IT, LLC or Meritage Management to pay expenses for  unsupported services and charges.

114.   Certain conveyances, payments, and/or transfers were fraudulent and were made with the intent to hinder, delay, or defraud the company and the other LLC members.

115.   All such fraudulent conveyances are void and have damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

### COUNT XI
### (Permanent and Provisional Injunctive Relief)

116.   Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

117.   As set forth above, upon information and belief, Plaintiffs are being irreparably harmed by those breaches:

118.   Plaintiffs can and will show probable success on the merits and, at a minimum, have raised serious and substantial questions going to the merits of the case.

119.   Plaintiffs are entitled to immediate and/or permanent injunctive relief against Bob Gross including removing him as manager, removing the personal belongings and possessions of he and his wife Melodie Gross from the three units that they presently occupy and refuse to pay rent for, and the surrender from his personal

Mystery Ranch, LLC  v.  Bob Gross                                    3AN-14-_____ CI
Complaint                                                                          Page 21 of 22

Exhibit 1 -- Page 21 of 22

units all business records, computers, hard drives, files, and any other items or furnishings paid for by the company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against the Defendants granting the following relief:

1.    Compensatory, consequential, treble, and punitive damages in an amount to be proven at trial, but in any event in excess of $1,000,000;

2.    Injunctive relief removing Bob Gross as manager;

3.    Immediate access to the property, office, books and records and computers of all related entities;

4.    Actual attorney's fees and costs;

5.    Pre-judgment and post-judgment interest at the highest allowable rate; and

6.    Such other and further relief as this court may deem just and equitable.


DATED this 1st day of August, 2014 at Anchorage, Alaska.

LAW OFFICE OF PAUL D. STOCKLER
Attorney for Plaintiffs

By: _____
        Paul D. Stockler
        Alaska Bar No.: 8606032

Law Office of Paul D. Stockler
737 W. 5th Avenue, Suite 205
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

<u>Mystery Ranch, LLC  v.  Bob Gross</u>
Complaint

3AN-14-_____ CI
Page 22 of 22

Exhibit 1 -- Page 22 of 22

IN THE ~~DISTRICT~~/SUPERIOR COURT FOR THE STATE OF ALASKA
AT ANCHORAGE

MYSTERY RANCH, LLC and JACK BARRETT,
_____
               Plaintiff(s),

vs.

BOB GROSS and RB ENTERPRISES, LLC,
_____
               Defendant(s).

CASE NO. 3AN- 14 - 5418 _____

SUMMONS AND
NOTICE TO BOTH PARTIES
OF JUDICIAL ASSIGNMENT

To Defendant:    BOB GROSS _____

You are hereby summoned and required to file with the court a written answer to the complaint which accompanies this summons. Your answer must be filed with the court at 825 W. 4th Ave., Anchorage, Alaska 99501 within 20 days* after the day you receive this summons. In addition, a copy of your answer must be sent to the plaintiff's attorney or plaintiff (if unrepresented) PAUL D. STOCKLER _____, whose address is: 737 W. 5TH AVENUE, . SUITE 205, ANCHORAGE, AK 99501 _____

If you fail to file your answer within the required time, a default judgment may be entered against you for the relief demanded in the complaint.

If you are not represented by an attorney, you must inform the court and all other parties in this case, in writing, of your current mailing address and any future changes to your mailing address and telephone number. You may use court form *Notice of Change of Address / Telephone Number* (TF-955), available at the clerk's office or on the court system's website at www.courts.alaska.gov/forms.htm, to inform the court. - OR - If you have an attorney, the attorney must comply with Alaska R. Civ. P. 5(i).

## NOTICE OF JUDICIAL ASSIGNMENT

TO: Plaintiff and Defendant

You are hereby given notice that:

[X]   This case has been assigned to Superior Court Judge   Miller _____
     and Master _____.

[ ]   This case has been assigned to District Court Judge _____.

CLERK OF COURT

8/1/14
_____
Date

By: _____
            Deputy Clerk

I certify that on 8/1/14 a copy of this Summons was   [ ] mailed   [X] given to
[ ] plaintiff   [X] plaintiff's counsel along with a copy of the
[ ] Domestic Relations Procedural Order   [ ] Civil Pre-Trial Order
to serve on the defendant with the summons.
Deputy Clerk _____

* The State or a state officer or agency named as a defendant has 40 days to file its answer. If you have been served with this summons outside the United States, you also have 40 days to file your answer.

CIV-100 ANCH (6/10)(st.3)       **Exhibit 2**       Civil Rules 4, 5, 12, 42(c), 55
SUMMONS

IN THE ~~DISTRICT~~/SUPERIOR COURT FOR THE STATE OF ALASKA
AT ANCHORAGE

MYSTERY RANCH, LLC and JACK BARRETT,
_____
               Plaintiff(s),

vs.

BOB GROSS and RB ENTERPRISES, LLC,
_____
               Defendant(s).

CASE NO. 3AN- 14 5418 _____

**SUMMONS AND
NOTICE TO BOTH PARTIES
OF JUDICIAL ASSIGNMENT**

To Defendant:    R B ENTERPRISES, LLC _____

You are hereby summoned and required to file with the court a written answer to the complaint which accompanies this summons. Your answer must be filed with the court at 825 W. 4th Ave., Anchorage, Alaska 99501 within 20 days* after the day you receive this summons. In addition, a copy of your answer must be sent to the plaintiff's attorney or plaintiff (if unrepresented) __PAUL D. STOCKLER_____, whose address is: __737 W. 5TH AVENUE,__ __SUITE 205, ANCHORAGE, AK 99501_____

If you fail to file your answer within the required time, a default judgment may be entered against you for the relief demanded in the complaint.

If you are not represented by an attorney, you must inform the court and all other parties in this case, in writing, of your current mailing address and any future changes to your mailing address and telephone number. You may use court form *Notice of Change of Address / Telephone Number* (TF-955), available at the clerk's office or on the court system's website at www.courts.alaska.gov/forms.htm, to inform the court. - OR - If you have an attorney, the attorney must comply with Alaska R. Civ. P. 5(i).

### NOTICE OF JUDICIAL ASSIGNMENT

TO: Plaintiff and Defendant

You are hereby given notice that:

[X]   This case has been assigned to Superior Court Judge __MILLER_____
      and Master _____.

[ ]   This case has been assigned to District Court Judge _____.

CLERK OF COURT

_____8/1/14_____
    Date

By: _____
              Deputy Clerk

I certify that on __8/1/14__ a copy of this Summons was   [ ] mailed   [X] given to
[ ] plaintiff   [X] plaintiff's counsel along with a copy of the
[ ] Domestic Relations Procedural Order   [ ] Civil Pre-Trial Order
to serve on the defendant with the summons.
Deputy Clerk _____

\* The State or a state officer or agency named as a defendant has 40 days to file its answer. If you have been served with this summons outside the United States, you also have 40 days to file your answer.

CIV-100 ANCH (6/10)(st.3)
SUMMONS

**Exhibit 3**

Civil Rules 4, 5, 12, 42(c), 55

Bruce E. Falconer  AK Bar No. 8707062
Charles A. Cacciola AK Bar No. 1306045
BOYD, CHANDLER & FALCONER, LLP
911 W. 8th Avenue, Suite 302
Anchorage, Alaska 99501
(907) 272-8401

Attorneys for Defendants

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

| | | |
|---|---|---|
| MYSTERY RANCH, LLC, and | ) | |
| JACK BARRETT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BOB GROSS and | ) | |
| RB ENTERPRISES, LLC, | ) | Case No. 3AN-14-8418 CI |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS OR STAY PROCEEDINGS

Pursuant to AS 09.43.300 *et seq.* and Rule 12(b)(1) and (3) of the Alaska Rules of

Civil Procedure, defendants move for an order compelling plaintiffs to submit their

claims to arbitration in accordance with the terms of the LLC operating agreement

between the parties and to dismiss this case or, alternatively, stay these proceedings

pending the outcome of arbitration.  The motion is supported by the accompanying

memorandum and affidavit of Bob Gross and an exhibit thereto.  A proposed form of

order granting defendants motion is also filed herewith.

DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS OR STAY PROCEEDINGS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI
Page 1 of 2

Exhibit 4 -- Page 1 of 50

BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

Dated this ____ day of September, 2014.

BOYD, CHANDLER &
FALCONER, LLP

By: _____
for   Bruce E. Falconer
AK Bar No. 8707062

**CERTIFICATE OF SERVICE**

I hereby certify that on this ____ day of
September, 2014, a true and correct
copy of the foregoing was mailed via U.S. Mail to:

Paul D. Stockler
Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, AK 99501

By: _____
Legal Assistant/Secretary
Boyd, Chandler & Falconer, LLP

BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS OR STAY PROCEEDINGS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI
Page 2 of 2

Exhibit 4 -- Page 2 of 50

Bruce E. Falconer  AK Bar No. 8707062
Charles A. Cacciola AK Bar No. 1306045
BOYD, CHANDLER & FALCONER, LLP
911 W. 8th Avenue, Suite 302
Anchorage, Alaska 99501
(907) 272-8401

Attorneys for Defendants

### IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

### THIRD JUDICIAL DISTRICT AT ANCHORAGE

| | |
|---|---|
| MYSTERY RANCH, LLC, and ) | |
| JACK BARRETT, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| BOB GROSS and ) | Case No. 3AN-14-8418 CI |
| RB ENTERPRISES, LLC, ) | |
| ) | |
| Defendants. ) | |

### MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS OR STAY PROCEEDINGS

### I.  INTRODUCTION

IT, LLC ("IT"), which owns and operates Inlet Tower Hotel and Suites, is a

manager-managed LLC governed by an Operating Agreement signed by its two members,

plaintiff Mystery Ranch, LLC ("Mystery") and defendant RB Enterprises, LLC ("RB").

Mystery and RB agreed that defendant Bob Gross ("Gross") would serve as IT's manager.

Plaintiff Jack Barrett ("Barrett") co-owns Mystery with his wife, and Gross co-owns RB

with his wife.  Barrett, on behalf of Mystery, and Gross, on behalf of RB, each signed the

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND
STAY PROCEEDINGS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI            Page 1 of 16

Exhibit 4 -- Page 3 of 50

IT Operating Agreement.  The Operating Agreement contains an arbitration provision obligating the parties to arbitrate any disputes arising out of the Operating Agreement. Plaintiffs' claims are *all* premised on a dispute between IT's two members arising out of the Operating Agreement and concern a deadlock that exists between the members regarding IT's business.  Plaintiffs' claims are therefore subject to the arbitration provision.

While *some* of plaintiffs' claims as alleged in the Complaint may not, at first glance, appear to be subject to the arbitration provision, this is only because of poor pleading, as shown by proper analysis of the claims asserted.  As pled, most of these claims are attempts by someone (e.g., Barrett) to assert claims that he does not have, but which instead must be asserted by Mystery alone; or they are claims that only IT may bring against Gross, as the LLC's manager, which have not been brought because the LLC members, Mystery and RB, have not agreed that the LLC has, or should assert, any such claims on its behalf.  Viewing the substance of the various counts alleged in a manner which, under the law, might afford some basis for relief, plaintiffs' claims must be arbitrated because they all arise out of the same basic dispute between IT's members over Gross' management of the LLC.

Below, defendants demonstrate the following:

1)     Jack Barrett does not have standing to bring any claims.

2)     Members in a manager-managed LLC owe no fiduciary duties to other members.

BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

Exhibit 4 -- Page 4 of 50

3) Claims against an LLC's manager for waste or other misconduct harming the company are harms to the company and must be brought by the company directly or derivatively.

4) Mystery cannot maintain a derivative action because the action is not supported by a majority of IT's members.

5) Any argument that obtaining majority support from the members would be futile presupposes a deadlock between the members, which is precisely what the Operating Agreement requires the members to resolve through arbitration.

6) To the extent the Complaint alleges legally cognizable claims, they are all claims which must be arbitrated.

The seeming complexity of defendants' argument results directly from plaintiffs' complete disregard for a very basic proposition of law: an LLC is a legal entity distinct from its members, Mystery and RB, both of whom are legally distinct from IT's manager, Bob Gross.

## II. STATEMENT OF FACTS

IT was created in August 2011 and was formed to own and operate Inlet Tower Hotel and Suites, located in Anchorage.[1]  IT has two 50% members, Mystery, which is owned by Jack and Dawn Barrett, and RB, which is owned by Bob and Melodie Gross.[2]  Neither the Barretts nor the Grosses have any direct ownership interest in IT.

IT is not member-managed – it is instead a manager-managed LLC.  Mystery and RB agreed that Gross would be the LLC's manager.[3]  Mystery and RB also agreed that

---

[1] Affidavit of Bob Gross at ¶ 2.

[2] *Id.* at ¶ 3.

[3] Exhibit A to Gross Affidavit at ¶ 10.1.

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI    Page 3 of 16

BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

Exhibit 4 -- Page 5 of 50

Gross would be the "Tax Matters Partner."[4]  Removal of Gross as manager requires agreement of the members.[5]  Mystery would like to remove Gross as manager, but RB has not agreed to this.

Under the Operating Agreement, the manager "acting alone shall have the authority to conduct the routine day-to-day affairs of the Company."[6]  The Operating Agreement also grants authority to the manager (i.e., Gross) "to do all non-routine things and make all decisions necessary or appropriate to carry on the business and affairs of the Company", except for certain specified actions (none of which are involved here) that require written approval of the members.[7]  And other than those certain specified actions, "no Member shall take part in the management of the Company."[8]

This dispute can be traced back to 2012 when Mystery's owners began to suffer personal financial difficulties.[9]  In numerous emails, Jack Barrett made demands that IT allow Mystery to "extract our capital out asap" so that the Barretts could access these funds for their personal use.[10]  The IT Operating Agreement specifically provides that "no

---

[4] *Id.* at ¶ 13.5.

[5] *Id.* at ¶ 10.1.

[6] *Id.*

[7] *Id.* at ¶ 11.1.

[8] *Id.* at ¶ 12.1.

[9] Gross Affidavit at ¶ 5.

[10] *Id.*

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI                    Page 4 of 16

BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

Exhibit 4 -- Page 6 of 50

Member shall have the right to withdraw or demand a return of all or any of such Member's Capital Contribution",[11] and the cash available from operations was not sufficient to allow any distributions to members and at the same time cover operating expenses.[12] The Operating Agreement requires that any distributions be authorized by the members,[13] and RB declined to agree to same, and rejected Mystery's/Barrett's proposals that funds be removed from a second mortgage reserve to make a payout to members, since it would have jeopardized IT's ability to pay its creditors.[14]

In 2014, Jack Barrett, on behalf of Mystery, increasingly jeopardized the success and solvency of IT by attempting to close a trust account used to hold tenants' security deposits and transfer those funds to an account in Arizona.[15] Not only did Barrett attempt to appropriate the funds in the trust account for his own use, totaling in excess of $60,000, he did so while checks drawn on the account were outstanding. Gross, as the LLC's manager, learned of this action from the bank because it intended to dishonor the checks unless the company deposited money in the account to cover checks before they

---

[11] Operating Agreement at ¶ 6.3.

[12] Gross Affidavit at ¶ 6.

[13] Operating Agreement at ¶ 9.1.

[14] Gross Affidavit at ¶ 6.

[15] Gross Affidavit at ¶ 7. Wells Fargo appears to have mistakenly relied upon Barrett's representation that he had authority to close the account when in fact he had no such authority.

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI                      Page 5 of 16

BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

Exhibit 4 -- Page 7 of 50

bounced.[16]  Barrett similarly took funds totaling more than $190,000 from IT's merchant account with American Express, the debit for which American Express initially reversed as an error on its part, but which American Express now advises it expects IT to repay.[17]

Earlier this year, IT's members, Mystery and RB, foreseeing the deadlock resulting from their differing views as to the conduct of IT's business, had discussions regarding RB's possible purchase of Mystery's interest in IT.[18]  Those negotiations broke down, however, with Mystery and Barrett filing the present lawsuit.

## III.   ARGUMENT

### A.   Standard for compelling arbitration.

"An agreement contained in a record to submit to arbitration an existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable" except under limited circumstances.[19]  "The court shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate."[20]  "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation

---

[16] *Id.*

[17] *Id.*

[18] Gross Affidavit at ¶ 8.

[19] AS 09.43.330.  The term "record" is defined in AS 09.43.590(6) and includes the IT Operating Agreement since it is "information that is inscribed on a tangible medium."
[20] AS 09.43.330(c).

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI                                    Page 6 of 16

BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

Exhibit 4 -- Page 8 of 50

that covers the dispute. Doubts should be resolved in favor of coverage."[21]

Although an LLC is not technically a party to an operating agreement between its members, courts have increasingly recognized that the LLC itself is bound by an arbitration clause in the operating agreement in the case of a dispute between the members and the LLC, and that members cannot evade the obligation to arbitrate by bringing a derivative suit.[22] This trend is explained by judicial recognition that derivative suits are substantively disputes between members, and "plaintiffs could avoid their own arbitration agreements simply by couching their claims as derivative" if the LLC is not bound by the agreement.[23]

---

[21] *Ahtna, Inc. v. Ebasco Constructors, Inc.*, 894 P. 2d 657, 662 n.7 (Alaska 1995)(*quoting United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960).

[22] *Elf Atochem N. America, Inc. v. Jaffari*, 727 A. 2d 286 (Del. 1999)(requiring arbitration of derivative claims for breach of fiduciary duty by manager when LLC agreement giving rise to manager's status and duties contained mandatory arbitration clause, even though company not signatory to operating agreement); *Hoffman v. Finger Lakes*, 7 Misc. 3d 179 (NYSC, Monroe 2005)(members' claim for injunctive relief restraining LLC subject to binding arbitration per arbitration clause in operating agreement even though company not a party to agreement); *Seven Hills Commercial, LLC v. Mirabal Custom Homes, Inc.*, No. 05-13-01306-CV (Tex. COA, 5th Dist., August 7, 2014)(although the LLC was not a party to operating agreement, "[b]ecause the Operating Agreement is the master agreement of [the LLC] and the agreement contains the arbitration provision assigning arbitrability to an arbitrator, we conclude [the LLC] clearly and unmistakably agreed to allow the arbitrator to decide the scope or applicability of the agreement to arbitrate."); *see also Bio-Tec Environmental, LLC v. Adams*, 792 F. Supp. 2d 1208, 1211 (D. New Mexico, 2011).

[23] *Elf Atochem, supra*, 727 A. 2d at 296.

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI                    Page 7 of 16

BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

Exhibit 4 -- Page 9 of 50

**B.      Disputes between members of IT must be arbitrated.**

As members of IT and signatories to its Operating Agreement, Mystery and RB are bound by the Operating Agreement.  Section 19.4(c) of the Operating Agreement, entitled "Arbitration", states: "Any and all controversies, deadlocks or disputes between or among Members arising out of or related to this Agreement will be submitted to arbitration . . ."[24]  The arbitration clause unambiguously states that Mystery and RB must arbitrate any claims between them relating to IT.

**C.      Jack Barrett does not have standing to bring claims.**

For a person to have standing, the person must suffer an injury-in-fact.  Absent exceptional circumstances, a third party cannot assert the claims of the injured party.  An LLC member is not the same legal person as the LLC.  An LLC has standing to sue and be sued.[25]  When an injury befalls an LLC, the suit must be brought by the LLC, not its

---

[24] The entire provision reads: "Any and all controversies, deadlocks or disputes between or among Members arising out of or related to this Agreement will be submitted to arbitration before a single arbitrator selected by mutual agreement of the parties, or if agreement cannot be reached, utilized the striking method of arbitrator selection form a list of arbitrators provided by the by the [sic] American Arbitration Association ("AAA"). The arbitration will be conducted within 90 (ninety) days of the demand for arbitration in accordance with the AAA's rules governing commercial arbitration. The arbitrator's decision will be final and binding and may be appealed only in the case of alleged misconduct, fraud, material mistake of fact, or such or other limited grounds established by Alaska law. Venue for arbitration is Palmer, Alaska.  Jurisdiction shall lie exclusively with the Third Judicial District for the State of Alaska at Anchorage, Alaska.  Cost and fees [sic] of the arbitration shall be awarded to the prevailing party. The prevailing party shall be that party in whose favor a net judgment is rendered."  IT Operating Agreement at ¶ 19.4(c).

[25] AS 10.50.735.

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI                    Page 8 of 16

BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

Exhibit 4 -- Page 10 of 50

individual members.[26]

Barrett asserts numerous claims against Gross and RB.  These claims are based upon alleged violations of the Operating Agreement and duties owed to members of an LLC.  Barrett is not a member of IT or a party to the Operating Agreement.  Plaintiffs' 22- page complaint does not identify any legal duty that either defendant owed to Barrett.  To the extent that plaintiffs allege cognizable injury arising from breach of contract or duty, the contracts are not ones Mr. Barrett is a party to and the duties are owed to Mystery (or more often to IT, as explained below), not to Barrett.  The claims, if any, belong to Mystery, not Jack Barrett.  To the extent that Barrett has been indirectly harmed because he is a member of Mystery, the claims are properly brought in Mystery's name and his injury is compensated though his membership in Mystery *if* Mystery prevails.  Plaintiffs' complaint baldly disregards the *raison d'etre* of corporate and LLC law – legally isolating the entity from its investors.

### D.    Members in a manager-managed LLC have no management rights and owe no duties to other members.

Plaintiffs' counts and allegations against RB arise out of claimed breaches of duties owed to Mystery by RB.  These claims fail because RB has no management rights or duties under the Operating Agreement and members of a manager-managed LLC have no duties to other members.[27]

---

[26] *Arctic Contractors, Inc. v. State*, 573 P.2d 1385, 1386 (Alaska 1978)(partly overruled on other grounds).

[27] AS 10.50.130 ("Unless otherwise provided in an operating agreement of the company, if a person is a member of a limited liability company that is managed by a manager and

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI                    Page 9 of 16

BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

Exhibit 4 -- Page 11 of 50

The Operating Agreement states that "the Members hereby delegate management of the Company to the Manager.  The Manager acting alone shall have the authority to conduct the routine day-to-day affairs of the company," and that the "Members agree that the initial Manager is Bob Gross.  Once appointed the Manager may only be removed by the Members."[28]

### E.    Claims for waste, mismanagement, or other injury to IT must be asserted by IT, not by a member, and IT has not asserted these claims.

Alaska has "reaffirmed the general rule that a shareholder has no personal or individual right of action against third parties for acts producing injury to the corporation."[29]  "When a wrong has been done to the corporation, the shareholder's right to sue the directors or wrongdoers for redress is derivative and not primary."[30]  The rule is the same for an LLC and Alaska statutes are clear - an LLC can sue and be sued.[31]  A member can force a lawsuit in the company's name, but only if the suit is authorized by a majority of the members.[32]

---

if the person is not a manager, the person does not have the fiduciary duty of a manger to the company or to the other members of the company when the person acts solely in the capacity of a member.")

[28] IT Operating Agreement at ¶ 10.1.

[29] *Arctic Contractors, supra,* 573 P.2 at 1386.

[30] Charles R.P. Keating & Jim Perkowitz-Solheim, 12B *Fletcher Cyclopedia of the Law of Private Corporations* §5928 (1993).

[31] AS 10.50.735.

[32] AS 10.50.735(c).

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI                    Page 10 of 16

BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

Exhibit 4 -- Page 12 of 50

The gravamen of plaintiffs' claims is that Gross' management of IT has resulted in waste of company assets. These allegations, if true, harm all IT members equally as the harm is to the company, not to the individual members. Management waste is the paradigmatic derivative claim and must be brought by IT. AS 10.50.735(c) states that calculation of the majority necessary to authorize a derivative suit may exclude "a member who has an interest in the outcome of the action that is adverse to the interest of the company." RB's interests align with the company's and are congruent with Mystery's – if the company was injured, RB and Mystery have equal rights through their 50% ownership interests in IT to benefit from an IT recovery.

**F.      Analysis of Each Count of the Complaint.**

### Count I:  Breach of Operating Agreement

To breach an agreement a person must be party to that agreement. The only parties to the IT Operating Agreement are Mystery and RB, and breach of that agreement is a dispute arising out of the Operating Agreement and therefore must be arbitrated.

### Count II:  Operating Agreement – Implied Covenant of Good Faith and Fair Dealing

A person must be a party to an agreement to breach an implied covenant which arises out of that agreement. The only parties to the Operating Agreement are Mystery and RB, and breach of the Operating Agreement, including an implied covenant therein, is clearly a dispute between the members arising out of the Operating Agreement and therefore must be arbitrated.

BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI                              Page 11 of 16

Exhibit 4 -- Page 13 of 50

### Count III:  Breach of Fiduciary Duties – Common Law and AS 10.50.135

Under Alaska law, as codified in AS 10.50.135, members of a manager-managed LLC do not have duties to the company or to the other members except as provided in the operating agreement.  A manager's duties are owed to the company, not individual members.  To the extent that this count alleges a cognizable injury, it is an injury to IT and must be brought by IT, not an individual member.  If there is deadlock between the members whether to authorize IT to bring such a claim, it is an arbitrable dispute between the members under the terms of the Operating Agreement.

### Count IV:  Breach of Duty of Good Faith

The nature of the alleged duty breached and the basis for the obligation is unclear.  If Count IV states a valid cause of action, it appears to be indistinct from either Count II or Count III and is therefore subject to arbitration for the same reasons.

### Count V:  Intentional Spoliation of Evidence

"The tort of spoliation requires a viable underlying cause of action."[33]  The plaintiffs' complaint does not identify the underlying cause of action for the spoliation claim, but if there is a viable underlying cause of action it most certainly arises out of the IT Operating Agreement and is premised on a dispute between the members.  Any spoliation claim is thus subject to the arbitration provision as it is so closely intertwined with the underlying claim that it must be litigated along with that claim.

---

[33] *Allstate Ins. Co. v. Dooley*, 243 P.3d 197, 201 (Alaska 2010).

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI                    Page 12 of 16

BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

Exhibit 4 -- Page 14 of 50

### Count VI:  Operating Agreement – Implied Covenant of Good Faith and Fair Dealing

A person must be a party to an agreement to breach an implied covenant which arises out of that agreement.  The only parties to the IT Operating Agreement are Mystery and RB and breach of the Operating Agreement, including an implied covenant therein, is clearly a dispute between the members arising out of the Operating Agreement and therefore must be arbitrated.

### Count VII:  Theft and Conversion

The claim, as alleged, appears to belong to either Meritage Management or Jeff Cunningham, neither of whom is a party to this suit.  No personal property owned by either plaintiff is identified as having been converted by defendants.  To the extent the claim is predicated on Gross' use of assets owned by IT in connection with managing the business, it arises out of a dispute between the members, and as such, is arbitrable, the dispute being over what the members agreed Gross would be entitled to in exchange for his management services.

### Count VIII:  Unfair Trade Practices Act

This claim is clearly predicated on a dispute between the members of IT relating to the manger's role and, as such, is subject to the arbitration provision. The dispute is a disagreement between IT's members regarding what they agreed to as the manager's role and, fundamentally, over the business value of having a resident-manager (*i.e.*, whether the LLC's manager should be a resident of Inlet Tower so as to be available to deal with tenant issues).

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI                    Page 13 of 16

BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

Exhibit 4 -- Page 15 of 50

### Count IX:  Misrepresentation

This claim appears to duplicate Count VIII as it also relates to the manager's unit at Inlet Towers and likewise is based on a dispute between IT's members concerning the manager's role in the business and what he is entitled to for his services as manager.  As such, it, too, is subject to arbitration.

### Count X:  Fraudulent Conveyance – AS 34.40.010

This claim fails on its face since the statute on which it is based (AS 34.40.010) presupposes a debtor-creditor relationship between the parties[34] and no such relationship is alleged.  Further, the claim is that unidentified "conveyances, payments and/or transfers were fraudulent" and made to "defraud the company and the other LLC members" and as such evidently arises out of the same dispute between the members of IT as plaintiffs' other claims.  The claim is therefore subject to arbitration.

### Count XI:  Permanent and Provisional Injunctive Relief

By this claim plaintiffs seek to have Gross removed as IT's manager, a matter which the IT Operating Agreement clearly provides must be agreed to by the members.  As such, it is plainly a dispute arising out of the Operating Agreement and is therefore subject to arbitration.[35]

---

[34]*First Nat'l Bank v. Enzler*, 537 P.2d 517 (Alaska 1975).

[35]Arbitrators are expressly empowered to enter orders for provisional remedies.  See AS 09.43.350(b).

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI                                 Page 14 of 16

BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

Exhibit 4 -- Page 16 of 50

## IV.   CONCLUSION

This case is fundamentally about a dispute between two LLC members, Mystery and RB, over IT's business and its management by their selected manager, Bob Gross. The LLC members agreed to resolve any disputes between them, including deadlocks, arising out of their operating agreement by arbitration. A party's solemn promise to arbitrate is not defeated by artful pleading.[36] Defendants therefore ask that the court enforce that agreement, dismiss this case or, in the alternative, stay all further proceedings, pending the outcome of arbitration. "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the dispute. Doubts should be resolved in favor of coverage."[37]

There should be no doubts in this case. Arbitration is the proper forum for resolving this dispute.

Dated this _4_ day of September, 2014.

BOYD, CHANDLER &
FALCONER, LLP

By: _____
For Bruce E. Falconer
AK Bar No. 8707062

---

[36] *Roby v. Corporation of Lloyd's*, 996 F.2d 1353, 1360 (2nd Cir. 1993)(citing *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 203 (3d Cir.), cert. denied, 464 U.S. 938 (1983)("If forum selection clauses are to be enforced as a matter of public policy, that same public policy requires that they not be defeated by artful pleading of claims such as negligent design, breach of implied warranty, or misrepresentation.")).

[37] *Ahtna, Inc., supra*, 894 P. 2d at 662 n.7.

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI                    Page 15 of 16

BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

Exhibit 4 -- Page 17 of 50

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of
September, 2014, a true and correct
copy of the foregoing was mailed via U.S. Mail to:

       Paul D. Stockler
       Law Office of Paul D. Stockler
       1227 W. 9th Avenue, Suite 301
       Anchorage, AK 99501

By: _Rinda Rasmussen_
       Legal Assistant/Secretary
       Boyd, Chandler & Falconer, LLP

BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND
STAY PROCEEDINGS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI        Page 16 of 16

Exhibit 4 -- Page 18 of 50

Bruce E. Falconer  AK Bar No. 8707062
Charles A. Cacciola AK Bar No. 1306045
BOYD, CHANDLER & FALCONER, LLP
911 W. 8th Avenue, Suite 302
Anchorage, Alaska 99501
(907) 272-8401

Attorneys for Defendants

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

| | |
|---|---|
| MYSTERY RANCH, LLC, and<br>JACK BARRETT,<br><br>            Plaintiffs,<br><br>vs.<br><br>BOB GROSS and<br>RB ENTERPRISES, LLC,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 3AN-14-8418 CI

## AFFIDAVIT OF BOB GROSS

| | |
|---|---|
| STATE OF ALASKA | ) |
| | ) ss. |
| THIRD JUDICIAL DISTRICT | ) |

Bob Gross, being first duly sworn upon oath, deposes and states as

follows:

1.     I am over the age of 21 and am competent to testify to the matters stated

herein which are true and correct based on my own personal knowledge.

BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

AFFIDAVIT OF BOB GROSS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI
Page 1 of 4

Exhibit 4 -- Page 19 of 50

2.      I am the manager of IT, LLC ("IT"), an Alaska limited liability company

formed in August of 2011 to own and operate Inlet Tower Hotel and Suites in Anchorage.

3.      IT has two members, Mystery Ranch, LLC ("Mystery"), which is co-

owned by Jack Barrett and his wife, Dawn Barrett, and RB Enterprises, LLC ("RB"),

which is co-owned by my wife, Melodie Gross, and me.  Mystery and RB each have a

50% ownership interest in IT.

4.      Attached as Exhibit A is a true and correct copy of the Operating

Agreement for IT, signed by Jack Barrett on behalf of Mystery and by me on behalf of

RB.

5.      The dispute between the members of IT can be traced back to 2012, when

I began receiving numerous emails from Jack Barrett to the effect that he and his wife

were having financial difficulties.  In those emails, Barrett made demands that IT allow

Mystery to "extract our capital out asap" so that he and his wife could access these funds

for their personal use.

6.      The Operating Agreement disallows members from withdrawing capital

and requires that any distributions by IT must be authorized by the members, and RB

declined to authorize distributions, including rejecting Mystery's/Barrett's proposals that

funds be removed from a second mortgage reserve to make a payout to members, since it

would have jeopardized IT's ability to pay its creditors.

**BOYD, CHANDLER & FALCONER, LLP**
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

AFFIDAVIT OF BOB GROSS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI
Page 2 of 4

Exhibit 4 -- Page 20 of 50

7.      In 2014, Jack Barrett attempted to close a Northrim trust account used to
hold Inlet Tower tenants' security deposits and transfer those funds to a Wells Fargo
account in Arizona.  Barrett not only attempted to appropriate these trust account funds
for his own use, totaling in excess of $60,000, he did so while checks drawn on the
account were outstanding.  I only learned of this action because as LLC manager
Northrim contacted me as it intended to dishonor the checks and wanted to give the
company an opportunity to deposit funds to cover the checks before they bounced.
Barrett has also taken funds totaling more than $190,000 from IT's merchant account
with American Express, the debits for which American Express initially reversed as an
error on its part, but which American Express now advises it expects IT to repay.

8.      Earlier this year, Mystery and RB had discussions regarding RB's possible
purchase of Mystery's interest in IT.  Those negotiations broke down, however, with
Mystery and Barrett filing the present lawsuit.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

_____
BOB GROSS

SUBSCRIBED AND SWORN to before me this ___ day of September, 2014.



_____
Notary Public in and for Alaska
My Commission Expires: 9/21/14

AFFIDAVIT OF BOB GROSS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI
Page 3 of 4

BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

Exhibit 4 -- Page 21 of 50

**CERTIFICATE OF SERVICE**

I hereby certify that on this ~4th~ day of
September, 2014, a true and correct
copy of the foregoing was mailed via U.S. Mail to:

> Paul D. Stockler
> Law Office of Paul D. Stockler
> 1227 W. 9th Avenue, Suite 301
> Anchorage, AK 99501

By: _Linda Rasmussen_
Legal Assistant/Secretary
Boyd, Chandler & Falconer, LLP

BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

AFFIDAVIT OF BOB GROSS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI
Page 4 of 4

Exhibit 4 -- Page 22 of 50

THE SECURITIES REFERENCED BY THIS
OPERATING AGREEMENT REPRESENTING THE OWNERSHIP
INTERESTS IN THIS COMPANY HAVE NOT BEEN REGISTERED
UNDER THE ALASKA SECURITIES ACT OR FEDERAL SECURITIES
LAWS, AND CANNOT BE RESOLD WITHOUT REGISTRATION
UNDER, OR EXEMPTION FROM, THOSE LAWS.

# OPERATING AGREEMENT

## OF

## IT, LLC

**THIS OPERATING AGREEMENT** is made and entered into as of the day of August 12, 2011, by and among IT, LLC, and Mystery Ranch, LLC an Alaskan limited liability company and RB Enterprises, LLC an Alaskan limited liability company each a "Member" and collectively the "Members". The Members have caused to be formed a limited liability company upon the terms and conditions set forth herein.

The parties hereto agree as follows:

Section 1.     Name and Formation

1.1   Name. The name of the Company is "IT, LLC" (Sometimes referred to herein as the "Company").

1.2   Formation. The Members hereby agree to form and operate the Company under the terms and conditions set forth herein, and as provided in the Company's original Articles of Organization, as both may be from time-to-time amended. Except as otherwise provided herein and the Articles of Organization, the rights and liabilities of the Members shall be governed by the Alaska Revised Limited Liability Company Act, AS 10.50, as amended (the "Act").

1.3   Defects as to Formalities. A failure to observe any formalities or requirements of this Operating Agreement, the Articles of Organization for the Company, or the Act shall not be grounds for imposing personal liability on the Members for liabilities of the Company.

1.4   No Partnership Intended for Non tax Purposes. The Members have formed the Company under the Act, and expressly do not intend hereby to form a joint venture or a partnership under either the Alaska Uniform Partnership Act or the Alaska Uniform Limited Partnership Act, or a corporation under the Alaska Corporations Code. The Members do not intend to be partners one to another, or partners as to any third party. The Members hereto agree and acknowledge that the Company is to be treated as a partnership for federal and state income tax purposes, and agree that all provisions of this Operating Agreement and the Company's Articles of Organization are to be construed so as to preserve that tax status.

1.5   Rights of Creditors and Third Parties. This Operating Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members and their successors and assigns. This Operating Agreement is expressly not intended for the benefit of any creditor of the Company or any other person. Except and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under the Operating Agreement or any agreement between the Company and any Member with respect to any contribution or otherwise.

1.6   Title to Property. All Company Property shall be owned by the Company as an entity and no Member shall have any ownership interest in such property in the Member's individual name or right, and each Member's Interest in the Company shall be personal property for all purposes. Except as otherwise provided in this Operating Agreement, the Company shall hold all Company Property in the name of the Company and not in the name or names of any Member.

1.7    <u>Payments of Individual Obligations.</u> The Company's credit and, assets be used solely for the benefit of the Company, and no asset of the Company shall be transferred or encumbered for or in payment of, or for purposes of guarantee of, any individual obligation of any Member unless otherwise provided for herein.

Section 2.    <u>Principal Place of Business; Registered Agent.</u>

2.1    <u>Principal Place of Business.</u> The principal office and place of business of the Company shall be at 205 E Dimond #515, Alaska 99515 or such other place designated by the Members. The Company may have other places of business at any other place or places as the Members may from time-to-time deem advisable.

2.2    <u>Registered Agent and Address.</u> The Company's registered agent and the address of its registered office in the State of Alaska are as follows:

<u>Name:</u>                Bob Gross
<u>Physical Address</u>:    205 E Dimond #515
                         Anchorage, Alaska 99515

The registered office and/or registered agent may be changed from time-to-time by the Members by filing a verified signed statement with the appropriate state authority in accordance with AS 10.50.060 and AS 10.50.063, as amended from time-to-time.

Section 3.    <u>Effective Date of Agreement/Company.</u> This Agreement is effective as of the date of the filing of the Company's original Articles of Organization with the Division of Banking, Securities and Corporations, State of Alaska. The Company will have perpetual existence, unless sooner terminated as provided in this Operating Agreement.

Section 4.    <u>Definitions.</u> The following terms used in this Operating Agreement shall have the meanings specified below:

"Act" means the Alaska Revised Limited Liability Company Act, AS 10.50, as amended from time-to-time.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant period, after giving effect to the following adjustments:

(a)    Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(b)    Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

Page 3 of 26

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"Agreement" or "Operating Agreement" means the Operating Agreement of IT, LLC as it may from time-to-time be amended.

"Articles of Organization" means the original Articles of Organization pursuant to which the Company was formed, as filed with the Department of Commerce, Community and Economic Development, State of Alaska, on August 12, 2011 and as may be amended from time-to-time thereafter.

"Capital Account" means the account maintained for each Member in accordance with Section 6.5.

"Capital Contribution" means, with respect to any Member, the amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Company with respect to the Interest held by such Member. Any reference to a Capital Contribution of a Member shall include the Capital Contribution made by a predecessor holder of the Interest of such Member. The Capital Contribution for each Member shall not be adjusted to reflect distributions or allocations of Profits or Losses to such Member.

"Cash Available from Operations" means all cash receipts of the Company in excess of amounts reasonably required for payment of operating expenses, repayment of current liabilities, and the establishment of and additions to the cash reserves established by the Members for the operation of the business, including, but not limited to, Company expenses under Section 8 of this Agreement, reasonable reserves for contingent or unforeseen liabilities or obligations of the Company, and amounts required for payment of the Company's debt obligations.

"Code" and "Regulations" mean the United States Internal Revenue Code of 1986, as amended and the income tax regulations, including temporary regulations, promulgated under the Code. References to specific sections of the Code or Regulations shall be deemed to refer to such sections as they may be amended, modified or supplemented from time-to-time (including corresponding provisions of succeeding sections of the Code or Regulations).

"Company" means IT, LLC as created and governed by this Operating Agreement and the Amended Articles of Organization.

"Company Minimum Gain" has the meaning set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Regulations. The rules of Section 1.704-2(k) of the Regulations shall apply in determining Company Minimum Gain attributable to the Company's interest in any lower-tier partnership (as defined in such Regulations).

"Company Property" means all the real and personal (tangible and intangible) property owned by the Company, and all leasehold or like interests therein.

Page 4 of 26

"Depreciation" means, for each Fiscal Year (i) an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such year, plus (ii) any amount treated by Section 1.704-2(k) (relating to deductions attributable to a lower-tier partnership) as depreciation, amortization or cost recovery deduction with respect to property owned by the Company, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Members.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a) The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Members, the determination of the fair market value of a contributed asset shall require the consent of a majority of the Members;

(b) The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Members, as of the following times: (i) the acquisition of an additional Interest by any new or existing Member in exchange for more than a *de minimus* Capital Contribution; (ii) the distribution by the Company to a Member of more than a de minim is amount of property as consideration for an Interest; and (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (i) and (ii) above shall be made only if the Members reasonably determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company; and provided further, that an adjustment under clause (iii) shall be allocated among the Members' Capital Accounts in the same manner as gain or loss from a sale of Company Property;

(c) The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the distributee and Members, the determination of the fair market value of the distributed asset shall require the consent of a majority of the Members; and

(d) The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and paragraph (f) under the definition of "Profits" and "Losses" or Section 7.3(g) hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this Section (d) to the extent the Members determine that an adjustment pursuant to paragraph (b) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an

Page 5 of 26

adjustment pursuant to this paragraph (d).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph (a), paragraph (b) or paragraph (d) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Interest" or "Company Interest" means the ownership interest of a Member in the Company at any particular time, including the right of such Member to any and all benefits to which such Member may be entitled as provided in this Operating Agreement, the Amended Articles of Organization, and in the Act, together with the obligations of such Member to comply with all the terms and provisions of this Operating Agreement, the Amended Articles of Organization, and the Act.

"Manager" means the Manager of the Company, or such Managing successor, who has been delegated by the Members the exclusive power to manage the day-to-day affairs of the Company, except as limited by this Agreement or the Act. The Members agree that as of the Effective Date the Manager of the Company is Bob Gross ("Initial Manager").

"Member(s)" means the Members set forth in Section 6.1, or their respective successors, and those persons who are hereafter admitted as Members under Section 14 below.

"Member Nonrecourse Debt" has the meaning set forth in Section 1.704-2(b)(4) of the Regulations.

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) and Section 1.704-2(k)(5) of the Regulations.

"Member Nonrecourse Deductions" has the meaning given to the term "partner nonrecourse deductions" in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Regulations, and, in accordance with Section 1.704-2(k)(5) of the Regulations, shall take into account liabilities of any "lower-tier partnership" (as defined therein) in which the Company owns an interest, that are treated by Section 1.752-4(a) of the Regulations as liabilities of the Company.

"Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Regulations.

"Nonrecourse Liability" has the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

"Percentage Interest" means a Member's Interest in the Company expressed as a percentage, as set forth in Section 6.1, as from time-to-time adjusted. Except as otherwise specifically provided in this Agreement, a Member's Percentage Interest shall not be adjusted to reflect distributions or allocations of profits or losses to such Member.

Page 6 of 26



"Profits" and "Losses" means for each Fiscal Year of the Company, an amount equal to the Company's taxable income or loss for such year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

(b)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(/), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from such taxable income or loss;

(c)    In the event the Gross Asset Value of any Company asset is adjusted pursuant to Section (b) or Section (c) hereof, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses; gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(d)    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year computed in accordance with the definition of "Depreciation" in this Section 4;

(e)    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in complete liquidation of a Member's Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

"Regulations" has the meaning set forth in the definition of "Code" and "Regulations."

"Regulatory Allocations" has the meaning set forth in Section 7.4.

Section 5.    Purpose and Powers.

5.1.    Purpose. The primary purpose of the Company is to purchase and operate the Inlet Towers as a multi-family income property. In addition, the Company

Page 7 of 26



shall have such other purposes as may be necessary, incidental or convenient to carry on the Company's primary purpose.

      5.2   Powers. Subject to the provisions of this Operating Agreement and the Act, the Company shall have the followings powers:

(a)   To conduct and operate the business of the Company and to execute documents and instruments relating to the Company business, including, but not limited to agreements, notes, mortgages, deeds of trust, leases, contracts and other documents.

(b)   To obtain short or long-term borrowings as reasonably necessary for the business of the Company.

(c)   To procure and maintain insurance covering the various risks to which the Company, its principals, or its operations may be subject.

(d)   To open bank accounts in the name of the Company, designate the authorized signatures therefore and make deposits and withdrawals from Company accounts on the signatures of one or more designated individuals.

(e)   To pay expenses incurred in performing the business and purposes of the Company including such expenses as may be necessary to comply with Federal, State and local employment laws.

(f)   To employ, discharge and pay the compensation of accountants, lawyers, managing agents, and others whose services are required or necessary.

(g)   To prosecute or defend, as the case may be, suits, arbitration or administrative proceedings asserted against or brought on behalf of the Company.

(h)   To acquire and dispose of real and personal property and interests therein.

(i)   To do all things necessary, incidental or convenient to the exercise of the foregoing powers and to the accomplishment of the foregoing Company's purposes.

Section 6.   Percentage Interests and Capital Contributions.

6.1.   Initial Capital Contributions; Percentage Interests.

(a)   The initial Capital Contributions and Percentage Interests of Members are as follows:

Page 8 of 26

| Name | Capital Contribution | Percentage Interest |
|------|----------------------|---------------------|
| Mystery Ranch, LLC | $1,100 | 50% |
| RB Enterprises, LLC | $1,100 | 50% |

(b)    The Members shall contribute the amounts specified above upon execution of this Agreement.

(c)    The Percentage Interests of the Members shall be subject to adjustment as provided in Section 6.4.

6.2    <u>No Interest on Capital.</u> No Member shall be entitled to receive interest on such Member's Capital Contributions or such Member's Capital Account.

6.3.    <u>No Withdrawal of Capital.</u> Except as otherwise provided in this Operating Agreement, no Member shall have the right to withdraw or demand a return of any or all of such Member's Capital Contribution. It is the intent of the Members that no distribution (or any part of any distribution) made to any Member pursuant to Section 9 hereof shall be deemed a return or withdrawal of Capital Contributions, even if such distribution represents (in full or in part) a distribution of revenue offset by depreciation or any other non-cash item accounted for as an expense, loss or deduction from, or offset to, the Company's income, and that no Member shall be obligated to re-pay any such amount to or for the account of the Company or any creditor of the Company. However, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Operating Agreement, any Member is obligated to make any such payment; such obligation shall be the obligation of such Member and not of any other Member.

6.4.    <u>Capital Accounts.</u> The Company shall establish and maintain a Capital Account for each Member in accordance with the following provisions:

(a)    To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive share of Profits and any items in the nature of income or gain that are specially allocated pursuant to Section 7.3, and Section 7.4 hereof, and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member;

(b)    To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any property distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Losses and any items in the nature of deduction or loss that are specially allocated pursuant to Section 7.3 or Section 7.4 hereof, and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company;

(c)    In the event all or a portion of an Interest in the Company is transferred or purchased in accordance with the terms of this Agreement, the

Page 9 of 26



transferee(s) or purchaser(s) shall succeed to the Capital Account of the transferor(s) or seller(s) to the extent it relates to the transferred Interest; and,

    (d)  In determining the amount of any liability for purposes of Sections 6.5(a) and 6.5(b) hereof, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

    The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.7041(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Members determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto are computed in order to comply with such Regulations, the Members may make such modification, provided, that it is not likely to have a material effect on the amounts distributable to any Partner pursuant to Section 16 hereof upon the dissolution of the Company. The Members also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Section 1.704-1(b)(2)(iv)(q) of the Regulations, and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b).

### 6.5 <u>Additional Capital Contributions.</u>

    (a)  <u>Additional Capital Calls.</u> If in Member's discretion the Company's funds are insufficient to service the Company's debt, or otherwise to operate the Company and properly manage any of the Company's assets, Member shall be authorized to deliver a written capital call notice to the Members calling for an additional Capital Contribution in cash in an amount sufficient to address the applicable cash requirement. Within Fifteen (15) business days after receipt of any such capital call notice, each Member shall be required to make an additional Capital Contribution to the Company in an amount equal to the total amount of the capital call as set forth in such notice, multiplied by such Member's Contribution Percentage as of the date of such written notice.

    (b) <u>Contribution Defaults.</u> In the event that any Member fails to honor all or any part of an additional capital call within the applicable 15 business day period provided above (any such Member being referred to herein as a "Defaulting Member," and the amount of any Defaulting Member's defaulted capital obligation being referred to herein as the "Default Amount"), then Member shall then have the option, to be exercised by notice to Members within 5 business days after receipt of Member's default notice (the "Option Exercise Period"), of making an additional Capital Contribution to the Company prior to the expiration of the Option Exercise Period, in an amount equal to such Non-Defaulting Member's pro-rata share of the Default Amount, determined by comparing such Non-Defaulting Member's Contribution Percentage to the aggregate Contribution Percentages of all Non-Defaulting Members. Each Non-Defaulting Member that elects to

Page 10 of 26



contribute its pro-rata share of the Default Amount shall also notify Members whether it would be interested in contributing any further portion of the Default Amount, should any other Non-Defaulting Member elect not to contribute its pro-rata share thereof. If any Non-Defaulting Member elects not to contribute its pro-rata share of the Default Amount, Members shall equitable allocate such portion of the Default Amount among the contributing Non-Defaulting Members in accordance with the interest expressed therein by each such contributing Non-Defaulting Member. If insufficient interest is expressed by the Non-Defaulting Members, Members shall have the option, in its sole discretion, of obtaining a loan or offering for purchase the unsubscribed portion of the Default Amount to persons that are not Members of the Company, and upon purchasing any such portion of the Default Amount, any such person shall become a full Member of the Company with a Contribution Percentage and Percentage Interest determined in accordance with the following sentence. In the event that any Member fails to honor a capital call as provided above, then after the Default Amount has been contributed to the Company pursuant to the procedure set forth in the Section, the Members' respective Contribution Percentages and Percentage Interests in the Company shall be adjusted to equal the percentage that such Member's total Capital Contributions bear to the total Capital Contributions of all Members (including for the purpose of such calculation the contribution of the Default Amount pursuant to the foregoing procedure).

Section 7.    <u>Allocations of Profits and Losses.</u>

7.1.    <u>Profits.</u> After giving effect to the special allocations set forth in Section 7.3 hereof, Profits for any Taxable Year shall be allocated to the Members in proportion to each Member's then Percentage Interest in the Company.

7.2.    <u>Losses.</u> After giving effect to the special allocations set forth in Section 7.3 hereof, Losses for any Fiscal Year shall be allocated to the Members in proportion to each Member's then Percentage Interest in the Company.

7.3.    <u>Special Allocations.</u>

(a)    <u>Minimum Gain Chargeback.</u> Except as otherwise provided in Section 1.704-2(f) of the Regulations, notwithstanding any other provision of this Section 7, if there is a net decrease in Company Minimum Gain during any Fiscal Year (taking into account for this purpose Section 1.704-2(k)(2) of the Regulations), each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(0(6) and 1.704-2(j)(2) of the Regulations. This Section 7.3(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

Page 11 of 26



(b) <u>Member Minimum Gain Chargeback.</u> Except as otherwise provided in Section 1.704-2(i)(4) of the Regulations, not withstanding any other provision of this Section 7, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year (taking into account for this purpose Section 1.704-2(k)(5) of the Regulations), each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Regulations, shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.7042(i)(4) and 1.704-2(j)(2) of the Regulations. This Section 7.3(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

(c) <u>Qualified Income Offset.</u> In the event a Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704- 1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible, <u>provided,</u> that an allocation pursuant to this Section 7.3(c) shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 7 have been tentatively made as if this Section 7.3(c) were not in the Agreement.

(d) <u>Gross Income Allocation.</u> In the event a Member has a deficit Capital Account at the end of any Fiscal Year that is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, such Member shall be specially allocated items of Company gross income and gain in the amount of such excess as quickly as possible, <u>provided,</u> that an allocation pursuant to this Section 7.3(d) shall be made only if and to the extent that the Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 7 have been tentatively made as if Section 7.3(c) hereof and this Section 7.3(d) were not in the Agreement.

(e) <u>Nonrecourse Deductions.</u> Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Members in proportion to each Member's then Percentage Interest in the Company.

(f) <u>Member Nonrecourse Deductions.</u> Any Member Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member

Page 12 of 26



who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i)(1).

(f)    Special Distributions to Members. All or a portion of the remaining items of Company income or gain, if any, shall be specially allocated to the Members in proportion to and to the extent of the remainder, if any, of (i) the aggregate distributions each Member has received pursuant to Sections 9.1, 9.2, and 16.2 from the commencement of the Company to a date thirty (30) days after the end of such Fiscal Year, over (ii) the aggregate items of income and gain allocated to such Member pursuant to this Section 7.3(g) for all prior Fiscal Years.

(g)    Depreciation, Amortization, Etc. All depreciation, amortization and similar deductions relating to Company Property shall be allocated to the Members in proportion to each Member's then Percentage Interest in the Company

(h)    Gain Upon Disposition of Company Property. Upon the sale, transfer, or other taxable disposition of any Company Property, gain realized by the Company that has not otherwise been allocated pursuant to this Section 7.3 shall be allocated among the Members as follows:

(i)    First, to the Members in amounts, and to the extent necessary, to increase each Member's Capital Account to an amount that is equal to the total of the amounts the Member is entitled to receive as distributions pursuant to Sections 16.2(b); and

(ii)    The balance, if any, to the Members in proportion to each Member's Percentage Interest in the Company.

7.4.    Curative Allocations. The allocations set forth in Section 7.3 hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss and deduction pursuant to this Section 7.4. Therefore, notwithstanding any other provision of this Section 7 (other than the Regulatory Allocations), the Members shall make such offsetting special allocations in whatever manner they determine appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Sections 7.1 and 7.2. In exercising their discretion under this Section 7.4, the Members shall take into account future Regulatory Allocations under Sections 7.3(a) and 7.3(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 7.3(e) and 7.3(f).

7.5.    Other Allocation Rules. The Members are aware of the income tax consequences of the allocations made by this Section 7 and hereby agree to be bound by the provisions of this Section 7 in reporting their shares of Company income and loss for

Page 13 of 26



income tax purpose, except to the extent otherwise required by law.

Section 8.  **Company Expenses.** The Company shall pay for all costs and expenses of the Company, including in connection with all Projects, as approved by the Members, which may include, but are not limited to:

(a)  All costs of non-member personnel directly employed by the Company;

(b)  All costs reasonably related to the conduct of the Company's day-to-day business affairs, including, but without limitation, the cost of supplies, taxes, licenses, fees and services contracted by the Company directly from third parties;

(c)  All costs of leasing equipment or other property (real or personal) used in the Company's business;

(d)  All costs of borrowed money, taxes and assessments on Company property, and other taxes applicable to the Company;

(e)  Legal, audit, accounting and other fees, including, without limitation, those for the organization of the Company and the drafting of this Agreement;

(f)  Printing and other expenses and taxes incurred in connection with the issuance, distribution, transfer, registration and recording of documents evidencing ownership of an Interest in the Company or in connection with the business of the Company;

(g)  Fees and expenses paid to consultants, insurance brokers and other agents;

(h)  Expenses in connection with the acquisition, management and disposition of Company property (including legal and accounting fees);

(i)  The cost of insurance obtained in connection with the business of the Company including liability insurance to indemnify and defend Manager in connection with acts or omissions performed or omitted by the Manager in good faith and in the belief that the acts or omissions were in the Company's interest or not opposed to the best interests of the Company.

(j)  Expenses of revising, amending, converting, modifying or terminating the Company;

(k)  Expenses in connection with distributions made by the Company to, and communications and bookkeeping and clerical work necessary in maintaining relations with, Members;

(l)  Expenses in connection with preparing and mailing

Page 14 of 26



reports required to be furnished to Members for investment, tax reporting or other purposes that the Members deems appropriate; and

(m) Fees and costs incurred in connection with any litigation, including any examinations or audits by regulatory agencies.

Section 9.    Distributions.

9.1    Distributions of Cash Available From Operations. At such times as the Members deem appropriate, Cash Available from Operations shall be distributed to the Members in accordance with the provisions of this Section, as follows:

(a)    Guaranteed Distributions to Members. A percentage (%) of Cash Available from Operations to individual Members performing ongoing business services to the Company at the direction of the Members, in guaranteed amounts and at guaranteed intervals.

(b)    Project Specific Distributions to Members. A percentage (%) of Cash Available from Operations may be distributed to Members based upon time spent or efforts made in connection with a specific Company project or endeavor, after distributions have been made under sections (a) above. The Members will use their best efforts to insure that Merit Based Distributions are made on a fair and reasonable basis;

(c)    Other Distributions to Members. The remaining percent of Cash Available from Operations may be distributed to the Members, pro rata, on the basis of each Member's Percentage Interest in the Company after distributions have been made under sections (a), (b) above.

Section 10.    Management of the Company.

10.1.    Management by Manager. Subject to the limitations in this Agreement, the Members hereby delegate the management of the Company to the Manager. The Manager acting alone shall have the authority to conduct the routine day-to-day affairs of the Company.

The Members agree that the Initial Manager is Bob Gross. Once appointed the Manager may only be removed by the Members.

10.2.    Company's Acquisition, Financing and Management Obligations. The Members hereby authorize the Manager to execute, deliver and perform any and all documents necessary or convenient for the operation of the Company. The Members authorize the Manager to bind the Company, to negotiate, execute, deliver and perform such documents, agreements, applications and instruments, and take all such actions, as either Member deems necessary in connection with the foregoing. To the extent any actions have been taken or documents have been executed by the Manager under the foregoing authority prior to the Effective Date of this Operating Agreement, such actions and/or documents are hereby approved, ratified and affirmed in all respects as actions taken or documents executed on

Page 15 of 26

Exhibit 4 -- Page 37 of 50

behalf of the Company as of the date such actions were taken or such documents were executed.

Section 11.    Powers, Rights and Obligations of Manager.

11.1.   General Authority and Powers of Manager. Except as provided in Section 11.5, a the Manager shall be authorized to do all non-routine things and make all decisions necessary or appropriate to carry on the business and affairs of the Company. The authority of the Manager shall include, but shall not be limited to the following:

(a)   to spend the capital and revenues of the Company and as deemed necessary;

(b)   to run the Company's business, including without limitation exercising the Company's rights and performing its obligations under all leases and contracts entered into in the ordinary course of the Company's business, and doing all other acts necessary, appropriate or helpful in connection therewith;

(c)   to employ persons, firms and/or corporations for the operation of the Company's business;

(d)   to execute, acknowledge and deliver any and all instruments to effectuate any of the powers set forth in this Section 11.1, or to effectuate any other provisions of this Agreement;

(e)   to enter into and to execute agreements for employment or services, as well as any other agreements and all other instruments the Manager deems necessary or appropriate to operate the Company's business and to operate and dispose of Company property or to effectively and properly perform its duties or exercise its powers hereunder;

(f)   to borrow money on a secured or unsecured basis from individuals, banks and other lending institutions to meet Company obligations, provide Company working capital and for any other Company purpose, and to execute promissory notes, mortgages, deeds of trust and assignments of Company property, and such other security instruments as a lender of funds may require, to secure repayment of such borrowings, provided, that, any borrowing in excess of $250,000 shall require the approval of the Members as provided in Section 11.5(f), except for borrowings authorized under Section 10;

(g)   to enter into such agreements and contracts, and to give such receipts, releases and discharges, with respect to the business of the Company, as the Manager deems advisable or appropriate;

(h)   to purchase, at the expense of the Company, such liability and other insurance as the Manager deem advisable to protect the Company's assets and business and the principals of the Company; and

Page 16 of 26

(i) to sue and be sued, complain, defend, settle and/or compromise, with respect to any claim in favor of or against the Company, in the name and on behalf of the Company, provided that the settling and/or compromising with respect to any claim against the Company in an amount in excess of $250,000 of insured amounts shall require the approval of the Members as provided in Section 11.5(h).

11.2. <u>Time Devoted to Company; Other Ventures.</u> The Manager shall devote so much of their time to the business of the Company as in the Manager's judgment the conduct of the Company's business reasonably requires, however, the Members acknowledge and agree that the Manager shall not be required to manage the Company as the Manager's sole and exclusive function. The Manager may engage in business ventures and activities of any nature and description independently or with others not in competition with the business of the Company; however, before a Manager may pursue a business opportunity within the scope and purpose of the Company, the Manager shall disclose all relevant information surrounding the opportunity and present the opportunity first to the Company This Section 11.2 is intended to modify any provisions or obligations of the Act to the contrary and each of the Members and the Company hereby waives and releases any claims they may have under the Act with respect to any such activities or ventures of the Manager.

11.3. <u>Liability of Manager to Members and Company.</u> In carrying out their duties and exercising the powers hereunder, the Manager shall exercise reasonable skill, care and business judgment, and shall perform their duties in good faith, in a manner they reasonable believe to be in the best interests of the Company, and with the care, including reasonable inquiry, that an ordinarily prudent person in a like position would use under similar circumstances. The Manager shall not be liable to the Company or the Members for any act or omission performed or omitted by them in good faith pursuant to the authority granted to them by this Agreement as a Manager or Tax Matters Partner (as defined in the Code) unless such act or omission constitutes gross negligence or willful misconduct by such Manager.

11.4. <u>Indemnification.</u> The Company shall indemnify and hold harmless the Manager, to the fullest extent permitted under the Act, from any loss or damage, including attorneys' fees actually and reasonably incurred by them, by reason of any act or omission performed or omitted by Manager on behalf of the Company or in furtherance of the Company's interests or as Tax Matters Partner; however, such indemnification or agreement to hold harmless shall be recoverable only out of the assets of the Company and not from the Members. The foregoing indemnity shall extend only to acts or omissions performed or omitted by the Manager in good faith and in the belief that the acts or omissions were in the Company's interest or not opposed to the best interests of the Company.

11.5. <u>Restrictions on Authority of Manager.</u> The following Company decisions shall require the written consent of Members holding sixty-six (100%) of the Percentage Interests in the Company (unless a higher voting percentage is mandated by the Act or this Operating Agreement) in which case the higher voting percentage shall control:

(a) the dissolution and winding up of the Company;

Page 17 of 26

(b)    the sale, exchange or other transfer of all or substantially all of the assets of the Company;

(c)    a decision by the Manager to borrow money in excess of $250,000;

(d)    the entry into by the Company of any merger, consolidation, liquidation, bankruptcy proceeding, partnership, joint venture, limited liability company or other like corporate transaction;

(e)    a decision by the Manager to settle and/or compromise with respect to any claim against the Company in an amount in excess of $250,000 of insured amounts;

(f)    any amendment to this Agreement or the Company's Articles of Organization;

(g)    any act in contravention of this Agreement;

(h)    the admission of any person or entity as a Member of the Company, except as provided for in Section 6.5;

11.6. <u>Assistance in Obtaining Financing.</u> To the extent that the paid in capital and revenues of the Company are insufficient to cover the operating and capital expenses of the Company, the Company shall have the responsibility to obtain such financing as the Manager may determine, and any debt incurred by the Company shall be secured solely by the assets of the Company, or shall be secured by other assets that do not provide recourse to the Company or its Members, unless the Members or some of the Members specifically agree in writing, in each of their sole discretion, to individually guarantee the debt, or a portion thereof.

11.7. <u>Member Meetings.</u> Meetings of the Members may be called by the Manager or by 100% of the Members. Action by a majority of the Percentage Interests of the Members shall be action by the Members, unless a greater percentage is required by the terms of this Agreement.

(a)    The Manager may designate any place, either within or outside of Alaska, as the location for any meeting of the Members. If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal office of the Company. If a meeting of the Members is held at a location other than Anchorage, Alaska, Members reasonable travel costs shall be paid by the Company.

(b)    Except as provided in paragraph (c) below, written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than ten (10) nor more than fifty (50) days before the date of the meeting, either personally, by facsimile, email, or by regular postal service mail, by or at the direction of the person calling the meeting, to each Member. If mailed, such notice shall be deemed to be delivered five (5) calendar days after being deposited in the United States mail, addressed to the Member at the Member's address as it appears on

Page 18 of 26



the books of the Company, with postage thereon prepaid. If faxed, such notice shall be deemed to be delivered upon confirmation of the sending/receipt of the facsimile by the facsimile machine. If personal delivery, such notice shall be deemed to be delivered upon personal delivery.

(c)   If all of the Members shall meet at any time and place, either within or outside of Alaska, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting lawful action may be taken.

(d)   At all meetings of the Members, a Member may vote in person or by a proxy executed in writing by the Member or by a duly authorized attorney-in-fact. Such proxy shall be filed with the Members before or at the time of the meeting and may be of any duration except that a Member who shall appear in person at a meeting shall void any outstanding proxy for so long as such Member is in attendance.

(e)   Any action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by Members sufficient to have approved the actions or resolutions at issue had a duly called meeting been held at which all Members were in attendance and delivered to the Manager for inclusion in the Company records. Action taken under this paragraph is effective when the necessary Members have signed the consent, unless the consent specifies a different effective date. The record date for determining Members entitled to take action without a meeting shall be the date the first Member signs a written consent. Written notice of any action taken without a meeting shall be provided to all Members immediately upon obtaining approval of the action.

(f)   When any notice is required to be given to any Member, a waiver thereof in writing signed by the person entitled to such notice, whether before, at or after the time stated therein, shall be equivalent to the giving of such notice.

(g)   With respect to a particular meeting or generally with respect to future meetings, the Manager may permit any or all Members to participate in the meeting by, or may permit the conduct of the meeting through, use of any means of communication by which all Members participating may simultaneously hear each other.

(h)   Upon call of the Manager, emergency meetings of the Members may be held, if required, upon twenty-four (24) hours notice (telephone or in person notice) to all Members, at a time and place designated by the Manager. If a meeting of the Members is held at a location other than  Anchorage, Alaska, Members reasonable travel costs shall be paid by the Company

Section 12.   <u>Status of Members.</u>

12.1 .  <u>No Participation in Management.</u> Except as specifically provided

**Page 19 of  26**

in Sections 11.5 above, no Member shall take part in the management of the Company.

12.2. <u>Limitation of Liability.</u> No Member shall have, solely by virtue of such Member's status as a Member in the Company, any personal liability whatsoever, whether to the Company, to any Members, or to the creditors of the Company, for the debts or obligations of the Company or any of its losses beyond the amount committed by such Member to the capital of the Company, except as otherwise required by the Act. To the full extent authorized by the Act, the Company shall indemnify and hold harmless any Member in connection with claims asserted against such Member solely by virtue of such Member's status as a Member, <u>provided,</u> that such indemnification and agreement to hold harmless shall be limited to the assets of the Company. Notwithstanding the foregoing, in the event any Member incurs a Company liability without authority to do so, such Member shall indemnify and hold harmless the Company and the other Members and the Manager against the entire amount of such liability.

12.3. <u>Death/Incapacity/Bankruptcy/Dissolution/Withdrawal of Member.</u> The death, incompetence, withdrawal, bankruptcy or dissolution of a Member, or the occurrence of any other event which terminates the continued membership of a Member in the Company, shall not cause dissolution of the Company, and the business of the Company shall continue. Upon the occurrence of such event, the rights of such Member to share in the Profits and Losses of the Company, to receive distributions from the Company, and to assign an interest in the Company pursuant to Section 14 below, shall, on the happening of such an event, devolve upon such Member's executor, administrator, guardian, conservator, or other legal representative or successor, subject to the terms and conditions of this Agreement, and the Company shall continue as a limited liability company. However, in any such event, such executor, administrator, guardian, conservator, or other legal representative or successor, or any permitted assignee of such executor, administrator, guardian, conservator, or other legal representative or successor, shall be admitted to the Company as a Member only in accordance with and pursuant to all of the terms and conditions of Section 14 hereof.

12.4. <u>Recourse of Members.</u> Each Member shall look solely to the assets of the Company for all distributions with respect to the Company and such Member's Capital Contribution thereto and share of Profits and Losses thereof, and shall have no recourse therefore, upon dissolution or otherwise, against the person or personal assets of any Member.

12.5. <u>No Right to Property.</u> No Member, regardless of the nature of such Member's contributions to the capital of the Company, shall have any right to demand or receive any distribution from the Company in any form other than cash, upon dissolution or otherwise.

Section 13. <u>Books and Records, Accounting, Reports and Statements and Tax Matters.</u>

13.1. <u>Books and Records.</u> The Manager shall, at the expense of the Company, keep and maintain, or cause to be kept and maintained, the books and records of

Page 20 of 26



the Company on the same method of accounting as utilized for federal and state income tax purposes.

13.2. <u>Annual Accounting Period.</u> All books and records of the Company shall be kept on the basis of an annual accounting period ending December 31 of each year, except for the final accounting period which shall end on the date of termination of the Company. All references herein to the "Fiscal Year" of the Company are to the annual accounting period described in the preceding sentence, whether the same shall consist of twelve months or less.

13.3. <u>Reports to Members.</u> The Manager shall send, at Company expense, to each Member quarterly reports regarding the finances of the Company. In addition to any audits that the Manager shall have undertaken on behalf of the Company, any Member may elect to have a financial audit performed by an independent public accounting firm on the Company's books and records, <u>provided,</u> that, such Member shall pay the entire cost of such audit as well as any costs incurred by the Manager as a result of such audit.

13.4. <u>Right to Examine and Copy Records.</u> Members shall be entitled, upon written request directed to the Manager, to review and copy the records of the Company at all reasonable times and at the location where such records are kept by the Company.

13.5. <u>Tax Matters Partner.</u> Should there be any controversy with the Internal Revenue Service or any other taxing authority involving the Company, the Manager may expend such funds as he deem necessary and advisable in the interest of the Company to resolve such controversy satisfactorily, including, without being limited thereto, attorneys' and accounting fees. The Manager is hereby designated as the "Tax Matters Partner" as referred to in Section 6231(a)(7)(A) of the Code, and is specially authorized to exercise all of the rights and powers now or hereafter granted to the Tax Matters Partner under the Code. Any cost incurred in the audit by any governmental authority of the income tax returns of a Member (as opposed to the Company) shall not be a Company expense. The Members agree to consult with and keep each other advised with respect to (i) any income tax audit of a Company income tax return, and (ii) any elections made by the Company for federal, state or local income tax purposes. The Members agree that all decisions made by the Tax Matters Partner hereunder will be made in a manner consistent with applicable federal and state tax laws, with the intent of maximizing return on investment hereunder.

13.6. <u>Tax Returns.</u> The Manager shall, at Company expense, cause the Company to prepare and timely file before delinquent (unless appropriate extensions are properly filed) all tax returns required to be filed by the Company for each fiscal year of the Company.

Section 14. <u>Transfers of Company Interests; Withdrawal and Admission of Members.</u>

14.1. <u>Transfers of Interests.</u> Subject to applicable legal requirements, a Member may, directly or indirectly sell, transfer, assign, pledge or otherwise encumber

**Page 21 of 26**



("Transfer"), voluntarily or involuntarily, all or any part of its Interest in the Company to (a) a person who is already a Member of the Company; (b) an affiliate of the Member; (c) a family member or family affiliate (including family or related trusts); or (d) subject to Section 14.2, any person not covered by clauses (a), (b) or (c), provided, that any transferee of an Interest under this Section 14.1 who is not already a Member of the Company, shall only become a Member in accordance with Section 14.3.

14.2. <u>Right of First Refusal.</u> A Member may transfer its Interest in the Company pursuant to Section 14.1(d) upon compliance with the following conditions:

(a)    In the event a Member ("Selling Member") desires to sell its Interest in the Company and receives a written offer ("Offer") therefore which the Selling Member intends to accept, the Selling Member, before accepting such Offer, shall first notify the other Members and the Manager and provide them with a copy of the Offer. The Offer must contain all material terms relating to the purchase and sale (including the name of the transferee), the consideration must be entirely monetary, and the Offer must contain a provision that the transferee agrees to be bound by all of the terms and conditions of this Operating Agreement.

(b)    After receiving a copy of the Offer, the non-selling Members shall have thirty (30) days within which to elect to purchase the Interest of the Selling Member upon the terms and conditions set forth in the Offer. If the non-selling Members (or some or one of them) do not respond or do not elect to purchase the Interest of the Selling Member within thirty (30) days following receipt of the Offer, the Selling Member may complete the purchase and sale to the purchaser identified in the Offer and upon the terms and conditions set forth in the Offer, but not otherwise.

(c)    In the event the non-selling Members (or some of one of them) elect to purchase the Interest of the Selling Member, the non-selling Members shall complete the purchase and sale within the time period set forth in the Offer or within fifteen (15) days after the non-selling Member's election to purchase, whichever is later. If all non-selling Members elect to purchase the Interest of the Selling Member, then each non-selling Member shall be entitled to purchase a pro-rata share of the Selling Member's Interest based on each Member's Percentage Interest in the Company. If some, but not all, non-selling Members elect to purchase the Selling Member's Interest, then the non-selling Members who elect to purchase the Selling Member's Interest shall be entitled to purchase the portion of the Selling Member's Interest represented by the ratio of the non-selling Member's Percentage Interest to the total of the Percentage Interests of all the non-selling Members electing to participate in such purchase.

14.3. <u>Admission of Transferees as Members.</u>

(a)    No transferee of a Member shall be admitted as a Member unless all of the following conditions have been satisfied:

(i)    the transfer complies with Section 14.1 and, if applicable, 14.2;

Page 22 of 26



(ii) the written consent of the Members holding at least sixty-six percent (66%) of the Percentage Interests in the Company to such transferee being admitted as a Member is first obtained;

(iii) the prospective transferee has executed an instrument, in form and substance satisfactory to the Manager, accepting and agreeing to be bound by all the terms and conditions of this Operating Agreement and has paid all expenses of the Company in effecting the transfer; and

(iv) such transfer is effected in compliance with all applicable state and federal securities laws.

This Section 14.3 shall not apply to a transferee who is already a Member.

Section 15.    Resignation and Admission of Manager.

15.1.    Resignation of Manager. The Manager shall be entitled to resign as a Manager. The effective date of such resignation shall be sixty (60) days after delivery of written notice to the Company and the Members, or such earlier date as the Manager's resignation is accepted by the Members.

15.2.    Death/ Incompetence/ Bankruptcy/ Dissolution of Manager. The Manager shall cease to be a Manager upon the death, incompetence, dissolution or bankruptcy of such Manager.

15.3.    Appointment of a New or Replacement Manager. A new or replacement Manager for a removed Manager who has resigned, may be appointed by the Members in accordance with Section 10.1.

Section 16.    Dissolution and Termination.

16.1.    Dissolution. The Company shall be dissolved upon the occurrence of any of the following events:

(a)    agreement of the Members as provided in Section 11.5; or

(b)    a sale; or

(c)    death or dissolution of all the Members.

No Member shall have the right to dissolve or terminate the Company for any reason other than as set forth above or to withdraw from the Company other than as set forth in Section 14, and each Member hereby waives any other right it may have.

16.2.    Distribution of Cash upon Termination. If the Company is dissolved pursuant to Section 16.1, the Company affairs shall be wound up as expeditiously



as possible, the assets sold, and the Company terminated. Any Member or an affiliate of a Member may be a purchaser of any or all of the assets. After payment of all Company liabilities and expenses of sale, the remaining cash shall be distributed as follows:

(a)   First, to pay off any indebtedness of the Company, including indebtedness of the Company to any Member or Members;

(b)   the balance ("Net Sale Proceeds") shall be distributed as follows:

i   first, to the Members, pro rata, in proportion to and to the extent of their respective Capital Contributions;

ii.   second, to the Members, pro rata, in accordance with their Capital Accounts, to the extent thereof, after giving effect to all contributions, distributions, and allocations for all prior periods; and

iii.   the balance, to the Members, pro rata, in accordance with their respective Percentage Interests.

Section 17.   Limitation on Liability; Indemnity and Contribution.   No Member shall have, solely by virtue of such Member's status as a Member or Manager in the Company, any personal liability whatever, whether to the Company, to any Members, or to the creditors of the Company, for the debts or obligations of the Company or any of its losses beyond the amount committed by such Member to the capital of the Company, except as otherwise required by the Act, provided, however, in the event any Member incurs a Company liability without authority to do so, such Member shall indemnify and hold harmless the Company and the other Members and the Manager against the entire amount of such liability.

Section 18.   Securities Laws.   Each Member acknowledges and agrees that such Member's Interest in the Company has not been registered under federal or state securities laws (the "Acts") and is being sold in reliance upon exemptions from registration requirements set forth in the Acts, and any permitted sale of such Interest must comply with exemption or registration requirements under the Acts. Each Member further acknowledges, represents, warrants and agrees that (i) it is an "accredited investor" as such term is used under federal securities laws and regulations; (ii) the Company has complied with all of the requirements under AS 45.55.900(b)(5)(B) including, without limitation, the information disclosure requirements under AS 45.55.900(b)(5)(B)(ii); (iii) the Member is a resident of Alaska, and the sale of the Interests are being made solely in Alaska; (iv) the Member is buying for investment purposes only; and (v) this Operating Agreement constitutes the signed agreement of each Member required under AS 45.55.900(b)(5)(B)(v).

Section 19.   Miscellaneous.

19.1.   Amendment.   This Operating Agreement may be amended from

Page 24 of 26



time-to time as provided by this Agreement.

19.2. <u>Notices.</u> Any notice required or permitted under this Operating Agreement shall be delivered by personal delivery, facsimile, or by first class mail, postage prepaid, addressed to the office of each Member as follows:

19.3. <u>Governing Law.</u> This Operating Agreement shall be governed by the internal laws of the State of Alaska, without giving effect to principles or provisions thereof relating to choice of law or conflict of laws.

19.4. Dispute Resolution

(a) Collaboration – The Members shall first attempt to resolve all disputes among and between them collaboratively at the lowest level possible, by engaging in informal, earnest discussion and collegial debate.

(b) Mediation – If Collaboration is not successful, the Members shall then attempt to resolve all controversies, deadlocks or disputes between and among them using mediation. The mediator, the time and pace for mediation and the rules governing the mediation process shall be determined by mutual agreement of the parties to the controversy, deadlock or dispute. If the parties cannot agree on the mediator, or the terms of the mediation process; or the mediation process does not result in a settlement, the controversy, dispute or deadlock will proceed to arbitration for resolution.

(c) Arbitration - Any and all controversies, deadlocks or disputes between or among Members arising out of or related to this Agreement will be submitted to arbitration before a single arbitrator selected by mutual agreement of the parties, or if agreement cannot be reached, utilizing the striking method of arbitrator selection from a list of arbitrators provided by the by the American Arbitration Association ("AAA").The arbitration will be conducted within ninety (90) days of the demand for arbitration in accordance with the AAA's rules governing commercial arbitration. The arbitrator's decision will be final and binding and may be appealed only in the case of alleged misconduct, fraud, material mistake of fact, or such or other limited grounds establish by Alaska law. Venue for arbitration is Palmer, Alaska. Jurisdiction shall lie exclusively with the Third Judicial District for the State of Alaska at Anchorage, Alaska. Cost and fess of the arbitration shall be awarded to the prevailing party. The prevailing party shall be that party in whose favor a net judgment is rendered.

19.5. <u>Agreement Binding.</u> This Operating Agreement shall be binding upon the successors, assigns, heirs, executors, personal representatives and other legal representatives, as the case may be, of the Members as provided herein.

19.6. <u>Waiver.</u> The failure by any party to object to a default under or breach of this Agreement or insist upon the strict performance of any duty or obligation of any other party shall not constitute a waiver, either express or implied, of the right to do so in the future.

**Page 25 of  26**

19.7.　　　　　Severability. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the remaining provisions hereof, and, in any such event, this Agreement shall be construed and interpreted in all respects as if such invalid or unenforceable provision were omitted.

19.8.　　　　　Section Headings. Section headings have been inserted solely for the convenience of the parties and shall not be considered a part of this Operating Agreement for interpretation or construction.

19.9. Counterparts. For the convenience of the Members, this Operating Agreement may be executed, including by facsimile signature, in one or more counterparts, each identical to the other, so long as the counterparts in a set contain the signatures of all of the parties to this Operating Agreement.

**IN WITNESS WHEREOF** the parties have caused to be executed this Operating Agreement as of the date first written above.

IN WITNESS WHEREOF, I have hereunto set my hand and seal on the date set forth beside my name.

Mystery Ranch, LLC, Member
Jack Barrett, Member Representative

RB Enterprises, LLC, Member
Bob Gross, Member Representative

Page 26 of 26

Bruce E. Falconer  AK Bar No. 8707062
Charles A. Cacciola AK Bar No. 1306045
BOYD, CHANDLER & FALCONER, LLP
911 W. 8th Avenue, Suite 302
Anchorage, Alaska 99501
(907) 272-8401

Attorneys for Defendants

## IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

## THIRD JUDICIAL DISTRICT AT ANCHORAGE

| | | |
|---|---|---|
| MYSTERY RANCH, LLC, and<br>JACK BARRETT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BOB GROSS and | ) | |
| RB ENTERPRISES, LLC, | ) | Case No. 3AN-14-8418 CI |
| | ) | |
| Defendants. | ) | |

## [PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS OR STAY PROCEEDINGS

The Court, having considered defendants' motion to compel arbitration and

dismiss or stay further proceedings and any opposition thereto, being fully informed as to

the matters raised, and finding that there is a valid agreement to arbitrate, hereby enters its

order as follows:

The defendants' motion is GRANTED and the parties are to submit their claims

to arbitration in accordance with section 19.4(c) of IT, LLC's operating agreement and

ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS OR
STAY PROCEEDINGS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI                    Page 1 of 2

BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

Exhibit 4 -- Page 49 of 50

this case is dismissed [alternatively, all proceedings in this case are stayed pending the outcome of arbitration].

Dated this ___ day of _____, 2014.

_____
GREGORY A. MILLER
Superior Court Judge

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of
September, 2014, a true and correct
copy of the foregoing was mailed via U.S. Mail to:

Paul D. Stockler
Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, AK 99501

By: _____
Legal Assistant/Secretary
Boyd, Chandler & Falconer, LLP

BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS OR
STAY PROCEEDINGS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI                    Page 2 of 2

Exhibit 4 -- Page 50 of 50

**IN THE SUPERIOR COURT FOR THE STATE OF ALASKA**

**THIRD JUDICIAL DISTRICT AT ANCHORAGE**

| | |
|---|---|
| MYSTERY RANCH, LLC and<br>JACK BARRETT,<br><br>                 Plaintiffs,<br><br>vs.<br><br>BOB GROSS and<br>RB ENTERPRISES, LLC,<br><br>                Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **CASE NO.: 3AN-14-08418 CI** |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL
ARBITRATION AND DISMISS OR STAY PROCEEDINGS**

COME NOW the Plaintiffs, Mystery Ranch, LLC and Jack Barrett, by and through counsel, Paul D. Stockler, and hereby files this opposition to Defendants' Motion to Compel Arbitration and/or Dismiss or Stay Proceedings.

This is an action filed by Jack Barrett and Mystery Ranch, LLC (an LLC owned by Jack Barrett and his wife Dawn Barrett). It is against Bob Gross and RB Enterprises, LLC (an LLC owned by Bob Gross and his wife Melanie Gross)

**I.    THE MOTION FOR ARBITRATION MUST BE DENIED**

This lawsuit is not against IT, LLC. IT, LLC is not even a party to this lawsuit. Plaintiffs did not sue them and when counsel for defendants entered an appearance he entered on behalf of Bob Gross and RB Enterprises LLC and not IT, LLC.

Defendants cannot use the IT, LLC Operating Agreement, who is not even a party to this action, or in particular the IT, LLC arbitration section as a basis for this

Mystery Ranch, LLC  v.  Bob Gross                                  3AN-14-08418 CI
Plfs' Opp. to Defs' Motion to Compel Arbitration and Dismiss or Stay Proceeding     Page 1 of 12

Exhibit 5 -- Page 1 of 12

Law Office of Paul D. Stockler<br>1227 W. 9th Avenue, Suite 301<br>Anchorage, Alaska 99501<br>(907) 277-8564 fax (907) 272-4877

court ordering arbitration.   Defendants don't even correctly cite the arbitration provision.

The IT, LLC Operating Agreement (which does not apply) attached as Exhibit A to defendants motion states:

19.4.  Dispute Resolution

(a)  Collaboration - The Members shall first attempt to resolve all disputes among and between them collaboratively at the lowest level possible, by engaging in informal, earnest discussion and collegial debate.

(b)  Mediation - If Collaboration is not successful, the Members shall then attempt to resolve all controversies, deadlocks or disputes between and among them using mediation.  The mediator, the time and pace(sic) for mediation and the rules governing the mediation process shall be determined by mutual agreement of the parties to the controversy, deadlock or dispute.  If the parties cannot agree on the mediator, or the terms of the mediation process, or the mediation process does not result in a settlement, the controversy, dispute or deadlock will proceed to arbitration for resolution.

(c)  Arbitration - Any and all controversies, deadlocks or disputes between or among Members arising out of or related to this Agreement will be submitted to arbitration before a single arbitrator selected by mutual agreement of the parties, or if agreement cannot be reached, utilizing the striking method of arbitrator selection from a list of arbitrators provided by the by the(sic) American Arbitration Association ("AAA").  The arbitration will be conducted within ninety (90) days of the demand for arbitration in accordance with the AAA's rules governing commercial arbitration.  The arbitrator's decision will be final and binding and may be appealed only in the case of alleged misconduct, fraud, material mistake of fact, or such or other limited grounds establish by Alaska law.  Venue for arbitration is Palmer, Alaska.  Jurisdiction shall lie exclusively with the Third Judicial District for the State of Alaska at Anchorage, Alaska.  Cost and fess(sic) of the arbitration shall be awarded to the prevailing party.  The prevailing party shall be that party in whose favor a net judgment is rendered.

If the court ordered anything from the IT, LLC Operating Agreement (which does not apply), the court would have to order mediation.  The motion to compel arbitration must be denied and defendants should be ordered to answer immediately.

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross                                          3AN-14-08418 CI
Plfs' Opp. to Defs' Motion to Compel Arbitration and Dismiss or Stay Proceeding        Page 2 of 12

Exhibit 5 -- Page 2 of 12

## II. THIS DISPUTE IS ABOUT MERITAGE MANAGEMENT, LLC

Meritage Management Company, LLC. ("MMC") is a separate and distinct legal entity from IT, LLC. There is no operating agreement for MMC and, therefore, no arbitration agreement applies.

MMC was originally formed as Meritage Realty USA LLC in 2005, involving Mr. Barrett and his wife Dawn (See attached exhibit 1). Bob Gross had nothing to do with it. Over the years there were several name changes as well as changes of managers and members.

On January 1, 2011, Dawn Barrett filed Articles of Amendment changing the name from Meritage Realty USA LLC to Meritage Real Estate Advisors, LLC with Jack Barrett and Bob Gross as member/managers. (See attached exhibit 2).

On December 15, 2011, Bob Gross filed with the State of Alaska a name change from Meritage Real Estate Advisors, LLC to Meritage Management Company, LLC. (See attached exhibit 3).

On July 23, 2012, Bob Gross (without the approval of Jack Barrett) filed a notice of change of registered agent making himself the registered agent. (See attached exhibit 3).

On the same day, Bob Gross filed a notice of change of officials (without the approval of Jack Barrett) purporting to transfer Bob Gross' membership interest to RB Enterprises, LLC and Jack Barrett's membership interest to Mystery Ranch, LLC. (See attached exhibit 3).

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross                                    3AN-14-08418 CI
Plfs' Opp. to Defs' Motion to Compel Arbitration and Dismiss or Stay Proceeding        Page 3 of 12

Exhibit 5 -- Page 3 of 12

Bob Gross did not have the authority to do this and on June 2, 2014, Jack Barrett changed it back to the way it was supposed to be with Jack Barrett and Bob Gross as member/managers. (See attached exhibit 4 and paragraph 10 of the complaint). IT, LLC (IT) and Meritage Management Company, LLC (MMC) are separate legal and tax entities. The two entities have separate and different ownership. Separate books and records were kept for the two entities and separate tax returns were filed. From the inception of the project, MMC has held and managed the operations of the Inlet Tower Hotel and Suites.

Bob Gross did not have the authority to purport to transfer Bob Gross' membership interest to RB Enterprises, LLC and Jack Barrett's membership interest to Mystery Ranch, LLC. In fact, the MMC tax return for 2012 had already been filed on September 14, 2013 with K-1's being issued to Bob Gross and Jack Barrett personally. (See attached exhibit 5).

Sometime after May 2014, without the authority to do so, Bob Gross has attempted to consolidate the assets and operations from MMC into IT. As manager of IT, Mr. Gross does not have the authority to do this. Under Sec. 11.5(d) of IT's operating agreement (Restrictions on Authority of Manager), the decision to enter the company into any merger, consolidation or other like corporate transactions requires the written consent of Members holding sixty-six (100%) of the percentage interests in the company. Bob Gross has no authority to do this under an **MMC** operating agreement, because none exists, and he cannot do it under the **IT, LLC Operating Agreement:**

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross                                              3AN-14-08418 CI
Plfs' Opp. to Defs' Motion to Compel Arbitration and Dismiss or Stay Proceeding          Page 4 of 12

Exhibit 5 -- Page 4 of 12

**THIS IT, LLC OPERATING AGREEMENT** is made and entered into as of the day of August 12, 2011, by and among IT, LLC, and Mystery Ranch, LLC an Alaskan limited liability company and RB Enterprises, LLC an Alaskan limited liability company each a "Member" and collectively the "Members". The Members have caused to be formed a limited liability company upon the terms and conditions set forth herein. (states in pertinent part):

11.5. Restrictions on Authority of Manager. The following Company decisions shall require the written consent of Members holding sixty-six (100%) of the Percentage Interests in the Company…

(b) the sale, exchange or other transfer of all or substantially all of the assets of the Company;

(d) the entry into by the Company of any merger, consolidation, liquidation, bankruptcy proceeding, partnership, joint venture, limited liability company or other like corporate transaction;

There is no written or verbal agreement by 66% of the percentage interests. Mystery Ranch, LLC owns 50% of IT, LLC interests. Jack Barrett, managing member of Mystery Ranch, LLC, would never agree to consolidate the two entities (MMC and IT, LLC). The two separate entities were set up for valid legal, business and tax planning purposes.

There is also no agreement by the members of MMC to have its assets and operations taken over by IT. Again, Jack Barrett, 50% owner of MMC and a MMC member manager, would never agree to this consolidation. Bob Gross never discussed the idea of the entity's consolidation with Jack Barrett, let alone asked for Mr. Barrett's approval. To make matters worse, Bob Gross, shortly before this lawsuit was filed, hired a new accounting firm and filed with the Internal Revenue Service a joint amended return for the 2012 tax year joining Meritage Management Company, LLC with Inlet Tower Management Company (without the approval of Jack Barrett) and

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross                                                                3AN-14-08418 CI
Plfs' Opp. to Defs' Motion to Compel Arbitration and Dismiss or Stay Proceeding          Page 5 of 12

Exhibit 5 -- Page 5 of 12

now attempts to attribute income or losses to RB Enterprises, LLC and Mystery Ranch, LLC (without any legal authority to do so and in direct contradiction of the 2013 IRS filing.  (See attached exhibit 6).

According to just portions of the complaint the motion to compel arbitration must be denied:

7.   On December 15, 2011, IT, LLC acquired the Inlet Tower Property.   The sole purpose of IT, LLC was to serve as the holding company for the Inlet Tower asset.

8.   IT, LLC was owned at the time, and still is, by Mystery Ranch, LLC and RB Enterprises, LLC.  Mystery Ranch, LLC was owned at the time, and still is, by Jack and Dawn Barrett.  RB Enterprises, LLC was owned at the time, and still is, by Bob and Melodie Gross.

9.   Meritage Management Company, LLC whose ownership at the time of creation was Jack Barrett and Bob Gross, was created for the sole purpose of serving as the operating company for IT, LLC.

10.   On July 23, 2012, Mr. Gross changed the State records for the operating company Meritage Management Company, LLC.   (See exhibit 3). Mr. Barrett learned of this when it was discovered by his CPA in January 2014.

11.   Mr. Barrett received a copy of an email dated May 28th from Mr. Gross to Eric Havelock of AHFC regarding a change of management structure for the Inlet Tower Property by IT, LLC.  (See attached exhibit 7)

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross                                                                    3AN-14-08418 CI
Plfs' Opp. to Defs' Motion to Compel Arbitration and Dismiss or Stay Proceeding        Page 6 of 12

Exhibit 5 -- Page 6 of 12

Until Mr. Havelock forwarded this email to him, Mr. Barrett had been unaware of this and had not agreed to the change.

12.    In July 2012, Mr. Gross had unilaterally reported to the State of Alaska a change in the ownership of Meritage Management Company, LLC. (See exhibit 3).

13.    The reported change in ownership consisted of Meritage Management Company, LLC, which had until that time been owned 50% by Mr. Barrett personally and 50% by Mr. Gross personally, going to Mystery Ranch, LLC, which was owned by Mr. Barrett 50% and his wife Dawn 50%, and RB Enterprises, LLC, which was owned by Bob Gross 95% and Melodie Gross 5%.

14.    This change in ownership created the potential risk of Meritage Management Company, LLC being treated as a "C" Corp rather than an "S" Corp.

15.    Mr. Barrett never consented in any way to transfer his personal ownership of Meritage Management Company, LLC to Mystery Ranch, LLC.

16.    Mr. Gross' 2012 filing (exhibit 3) with the State of Alaska was false.

17.    Mr. Barrett has since filed corrective paperwork with the State of Alaska regarding this ownership issue and has had his accountants working on the IRS entity change issues. (exhibit 4).

Mystery Ranch, LLC  v.  Bob Gross                                                    3AN-14-08418 CI
Plfs' Opp. to Defs' Motion to Compel Arbitration and Dismiss or Stay Proceeding          Page 7 of 12

Exhibit 5 -- Page 7 of 12

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

18.    Prior to the acquisition of the Inlet Tower Property, Mr. Barrett and Mr. Gross were advised by their Tax Planner/CPA to create this entity structure and to designate Meritage Management Company, LLC as an "S" Corp election for its duties of the partners jointly operating the Inlet Tower Property.

19.    When Mr. Gross reported the ownership transfer from Mr. Barrett to Mystery Ranch, LLC and from himself to RB Enterprises, LLC, without Mr. Barrett's consent, he inadvertently may have changed the entity's tax structure.  The entity's designation from inception was as an "S" Corp and its taxes were filed under the "S" Corp election.

20.    Since this change of ownership was never agreed to, Mr. Barrett has been investigating the legal and tax consequences of Mr. Gross' actions.  At a minimum, as a "C" Corp the entity could face a double taxation scenario, which would make no sense for any of its interests.  The advantage according to Mr. Gross, as he stated to the accountants in an email, was that he believed that under a "C" Corp he would pay no personal income tax for his room, food and beverage expenses, all benefits of which were not authorized by Mr. Barrett.

21.    According to Eric Havelock's email referenced above, Mr. Gross then transferred all Meritage Management Company, LLC's employees and assets to IT, LLC to be utilized in this new operating scenario which he presented to Mr. Havelock.

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross                                                3AN-14-08418 CI
Plfs' Opp. to Defs' Motion to Compel Arbitration and Dismiss or Stay Proceeding        Page 8 of 12

Exhibit 5 -- Page 8 of 12

22.    This was also done without Mr. Barrett's consent.

23.    Mr. Gross mentioned in his email that Meritage Management Company, LLC was "assisting" him in the management of the Inlet Tower Property, when in fact Meritage Management Company, LLC and its layers of management were managing the day-to-day operations of the property.

24.    By changing the ownership structure and then transferring management to IT, LLC, Mr. Gross effectively seized/stole assets which were originally owned by Mr. Barrett personally.

25.    Meritage Management Company, LLC's assets, 50% of which were originally owned by Mr. Barrett personally and 50% of which were originally owned by Mr. Gross personally, were placed without consent under Mr. Gross' sole control.

26.    The assets Mr. Gross seized control of were personal assets.  Not the assets of Mystery Ranch, LLC.  Not the assets of RB Enterprises, LLC.  And not the assets of IT, LLC.

27.    Mr. Gross did not have any authorization to act on Mr. Barrett's behalf.  Neither did Mr. Gross have any authority to act on behalf of Meritage Management Company, LLC or IT, LLC's behalf to seize the assets by IT, LLC or to change the management structure of the organization for the management of the project or for any other reason.

28.    From a tax standpoint, every time there is a distribution of

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

assets, it is considered a sale at the corporate level, and as such is taxed at the corporate level.  In addition, if the corporation is taxed as a "C" corporation, the distributions are taxed as dividends received at the owners' level.  Hence, double taxation.

There is no operating agreement for MMC.  There is no mandatory arbitration provision.  The arbitration provision in the IT, LLC agreement does not apply, nor has it been followed.  The motion for arbitration must be denied.

## III.   THE MOTION TO DISMISS MUST BE DENIED

Defendants do not even really address their authority to dismiss the complaint.  Presumably, it is under Alaska Rule of Civil Procedure 12 (b)(6) which states in pertinent part:

**Rule 12. Defenses and Objections--When and How Presented--By Pleading or Motion--Motion for Judgment on Pleadings.**

(a) **When Presented.** A defendant shall serve an answer within 20 days after the service of the summons and complaint upon that defendant, unless otherwise directed when service of process is made pursuant to Rule 4(e). A party served with a pleading stating a cross-claim against that party shall serve an answer thereto within 20 days after the service upon that party. The plaintiff shall serve a reply to a counter-claim in the answer within 20 days after service of the answer or, if a reply is ordered by the court, within 20 days after service of the order, unless the order otherwise directs. The state or an officer or agency thereof shall serve an answer to the complaint or to a cross-claim, or a reply to a counter-claim, within 40 days after the service upon the attorney general of the pleading in which the claim is asserted. A non-governmental party shall serve an answer to the complaint or to a cross-claim, or a reply to a counter-claim within, 40 days after service upon an officer or agency of the state appointed, authorized, or designated as agent to receive service for such party pursuant to statute. An individual in a foreign country who is served with a summons and complaint under subsection (d)(13) of Rule 4 shall serve an answer to the complaint or to a cross-claim, or a reply to a counterclaim, within 40 days after service upon that individual. The service of a motion

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross                                          3AN-14-08418 CI
Plfs' Opp. to Defs' Motion to Compel Arbitration and Dismiss or Stay Proceeding          Page 10 of 12

Exhibit 5 -- Page 10 of 12

permitted under this rule alters these periods of time as follows, unless a different time is fixed by order of the court: (1) if the court denies the motion or postpones its disposition until the trial on the merits, the responsive pleading shall be served within 10 days after notice of the court's action; (2) if the court grants a motion for a more definite statement the responsive pleading shall be served within 10 days after the service of the more definite statement.

(b) **How Presented.** Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counter-claim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter, (2) lack of jurisdiction over the person, (3) improper venue, (4) insufficiency of process, (5) insufficiency of service of process, (6) failure to state a claim upon which relief can be granted, (7) failure to join a party under Rule 19. A motion making any of these defenses shall be made before pleading if a further pleading is permitted. No defense or objection is waived by being joined with one or more other defenses or objections in a responsive pleading or motion. If a pleading sets forth a claim for relief to which the adverse party is not required to serve a responsive pleading, the adverse party may assert at the trial any defense in law or fact to that claim for relief. If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56. A decision granting a motion to dismiss is not a final judgment under Civil Rule 58. When the decision adjudicates all unresolved claims as to all parties, the judge shall direct the appropriate party to file a proposed final judgment. The proposed judgment must be filed within 20 days of service of the decision, on a separate document distinct from any opinion, memorandum or order that the court may issue.

The complaint lays out ample claims that must be answered. The motion to dismiss should be denied and the defendants, who are already late in answering, should be given three (3) days to answer or default judgment should be entered.

//

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross                                                    3AN-14-08418 CI
Plfs' Opp. to Defs' Motion to Compel Arbitration and Dismiss or Stay Proceeding          Page 11 of 12

Exhibit 5 -- Page 11 of 12

DATED this 16th day of September, 2014 at Anchorage, Alaska.

LAW OFFICE OF PAUL D. STOCKLER
Attorney for Plaintiffs

By:_____
Paul D. Stockler
Alaska Bar No.: 8606032

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day
of September, 2014, a true and correct
copy of the foregoing document was
served via hand-delivery on the following:

Bruce E. Falconer
Boyd, Chandler & Falconer, LLP
911 W. 8th Avenue, Suite 302
Anchorage, Alaska 99501

_____
Scott G. LeFebvre

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC v. Bob Gross
Plfs' Opp. to Defs' Motion to Compel Arbitration and Dismiss or Stay Proceeding

3AN-14-08418 CI
Page 12 of 12

Exhibit 5 -- Page 12 of 12

Bruce E. Falconer  AK Bar No. 8707062
Charles A. Cacciola AK Bar No. 1306045
BOYD, CHANDLER & FALCONER, LLP
911 W. 8th Avenue, Suite 302
Anchorage, Alaska 99501
(907) 272-8401

Attorneys for Defendants

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

MYSTERY RANCH, LLC, and )
JACK BARRETT, )
)
               Plaintiffs, )
)
vs. )
)
BOB GROSS and )
RB ENTERPRISES, LLC, )       Case No. 3AN-14-8418 CI
)
              Defendants. )
_____ )

**[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO COMPEL
ARBITRATION AND DISMISS OR STAY PROCEEDINGS**

      The Court, having considered defendants' motion to compel arbitration and

dismiss or stay further proceedings and any opposition thereto, being fully informed as to

the matters raised, and finding that there is a valid agreement to arbitrate, and that Plaintiffs have not amended their complaint, hereby enters its

order as follows:

      The defendants' motion is GRANTED and the parties are to submit their claims

to arbitration in accordance with section 19.4(c) of IT, LLC's operating agreement and

ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS OR
STAY PROCEEDINGS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI             Page 1 of 2

BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

SEP – 4 2014

Exhibit 6 -- Page 1 of 2

this case is dismissed [alternatively, all proceedings in this case are stayed pending the outcome of arbitration].

Dated this ____ day of _____, 2014.

_____
GREGORY A. MILLER
Superior Court Judge

I certify that on __12|10|14__ a copy
of the following was mailed/ faxed/ hand-delivered
to each of the following at their addresses of
record.

P. Stockler
B. Falconer

_____
Administrative Assistant

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of
September, 2014, a true and correct
copy of the foregoing was mailed via U.S. Mail to:

> Paul D. Stockler
> Law Office of Paul D. Stockler
> 1227 W. 9th Avenue, Suite 301
> Anchorage, AK 99501

By: _____
Legal Assistant/Secretary
Boyd, Chandler & Falconer, LLP

BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
911 WEST EIGHTH AVENUE, SUITE 302
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
FACSIMILE: (907) 274-3698

ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS OR
STAY PROCEEDINGS
*Mystery Ranch, LLC, et al. v. Gross, et al.*, 3AN-14-8418 CI      Page 2 of 2

Exhibit 6 -- Page 2 of 2

**IN THE SUPERIOR COURT FOR THE STATE OF ALASKA**

**THIRD JUDICIAL DISTRICT AT ANCHORAGE**

| | |
|---|---|
| **MYSTERY RANCH, LLC and**<br>**JACK BARRETT,** | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| **BOB GROSS and**<br>**RB ENTERPRISES, LLC,** | ) ) ) |
| Defendants. | ) ) |

**CASE NO.:  3AN-14-08418 CI**

<u>**FIRST AMENDED COMPLAINT**</u>

COME NOW the Plaintiffs, Mystery Ranch, LLC and Jack Barrett, by and through counsel, Paul D. Stockler, for their cause of action against Defendants, Bob Gross and RB Enterprises, LLC, complain and allege as follows:

<u>**PARTIES**</u>

1.      Plaintiff, Mystery Ranch, LLC, is limited liability corporation with its principal place of business in Alaska.

2.      Plaintiff, Jack Barrett, is a resident of Anchorage, Alaska and is in all ways competent to bring this action.

3.      Upon information and belief, defendants, Bob and Melodie Gross, are residents of Anchorage, Alaska and duly subject to the laws of the State of Alaska.

4.      Upon information and belief, defendant, RB Enterprises, LLC, is a limited liability corporation with its principal place of business in Alaska.

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

**JURISDICTION / VENUE**

5.    Jurisdiction is proper under AS 22.10.020.  With the principal places of business and residences of the parties being Anchorage, Alaska, venue is proper.

**GENERAL ALLEGATIONS**

6.    Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

7.    In December 2011, Mystery Ranch, LLC was owned at the time, and still is, by Jack and Dawn Barrett.  RB Enterprises, LLC was owned at the time, and still is, by Bob and Melodie Gross.

8.    Meritage Management Company, LLC whose ownership at the time of creation was Jack Barrett and Bob Gross, was created for the sole purpose of serving as an operating company.

9.    On July 23, 2012, Mr. Gross changed the State records for the operating company Meritage Management Company, LLC.  Mr. Barrett learned of this when it was discovered by his CPA in January 2014.

10.    Mr. Barrett had been unaware of this and had not agreed to the change.

11.    In July 2012, Mr. Gross had unilaterally reported to the State of Alaska a change in the ownership of Meritage Management Company, LLC.

12.    The reported change in ownership consisted of Meritage Management Company, LLC, which had until that time been owned 50% by Mr. Barrett personally and 50% by Mr. Gross personally, going to Mystery Ranch, LLC, which was owned by Mr. Barrett 50% and his wife Dawn 50%, and RB Enterprises, LLC, which was owned

Mystery Ranch, LLC  v.  Bob Gross
First Amended Complaint

3AN-14-08418 CI
Page 2 of 15

Exhibit 7 -- Page 2 of 15

by Bob Gross 95% and Melodie Gross 5%.

13.    This change in ownership created the potential risk of Meritage Management Company, LLC being treated as a "C" Corp rather than an "S" Corp.

14.    Mr. Barrett never consented in any way to transfer his personal ownership of Meritage Management Company, LLC to Mystery Ranch, LLC.

15.    Mr. Gross' 2012 filing with the State of Alaska was false.

16.    Mr. Barrett has since filed corrective paperwork with the State of Alaska regarding this ownership issue and has had his accountants working on the IRS entity change issues.

17.    Mr. Barrett and Mr. Gross had previously been advised by their Tax Planner/CPA to create this entity structure and to designate Meritage Management Company, LLC as an "S" Corp election.

18.    When Mr. Gross reported the ownership transfer from Mr. Barrett to Mystery Ranch, LLC and from himself to RB Enterprises, LLC, without Mr. Barrett's consent, he changed the entity's tax structure.  The entity's designation from inception was as an "S" Corp and its taxes were filed under the "S" Corp election.

19.    Since this change of ownership was never agreed to, Mr. Barrett has been investigating the legal and tax consequences of Mr. Gross' actions.  At a minimum, as a "C" Corp the entity could face a double taxation scenario, which would make no sense for any of its interests.  The advantage according to Mr. Gross, as he stated to the accountants in an email, was that he believed that under a "C" Corp he would pay no personal income taxes.

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross                                3AN-14-08418 CI
First Amended Complaint                                          Page 3 of 15

Exhibit 7 -- Page 3 of 15

20.    Mr. Gross was not the tax partner nor was he the managing partner nor was there a management agreement and he then transferred all Meritage Management Company, LLC's employees and assets except for the COO Jeff Cunningham.

21.    This was also done without Mr. Barrett's consent.

22.    By changing the ownership structure and then transferring management, Mr. Gross effectively seized/stole assets which were originally owned by Mr. Barrett personally.

23.    Meritage Management Company, LLC's assets, 50% of which were originally owned by Mr. Barrett personally and 50% of which were originally owned by Mr. Gross personally, were placed without consent under Mr. Gross' sole control.

24.    The assets Mr. Gross seized control of were personal assets.  Not the assets of Mystery Ranch, LLC.  Not the assets of RB Enterprises, LLC.

25.    Mr. Gross did not have any authorization to act on Mr. Barrett's behalf. Neither did Mr. Gross have any authority to act on behalf of Meritage Management Company, LLC or to seize the assets or to change the management structure of the organization for the management of the project or for any other reason.

26.    From a tax standpoint, every time there is a distribution of assets, it is considered a sale at the corporate level, and as such is taxed at the corporate level. In addition, if the corporation is taxed as a "C" corporation, the distributions are taxed as dividends received at the owners' level.  Hence, double taxation.

27.    Since May 20, 2014, Mr. Barrett has been locked out of the books and

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

records, he has made repeated requests to review the Meritage Management Company, LLC books and records as well as any other related party transactions, books and records. All such requests have been denied by Mr. Gross.

28.    Mr. Barrett does not have access to the current balance sheet, so he is unsure as to what the current asset value is on the Meritage Management Company, LLC books at this time.

29.    More recently, without Mr. Barrett's consent Mr. Gross has hired his own accounting firm Swalling and Associates and has been going back and re-filing previously filed Meritage Management Company, LLC tax returns without the consent of Mr. Barrett and to the benefit of Mr. Gross. Swalling and Associates has been written repeated letters to stop re-filing previously filed returns.

30.    However, Meritage Management Company, LLC assets are still being used by Bob Gross and RB Enterprises without Mr. Barrett or Mystery Ranch's permission or consent.

31.    In September 2012, Mr. Gross went to Northrim Bank and changed the account name of the Operating Account and in the process had Mr. Barrett removed as a signer from the Meritage Management Company, LLC operating account. This was done without Mr. Barrett's knowledge or consent.

32.    At it's inception Mr. Gross and Mr. Barrett made an "S" Corp election for Meritage Management Company, LLC.

33.    In September 2012, the 2011 tax return for Meritage Management Company, LLC was filed as an "S" Corporation.

Mystery Ranch, LLC v. Bob Gross                                      3AN-14-08418 CI
First Amended Complaint                                              Page 5 of 15

Exhibit 7 -- Page 5 of 15

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

34. In January 2013, all employees/vendors were given W-2/1099 statements from Meritage Management Company, LLC for year-end 2012 and all third party vendors were provided W-9 forms from Meritage Management Company, LLC. These contained an "S" Corp election.

35. In September 2013, Meritage Management Company, LLC filed its 2012 return as an "S" Corp. This return was signed by Mr. Gross.

36. In late January 2014, bookkeeper Dawni Haines, from LPD Bookkeeping and Jeff Cunningham, COO, verified that W-2's were sent to all employees from Meritage Management Company, LLC.

37. In January of 2014, third party vendors were again given W-9 forms for Meritage Management Company, LLC where an "S" Corp election was noted.

38. In May 2014, Mr. Gross claimed that Meritage Management Company, LLC was not really an "S" Corp, but rather a "C" Corp in an email as his justification as to why he should not have a W-2 issued to him for his 2012 and 2013 room and board.

39. Mr. Gross made this claim due to the changes he made to the ownership structure of Meritage Management Company, LLC.

40. Mr. Gross claims that the change in the ownership structure resulted in an "inadvertent" termination of the "S" Corp election.

41. This claim was made in spite of the 2012 and 2013 tax returns being filed as an "S" Corp.

42. In May 2014, Mr. Gross accused Mr. Barrett of being reckless in an effort to justify his actions to change the operations/management of Meritage Management

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross
First Amended Complaint

3AN-14-08418 CI
Page 6 of 15

Exhibit 7 -- Page 6 of 15

Company, LLC.  This action and subsequent actions by Mr. Gross were made in an attempt to cover-up his breach of fiduciary duties, his thefts, his use of corporate assets for personal gain as well as other reasons to be proven during discovery.  Mr. Barrett was never involved in the day to day check writing or disbursement of funds. In fact, Mr. Barrett cannot recall one check that he ever signed for Meritage Management Company, LLC.

43.    The accusation was made in spite of the fact that Jeff Cunningham ran the day-to-day operations and Mr. Barrett travelled out of State frequently for other business affairs.

44.    Mr. Gross offers no evidence to substantiate his claim that Mr. Barrett was "reckless".

45.    Mr. Gross sent Mr. Barrett a six page letter in which he stated that he knew that Mr. Barrett  would not agree to an operating agreement change for Meritage Management Company, LLC wherein Mr. Gross is given unilateral control of operations in complete contrast to the origination of how the asset and operations would be held in entities and joint ownership and management of the day-to-day operating decisions and control.

46.    Mr. Gross' actions were driven, as stated in his various correspondence to Mr. Barrett, their COO, and their CPA, by his desire not to claim compensation for rooms, meals, and gratuity, which was paid by the company and not reported, as personal income and which is a breach of his fiduciary duty and a theft from his partner.

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross                                    3AN-14-08418 CI
First Amended Complaint                                              Page 7 of 15

Exhibit 7 -- Page 7 of 15

47.     Additionally, Mr. Gross did not want to have to document his expenses because there were expenses of a personal nature which were not approved by Mr. Barrett or their COO and which were not in compliance with their CPA, the IRS, or any Loan Agreement which essentially bifurcates profits from being made again which is a breach of his fiduciary duty and a theft from his partner.

48.     Mr. Barrett consulted with a tax attorney, who concurred with their CPA and differed with Mr. Gross' assessment.

49.     Mr. Gross was upset with Mr. Barrett for seeking the consultation with a tax attorney.

50.     On June 19, 2014, Mr. Barrett received a telephone call from Ms. Linda Owens from the IRS informing him that he needed to immediately address the outstanding IRS payroll tax liability for Meritage Management Company, LLC of approximately $28,000.00 for 2013 and 2014.  Ms. Owens did not mention the over-due balance for 2012 which is anticipated to be approximately $22,000.00.

51.     On June 30, 2014, Mr. Barrett was informed that Swalling & Associates were questioning employees about financial processes.  This appears to be audit work of Meritage Management Company, LLC which was not approved by Mr. Barrett or Mystery Ranch.

## COUNT  I
### (Breach of Duty of Good Faith and Fiduciary Duty)

52.     Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

53.     Upon information and belief, RB Enterprises and Gross breached their

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross                                    3AN-14-08418 CI
First Amended Complaint                                              Page 8 of 15

Exhibit 7 -- Page 8 of 15

duty of good faith and fiduciary duties owed to Meritage Management, LLC, Mr. Barrett and Mystery Ranch.

54.    Upon information and belief, RB Enterprises and Gross breaches by, among other things, engaging in what can be properly described as mismanagement and misappropriation, as more fully described above.

55.    RB Enterprises and Gross also breached their fiduciary duties by, among other things, (1) to engaging in related-party transactions that were fraudulent and/or not for reasonable value; (2) to pay expenses that were not related to the businesses; (3) to enter into or undertake other transactions and transfers that were unrelated to the businesses and/or did not provide reasonable value to the businesses;  (4) to enter into joint ventures with third-parties without the knowledge and consent of the other members of the LLC and (5) re-filing false and fraudulent tax returns with the IRS.

56.    RB Enterprises and Gross breaches have damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

### COUNT  II
**(Implied Covenant of Good Faith and Fair Dealing)**

57.    Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

58.    There is covenant of good faith and fair dealing implied in all contracts and LLC's.

59.    RB Enterprises and Gross breached the covenant of good faith and fair dealing implied owed to Meritage Management, LLC and Jack Barrett and Mystery Ranch, among other things, engaging in what can be properly described as fraud,

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

mismanagement and misappropriation, as more fully described above.

60.    RB Enterprises and Gross breached the covenant of good faith and fair dealing by, among other things, denying plaintiffs "the full, exclusive and unrestricted use and possession" of the Business Offices including changing all locks and passwords.

61.    RB Enterprises and Gross breaches of the covenant of good faith and fair dealing have damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

62.    RB Enterprises and Gross breaches of the covenant of good faith and fair dealing were done intentionally and with reckless disregard for the rights of Plaintiffs and entitle Plaintiffs to punitive and exemplary damages in an amount to be established at trial.

## COUNT III
### (Breach of Fiduciary Duties - Common Law and AS 10.50.135)

63.    Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

64.    As one of the managers of Meritage Management, LLC. Gross owed fiduciary duties to act with care, honesty, and with loyalty to, and exercise good business judgment for, Plaintiffs, and he breached those duties.

65.    Further, RB Enterprises and Gross engaged in conduct that can be properly described as fraudulent, mismanagement and misappropriation, as more fully described above.

66.    All related party transactions that were not specifically approved by the

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross                                  3AN-14-08418 CI
First Amended Complaint                                            Page 10 of 15

Exhibit 7 -- Page 10 of 15

other members to the LLC, are void under AS 10.50.140.

67.     RB Enterprises and Gross breaches of fiduciary duties to Plaintiffs have damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

68.     RB Enterprises and Gross breaches of fiduciary duties were done intentionally and with reckless disregard for the rights of Plaintiffs and entitle Plaintiffs to punitive and exemplary damages in an amount to be established at trial.

## COUNT V
### (Intentional Spoliation of Evidence)

69.     Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

70.     Gross had an obligation, both as a member of a limited liability company and as a fiduciary, to maintain and preserve the business records.

71.     Gross has intentionally destroyed or altered records belonging to Meritage Management in an effort to both cover up his improper conduct and to make it difficult for the Plaintiffs to bring claims against them.

72.     RB Enterprises and Gross either altered, erased or "scrubbed" data from computers or operating systems in an effort to both cover up his improper conduct and to make it difficult for Plaintiffs to bring claims against them.

73.     The above described conduct has damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

74.     The conduct of RB Enterprises and Gross was done intentionally and

**Law Office of Paul D. Stockler**
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

1    with reckless disregard for the rights of Plaintiffs and entitles Plaintiffs to punitive and

2    exemplary damages in an amount to be established at trial.

3    ## COUNT VI
     ### (Conversion)

4    75.    Plaintiffs reallege and incorporate by reference all paragraphs of this

5    Complaint.

6    76.    RB Enterprises and Gross have wrongfully and intentionally denied

7    Plaintiffs possession of personal property, including without limitation business

8    records, files, and computers.

9

10   77.    RB Enterprises and Gross conversion of property has damaged Plaintiffs

11   in an amount exceeding $100,000, the exact amount to be proven at trial.

12   78.    RB Enterprises and Gross conversion of property was done intentionally

13   and with reckless disregard for the rights of Plaintiffs and entitles Plaintiffs to punitive

14   and exemplary damages in an amount to be established at trial.

15   ## COUNT VII
     ### (Unfair Trade Practices Act)

16

17   79.    Plaintiffs reallege and incorporate by reference all paragraphs of this

18   Complaint.

19   80.    RB Enterprises and Gross used related-party agreements, entered into

20   fraudulent and/or misleading transactions in whole or in part and constitute "unfair or

21   deceptive acts or practices" prohibited under AS 45.50.471.

22   81.    The unfair and deceptive acts have damaged Plaintiffs in an amount

23   exceeding $100,000, the exact amount to be proven at trial, and entitle Plaintiffs to an

24

25   Mystery Ranch, LLC  v.  Bob Gross                                    3AN-14-08418 CI
     First Amended Complaint                                             Page 12 of 15

26

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Exhibit 7 -- Page 12 of 15

1  award of treble damages, punitive damages, and full actual attorney's fees under the

2  Act.

3  ## COUNT VII
### (Misrepresentation)

4
5  82.    Plaintiffs reallege and incorporate by reference all paragraphs of this

6  Complaint.

7  83.    RB Enterprises and Gross misrepresented, negligently or intentionally,

8  the terms of the agreements and the amounts due thereunder, including invoices  of

9  unsupported services and expenses.

10  84.    RB Enterprises and Gross made misrepresentations, negligently or

11  intentionally, in causing  expenses unrelated or of no benefit to Meritage Management,

12  LLC.

13  85.    The misrepresentation have damaged Plaintiffs in an amount exceeding

14  $100,000, the exact amount to be proven at trial.

15  ## COUNT IX
### (Fraudulent Conveyance - AS 34.40.010)

16
17  86.    Plaintiffs reallege and incorporate by reference all paragraphs of this

18  Complaint.

19  87.    RB Enterprises and Gross caused Meritage Management to pay

20  expenses for unsupported services and charges.

21  88.    Certain conveyances, payments, and/or transfers were fraudulent and

22  were made with the intent to hinder, delay, or defraud the company and the other LLC

23  members.

24

25
26

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross                                    3AN-14-08418 CI
First Amended Complaint                                              Page 13 of 15

Exhibit 7 -- Page 13 of 15

89.  All such fraudulent conveyances are void and have damaged Plaintiffs in an amount exceeding $100,000, the exact amount to be proven at trial.

## COUNT X
### (Permanent and Provisional Injunctive Relief)

90.  Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint.

91.  As set forth above, upon information and belief, Plaintiffs are being irreparably harmed by those breaches.

92.  Plaintiffs can and will show probable success on the merits and, at a minimum, have raised serious and substantial questions going to the merits of the case.

93.  Plaintiffs are entitled to immediate and/or permanent injunctive relief against Bob Gross including removing him as manager, removing the personal belongings and possessions of his and the surrender from of all business records, computers, hard drives, files, and any other items or furnishings paid for by the company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against the Defendants granting the following relief:

1.  Compensatory, consequential, treble, and punitive damages in an amount to be proven at trial, but in any event in excess of $100,000;

2.  Injunctive relief removing Bob Gross;

3.  Immediate access to the property, office, books and records and

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross                                    3AN-14-08418 CI
First Amended Complaint                                              Page 14 of 15

Exhibit 7 -- Page 14 of 15

computers of all related entities;

4.    Actual attorney's fees and costs;

5.    Pre-judgment and post-judgment interest at the highest allowable rate; and

6.    Such other and further relief as this court may deem just and equitable.

DATED this 1st day of December, 2014 at Anchorage, Alaska.

LAW OFFICE OF PAUL D. STOCKLER
Attorney for Plaintiffs

By:_____
       Paul D. Stockler
       Alaska Bar No.: 8606032

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of December, 2014, a true and correct copy of the foregoing document was served via mail on the following:

Bruce E. Falconer
Boyd, Chandler & Falconer, LLP
911 W. 8th Avenue, Suite 302
Anchorage, Alaska  99501

_____
Scott G. LeFebvre

Law Office of Paul D. Stockler
1227 W. 9th Avenue, Suite 301
Anchorage, Alaska 99501
(907) 277-8564 fax (907) 272-4877

Mystery Ranch, LLC  v.  Bob Gross
First Amended Complaint

3AN-14-08418 CI
Page 15 of 15

Exhibit 7 -- Page 15 of 15

Paul D. Stockler (Alaska Bar No. 8606032)
**LAW OFFICE OF PAUL D. STOCKLER**
813 W. 3rd Avenue
Anchorage, AK 99501
Email: paulstockler@gmail.com
Ph.: 907-230-1441
Fax: 907-258-8751

*Counsel for Plaintiffs*

## IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
## THIRD JUDICIAL DISTRICT AT ANCHORAGE

| | |
|---|---|
| MYSTERY RANCH, LLC and JACK BARRETT, | **MOTION TO CONFIRM ARBITRATION AWARD** |
| Plaintiffs, | |
| vs. | |
| BOB GROSS and RB ENTERPRISES, LLC, | **Case No. 3AN-14-08418 CI** |
| Defendants. | |

Mystery Ranch, LLC and Jack Barrett, by and through their counsel of record, hereby submit this Motion to Confirm Arbitration Award. Mystery Ranch, LLC and Jack Barrett respectfully show the Court as follows:

### ARGUMENT

As per the operating agreement between Plaintiffs and Defendants, Plaintiffs and Defendants entered into a written agreement which included an arbitration clause. Pursuant to the arbitration agreement referenced above, on or about September 12, 2018 through September 18, 2018, an arbitration was conducted and testimony and evidence were presented to Arbitrator

Exhibit 8 -- Page 1 of 33

William Bankston. Thereafter, on November 9, 2018, and also pursuant to a modification thereof on December 21, 2018, the Arbitrator rendered an award of $272,189.82 to Plaintiffs. *A copy of the Decision and Interim Award and the Modification Decision are attached hereto as Exhibits "A" and "B" respectfully.*

The amount originally set forth in the Arbitration award to the Plaintiffs herein was $272,189.82. Since that time, interest has accrued, one payment has been made, and the total amount due to Plaintiffs as of March 12, 2019 is $268,759.42.

The Arbitrator's award was made in accordance with the terms and provisions of the parties' Arbitration agreement and is in all respects proper. It is anticipated that this award may be further augmented by an award of attorney's fees which Plaintiffs have requested and the Arbitrator has not yet ruled. The Arbitrator further specifically precluded Plaintiffs from registering this Arbitration award with the Alaska Superior Court until this time.

Although the Arbitrator has not rendered this award directly against co-Defendant Bob Gross, Plaintiffs specifically reserve the right to pursue personal liability of Bob Gross based upon alter ego or other legal principles.

Pursuant to Alaska Revised Statute AS 09.43.110, Plaintiffs respectfully request that this Court enter an order confirming the Arbitration award and further enter a judgment against RB Enterprises, LLC. Plaintiffs further request such other relief as the Court may deem proper.

DATED this ___19th___ day of March, 2019.

**LAW OFFICE OF PAUL D. STOCKLER**
*Counsel for Plaintiffs*

By:_____
      Paul D. Stockler

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the ___19th___ day of March, 2019, a true and correct copy of the foregoing **MOTION TO CONFIRM ARBITRATION AWARD** was served by:

( ) facsimile
( X ) hand delivery
( X ) first class mail

on the following attorney(s) of record:

Bruce E. Falconer
BOYD, CHANDLER & FALCONER, LLP
911 W. 8th Avenue, Suite 302
Anchorage, Alaska 99501

Lorena Perez-Garcia
AMERICAN ARBITRATION ASSOCIATION
45 E River Park Place West, Suite 308
Fresno, CA 93720

_____
Paul D. Stockler

# IN THE MATTER OF THE ARBITRATION OF

MYSTERY RANCH, LLC and )
JACK BARRETT, )
)
                Claimants, )    **AAA Case No. 01-15-0005-1171**
and )
)
BOB GROSS and )
RB ENTERPRISES, LLC, )    **DECISION AND INTERIM AWARD**
)
                Respondents. )

    I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and having been duly sworn, and having duly heard the proofs and allegations of the Parties, hereby enter the Decision as follows.

    The hearing in this arbitration matter began on September 12 for six days, ending on September 18, 2018. Oral argument was held telephonically on September 21, 2018. The following witnesses testified:

    Jack Barrett; Elizabeth M. Przywojski;[1] representative from American Express, Mario Morales-Arias;[2] Michael Mohn; Richard Sorge; Jeremiah Grant; Peter H. Burns; Jeffrey T. Cunningham; Dawn E. Barrett; James O. Wood; Robert A. Gross; and William G. Schlegel.

    All parties were offered the opportunity to present the witnesses they desired to call and cross examine the witnesses. Each party received an equal allocation of time.

    Claimants[3] offered Exhibits 1-378; Respondents[4] offered Exhibits in five notebooks designated RA to RV with tabs for multiple exhibits. All exhibits were admitted.

---

[1] C. Cody Tirpak, attorney for Elizabeth Przywojski, was present during Ms. Przywojski's testimony.

[2] Matthew McGuane, attorney for American Express, was present during Mr. Morales-Arias' testimony.

[3] Claimants will sometimes be collectively referred to in this Decision as Mystery Ranch.

DECISION AND INTERIM AWARD
M3792\65\ORDERS\DECISION

Page 1 of 17

Mystery Ranch, LLC (Mystery Ranch) presented a number of claims. RB Enterprises, LLC (RB) defended against the claims. The Arbitrator offered to continue to retain jurisdiction to arbitrate future disputes, but the parties declined this offer. These parties have demonstrated an inability to work together. Both parties have acted in bad faith and engaged in attacks against the other. Mystery Ranch has utilized self-help in attempting to remove Bob Gross as the Manager and divert IT funds to Mystery Ranch. Bob Gross has failed to inform Mystery Ranch of partnership business information and decisions and has taken unilateral actions for his own benefit. This Decision will eliminate many of these conflicts in the future; however, the Decision may not prevent future arbitrable disputes.

**The Operating Agreement.** When the parties entered into the Operating Agreement, Gross indicated that the Operating Agreement had to be signed quickly. Barrett signed the Operating Agreement without having it reviewed by an attorney.[5] Gross then changed the Operating Agreement without talking to Barrett and submitted the changed Operating Agreement to AHFC.[6] Gross changed Managing Members to Members; and changed paragraph numbers to letters; and changed the capital contribution from $1,000 to $1,100 in Section 6.1(a). The Arbitrator rules that Section 6.1(a) shall be "$1,000 each" for the capital contribution for all future partnership financial reporting. Gross changed Section 8(l) to Members so that it conformed to the introductory language of Section 8. Section 8 states the Members shall approve the expenses listed. If this section is interpreted literally, the partnership cannot function. Gross and Mystery Ranch have proven incapable of coming to any agreement concerning expenses. The Arbitrator rules that the expenses for IT will continue to be incurred and paid as in the past partnership operations except as modified by this Decision.

Gross did not change the indentation of paragraphs 19.7, 19.8 and 19.9, thereby leaving Barrett's signature and adding Gross' signature to the changed Operating

---

[4] Respondents will sometimes be collectively referred to in this Decision as RB Enterprises.

[5] Operating Agreement R Book (1), D(4).

[6] *See* transmittal email to AHFC, Claimants' Replacement Exhibit 3.

DECISION AND INTERIM AWARD
M3792\65\ORDERS\DECISION

Exhibit ___A___   Page 2 of 17

Exhibit 8 -- Page 6 of 33   Page   2   of   18   Pages

Agreement. One change to the Operating Agreement is important. Gross changed Section 12.4 to eliminate "of Managing Members." The section now reads that no Member shall have any recourse therefore, upon dissolution or otherwise, against the "person or personal assets of any Member." The Arbitrator rules that in any future dispute where Section 12.4 is relevant; Section 12.4 will read as follows.

> Recourse of Members. Each Member shall look solely to the actions of the Company for all distributions with respect to the Company and such Member's Capital Contribution thereto and share of Profits and Losses thereof, and shall have no recourse therefore, upon dissolution or otherwise, against the person or personal assets of Managing Members or any Member.

The other changes to the Operating Agreement were not material to the issues in this dispute and do not influence the Arbitrator's decision.[7] Other than this Decision, the Arbitrator makes no other ruling on the Operating Agreement. Gross should have informed Mystery Ranch of the changes. The Operating Agreement is silent about any self dealings, conflicts of interest, or dealings with affiliates. Therefore, where the Operating Agreement is silent, it will be governed by the Alaska Statutes and this Decision.[8]

**Dealing With Affiliates.** Gross has taken the position that as the Manager of IT, he has broad powers to enter into contracts on behalf of IT, as well as enter into contracts with himself or his affiliates without notice or approval of Mystery Ranch. The Arbitrator rules that when Gross deals with Tower Properties or Glacier Properties or their affiliates (collectively, Gross Affiliates), Melodie Gross, or himself, Gross will be subject to the requirements of this section. All existing and future contracts which IT has entered into with the Gross Affiliates will be subject to this section. In dealing with Gross Affiliates, Gross shall obtain at least two competing bids for all existing and future contracts. All contracts with Gross Affiliates will be at or below the fair market value with commercially reasonable terms for any work, project, or service. The Gross Affiliates

---

[7] Claimants' Replacement Exhibit 3.

[8] *Id.* at Section 1.2.

DECISION AND INTERIM AWARD
M3792\65\ORDERS\DECISION

Exhibit _A_
Page _2_ of _18_ Pages
Exhibit 8 -- Page 7 of 33

Page 3 of 17

may not file any lien against IT or its property for any work performed. IT will accept the lowest responsible bidder. In the event any Gross Affiliate which performs any work on the premises, that entity will be fully licensed, bonded and insured for worker's compensation and liability.[9] IT will not pay for any Gross Affiliate's licensing, bonding or insurance, nor will IT reimburse any Gross Affiliate for such costs. All contracts and work will satisfy the AHFC requirements. Any such contracts and bids will be copied to Mystery Ranch prior to award and after award. All existing Gross Affiliate contracts will be subject to this section. Within 60 days of this Decision, Gross will furnish all third party and all Gross Affiliate contracts to Mystery Ranch and any amendments to the contracts. In the future, Gross will provide all contracts to Mystery Ranch within 30 days of the execution of any contract. Within 120 days from the date of this Decision, all existing contracts (Gross Affiliate and all existing contracts) which are cancellable in 30 days will be rebid. All future contracts as they expire will follow this procedure. This section does not apply to Bob Gross' or Melodie Gross' compensation.

**Management of Inlet Towers**. Mystery Ranch arbitrated disputes that it had with the management by IT, LLC (IT). The arbitration included any claims by or against Meritage Management, LLC related solely to IT and RB.[10]

**Fiduciary Duty**. Mystery Ranch has asked that the Arbitrator determine whether Bob Gross, as the Manager, has a fiduciary duty to Mystery Ranch. Alaska Statutes define the duty of one member to another as follows:

> **(a)** Except as otherwise provided in the company's articles of organization, the members of a limited liability company manage the affairs and make the decisions of the company. Management by the members is subject to a provision in an operating agreement or this chapter limiting or increasing the management rights and duties of the members, including limits or increases placed on a class of members or an individual member.

---

[9] The Arbitrator assumes Gross has opted out of workers compensation coverage. *See* R Book (4), L(8). Since Gross performs work and can be injured and could lien IT property, Bob Gross and Melodie Gross will be added to the workers compensation coverage.
[10] See Order No. 3.

**(b)** If a limited liability company is managed by a manager, the manager has the exclusive power to manage the affairs of the company to the extent authorized by the operating agreement.[11]

. . .

**(a)** A person who is a manager or a managing member of a limited liability company shall perform the duties of management in good faith, in a manner the person reasonably believes to be in the best interests of the company, and with the care, including reasonable inquiry, that an ordinarily prudent person in a like position would use under similar circumstances. Except as provided in (b) of this section, the person is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, in each case prepared or presented by

**(1)** an employee of the company whom the person reasonably believes to be reliable and competent in the matters presented; or

**(2)** counsel, public accountants, or other professionals or experts as to matters that the person reasonably believes to be within the professional's or expert's competence.

**(b)** A person is not acting in good faith under (a) of this section if the person has knowledge concerning the matter in question that makes reliance otherwise permitted by (a) of this section unwarranted.[12]

Because of Bob Gross' actions in assuming complete control of the IT partnership with little or no input from Mystery Ranch, Bob Gross has in fact assumed a fiduciary duty. This fiduciary duty is furthermore enhanced by the case law interpretation in Alaska. Therefore, the Arbitrator finds that from the date of this Decision forward, Bob Gross, as Manager, will have a fiduciary duty to Mystery Ranch.[13]

**Dissolution of IT.** Mystery Ranch has requested that IT be dissolved. Dissolution would require the property to be sold and all liabilities paid. The sale of this property is a decision for IT. Mystery Ranch's request for dissolution is DENIED.

**Financial Records.** Mystery Ranch complained throughout this proceeding that it was not able to obtain copies of IT's financial records. The Operating Agreement

---

[11] AS 10.50.110.

[12] AS 10.50.135.

[13] *See generally Alaska Interstate Constr., LLC v. Pacific Diversified Investments, Inc.,* 279 P.3d 1156 (Alaska 2012).

DECISION AND INTERIM AWARD
M3792\65\ORDERS\DECISION

Page 5 of 17

provides the right to copy and review the records.[14] Mystery Ranch owns 50% of IT. Mystery Ranch is entitled to access to all of the financial records of IT. Mystery Ranch will not be allowed to manipulate, alter, or destroy any financial records. In response to Mystery Ranch's request for future access to IT's financial information, IT shall provide Mystery Ranch within 30 days of this Decision with CPA level access[15] to its QuickBooks accounts, allowing Mystery Ranch to view the entirety of bookkeeping entries. In the event that IT changes its use of QuickBooks and/or adopts another accounting system, IT shall pay for any software necessary for Mystery Ranch to have the same CPA access to any new bookkeeping system. If Mystery Ranch does not have the software to access the current QuickBooks accounts, IT will purchase the software for Mystery Ranch.

Mystery Ranch was not able to access the Roommaster program. Mystery Ranch did not have the software to access Roommaster. Within 30 days of this Decision Gross will contact the Roommaster software company to give Mystery Ranch access to the Roommaster data. IT shall pay for Mystery Ranch's acquisition of the software, if required, for Mystery Ranch to access Roommaster. Mystery Ranch will not be allowed to alter, delete, or manipulate any Roommaster entries. If Roommaster software owns Roommaster, this ownership should be clarified and a license for the software should be furnished to Mystery Ranch at IT's expense. If IT changes software or accounting systems from Roommaster, it shall provide the computer software program to Mystery Ranch for access to the information.

As Manager, Gross has failed to furnish adequate material information to Mystery Ranch. All communication with AHFC, including all notices received from AHFC and all emails and letters to and from AHFC, shall be copied simultaneously to Mystery Ranch when they are received or sent without exception.

**Capital Projects/Deferred Maintenance.** IT has engaged in capital projects, (which may also include substantial improvements which are allowed a tax deduction as

---

[14] Claimants' Replacement Exhibit 3, Section 13.4.
[15] The CPA level access will not allow any deletions or cancellation of data.

an expense). The sums of money to bring the alarm systems into compliance with MOA codes will be paid by IT. The Arbitrator rules that the premises will be MOA code compliant as to the alarm system within thirty (30) days of this Decision. The arctic entry will be completed by IT and code compliant. When the parties entered into the transaction, significant deferred maintenance remained to be performed. Much of the deferred maintenance has been accomplished. In the future, capital projects in excess of $50,000 must be approved in advance by Mystery Ranch. The budget for capital projects will be prepared by Gross as the Manager on an annual basis and furnished to Mystery Ranch beginning March 1, 2019. Any dispute over a capital project or the capital project budget will be resolved through arbitration.

**Mystery Ranch's Attempts at Self-Help**. Mystery Ranch engaged in its own self-help by changing the locks at Inlet Towers in an attempt to take over the premises and remove Bob Gross as manager. Mystery Ranch attempted to utilize its own self-help to remove Gross from management of IT were improper and have resulted in a protective order being entered by the Superior Court.[16] Unless this protective order is changed by the Superior Court, this protective order will remain in place for the life of the partnership.

**Loan to Mystery Ranch**. When this transaction was formed, Mystery Ranch paid the money to close the transaction. Mystery Ranch paid the money under the assumption that IT would carry a debt on its books and repay Mystery Ranch. When the asset was purchased, it was Barrett's understanding Mystery Ranch would be repaid its money within one year. The money was not paid within one year.

The failure to pay Mystery Ranch and the financial difficulties experienced by the Barretts were a contributing factor to many actions taken by Mystery Ranch. The initial tax return was prepared by Gross. The initial tax return was amended and the amendment was prepared by CPA Przywojski.[17] The amended tax return properly reflects the initial capital account opening balances of the tax returns for IT without a liability of IT to

---

[16] R Book (2), H(5).
[17] Claimants' Exhibit 28.

DECISION AND INTERIM AWARD
M3792\65\ORDERS\DECISION

Mystery Ranch. Mystery Ranch's request to have IT incur a liability for the repayment of this money is DENIED.

Mystery Ranch took many of its actions in an attempt to obtain payment for money it loaned. Some payments were made. Some payments were sent to the wrong address. Some payments were tendered and the checks not cashed.

Mystery Ranch and Barrett attempted its own self-help to collect funds from IT. Mystery Ranch set up new bank accounts for IT. Bank accounts were established at Wells Fargo for IT. By communications with American Express (AMEX), AMEX funds were diverted from IT's merchant accounts and placed under Barrett's control. Barrett managed to divert $196,088.31 AMEX funds from IT's merchant account to an account controlled by Barrett. These funds were the property of IT. The diversion of funds and interference with the AMEX accounts was entirely improper. From AMEX's testimony, AMEX has written off this balance.[18] Gross requests that $196,088.31 which was disposed of by Barrett be credited to the Mystery Ranch loan.[19] The amount of $196,088.31 is credited to the balance of the Mystery Ranch loan. The AMEX money was an asset of IT and was diverted to Barrett's control. Barrett received the benefit of the funds. What Barrett did with the money and to whose benefit the funds went was under the control of Barrett. Therefore, the Arbitrator finds that the $196,088.31 is credited to the balance of the Mystery Ranch loan. The Arbitrator has calculated the sums due on the Mystery Ranch loan as *Exhibit A*. The loan to Mystery Ranch will bear interest at 7.5% as set forth in *Exhibit A*. If any party disputes the calculations, they may file their dispute by November 19, 2018. Any reply will be due by November 29, 2018.

The Mystery Ranch loan shall be paid by RB within 120 days of this Decision. The Arbitrator has ordered IT to pay all funds paid to the AAA by both parties.[20] After IT has paid the funds to the AAA, the funds paid to RB will be paid by RB to Mystery Ranch and credited to the sums owed on the Mystery Ranch loan. If the Mystery Ranch

---

[18] The Final Audit placed a $196,000 contingent liability for this sum.

[19] R Book (1), E(2), p.2.

[20] *See* AAA Fees, *supra*, p.16.

loan is not paid within 120 days of this Decision, the loan balance may be reduced to judgment.[21] Mystery Ranch is prohibited from executing on RB Enterprises, LLC's interest in IT, LLC for a period of 270 days from the date of this Decision. After 270 days from the date of this Decision and if the Mystery Ranch loan amount is reduced to judgment, Mystery Ranch is entitled to execute on RB Enterprises' interest in IT, LLC. If reduced to judgment, Mystery Ranch can execute on any other RB Enterprises' asset after judgment except as set forth herein.

Tax Issues. Mystery Ranch asserted numerous allegations concerning the tax treatment of expenses and the tax filings by Gross in relationship to IT and Meritage. These tax issues related to whether Bob Gross and Melodie Gross were entitled to receive free room and meals without paying a tax, whether Gross made the appropriate tax reporting for trade outs, the issues surrounding the difference between Meritage as an S-corporation when it was changed to a C-corporation, and whether there would be a tax liability resulting from the transfer of property from Meritage to IT. Mystery Ranch asserted the transfer from Meritage to IT was a statutory merger and done without Mystery Ranch's approval as required by the Operating Agreement and that an underestimated tax liability would be due because of the value of property transferred to IT. The oral lease between IT and Meritage Management was cancelled in 2014.[22] All the assets of Meritage Management were owned by IT. IT is owned by Mystery Ranch and RB. Mystery Ranch is owned by Jack Barrett and Dawn Barrett. RB is owned by Bob Gross and Melodie Gross. The transfer has been completed. No merger in the legal statutory framework occurred.[23] There is no cause of action by IT, Meritage Management, Mystery Ranch or RB relating to this transfer; however, the indemnity provisions set forth below for any tax liability apply to this transfer by Gross.

With regard to all tax transactions, Bob Gross, individually, shall indemnify and hold IT and Mystery Ranch harmless from any tax liability to IT, as determined by the

---

[21] The loan may be reduced to judgment pursuant to Alaska law in the Superior Court, Third Judicial District in Anchorage, Alaska.
[22] Claimants' Exhibit 252.
[23] R Book (1), D(56).

Internal Revenue Service (IRS).[24] The tax treatments which Gross has taken are decisions by Gross which largely benefit Gross. In the event a claim is made by the IRS related to any tax issue, and it is ultimately determined by the IRS that a tax liability is owed by IT or Mystery Ranch, Gross shall pay all accountants' fees, attorney's fees, expert witness fees, the taxes, penalties and interest incurred by IT and shall pay Mystery Ranch the tax liability resulting from the tax filings for IT. All payments made by IT to any IT attorney, IT expert and IT accountant for defense of any IRS audit concerning the tax issues shall be paid or repaid by Gross to IT. In the event that Gross owes any money, as a result of any indemnity agreement as set forth in this Decision, then in that event that sum will be paid solely out of any distribution to RB, with interest at the rate of 7.5% from the date the payment was due. The sum due pursuant to any indemnity established by this Decision shall not be reduced to judgment against Gross.

**Communications With the IRS.** Mystery Ranch has filed communications with the IRS to dispute tax filings by Gross. These filings resulted in accounting expenses to IT. No fees are awarded to RB or IT based on these recent communications. In the future, Mystery Ranch shall communicate any exception with a tax filing with the IRS by filing Form 8082 or any other means in which the IRS, by statute or regulation, allows communication from a member of an LLC to the IRS to question the tax treatment of any action taken by Gross. All other communication with the IRS by Mystery Ranch is impermissible.

**Compensation to Bob Gross and Melodie Gross.** The Arbitrator has reviewed the evidence concerning the Gross' employment and the compensation which the Grosses receive. The Arbitrator finds that the compensation to Bob Gross and Melodie Gross is equivalent to and in some cases less than the cost to hire third party property managers.[25] The management fees charged by third parties support the Arbitrator's finding that the management fees, free rooms, meals, and bar credit fees paid by IT to Bob Gross and

---

[24] No actual tax liability of Mystery Ranch was proven. Mystery Ranch's expert, Przywojski could not testify to any dollar amount of tax liability owed by Mystery Ranch resulting from Gross' actions related to tax issues.

[25] *See* R Book (4), L(6) p.92; L(13); L(15); L(16).

Melodie Gross are within the scope of what a third party would charge. The management fees are allowed by the AHFC documents.[26] Gross shall remain as the manager of IT. Neither Jack Barrett ("Barrett") nor Jeffrey Cunningham ("Cunningham") will replace Gross as the manager.

Gross unilaterally increased Melodie Gross' and his compensation without approval of Mystery Ranch.[27] Since Gross could take such action in the future without allowing Mystery Ranch any input in the decision, the Arbitrator finds it necessary to limit Bob Gross' and Melodie Gross' compensation increases. Having found that the existing employment compensation as of September 21, 2018 is reasonable, Bob Gross' and Melodie Gross' compensation is fixed as of September 21, 2018 and will not be increased except by five percent annually to the guaranteed compensation of Bob Gross and the salary of Melodie Gross commencing in 2020. If Bob Gross or Melodie Gross desires to have their compensation increased beyond this amount, Mystery Ranch must approve of any increase. No such increase will violate the terms of the AHFC loan documents. If Mystery Ranch does not approve, the compensation will remain as ordered or the parties can arbitrate the dispute.

**Improvements to Gross' Living Quarters.** Bob Gross and Melodie Gross receive free, non-taxable apartments from IT for their living quarters. They have not built out or improved the space.[28] Any improvements to Gross' living quarters will not be made by IT, but must be made by Gross or RB from independent funds. Once those improvements are made, and the receipts are available, copies of the entire costs of improvements will be furnished to Mystery Ranch. When IT is sold, Bob Gross and/or RB will not be reimbursed by IT for the cost of the improvements. Any such improvement costs can be paid to Gross or RB from the distribution, if any, to RB Enterprises. Bob Gross and Melodie Gross will indemnify and hold harmless IT for any and all liens for nonpayment of these improvements.

---

[26] Claimants' Exhibit 9, First Loan Agreement, Section 4.14.
[27] Barrett approved $5,000 per month for a general manager. R Book (4), L(7).
[28] R Book (4), L(24).

**Employment Agreements.** Gross has stated the Operating Agreement is his employment agreement.[29] Bob Gross and Melodie Gross shall execute written employment contracts within 90 days of this Decision which will contain the conditions of their employment which exist as of September 21, 2018 with the five percent annual increase commencing in 2020. The employment agreements will be for their respective compensation, meals, and lodging, including their duties. Bob Gross and Melodie Gross are required to live on the premises. Mystery Ranch made claims for lost profits and unjust enrichment for rooms occupied by Gross (1509, 1510 and 1511);[30] the food and beverage amounts paid for Gross;[31] and the guaranteed payment to Gross and to Melodie Gross.[32] All these claims are DENIED. The employment agreements may be prepared by an attorney familiar with the tax treatment of these issues. The attorney's fees for this preparation will be an IT expense.[33]

**Security Deposits.** IT transferred the security deposits which it held on the residential units in Inlet Towers Trust Account to IT's general account.[34] Gross based his decision to transfer the security deposits on the advice given to him by counsel[35] and a teacher of real estate practice classes.[36] Since Gross was closing his real estate company, Gross believed that real estate law required him to transfer all monies in trust to the party to whom the money belonged.[37] The Arbitrator finds that the transfer of the security deposits should not have been made to IT's general account.[38] IT is ordered to segregate the security deposits[39] by the residential units in Inlet Towers into a separate trust account

---

[29] Claimants' Exhibit 345, para. 17.
[30] Claimants' Exhibit 346, Schedule 2, Schedule 7.
[31] *Id.* at Schedule 6a and 6b.
[32] *Id.*, Schedule 12.
[33] *See* Compensation to Bob Gross and Melodie Gross, *supra*, for additional terms of the employment agreements.
[34] Claimants' Exhibit 335.
[35] R Book (3), I(9).
[36] Jerry Royce.
[37] R U(38).
[38] Claimants' Exhibit 374.
[39] Claimants' Exhibit 377, Balance Sheet lists the security deposits as a liability, Account No. 2310.

within 30 days of the Decision and maintain that separate trust account for all residential security deposits collected by IT. In the future, IT is ordered to place all security deposits collected for residential units of Inlet Towers into a trust account for the security deposits.

**Loans From Gross Affiliates.** Gross has loaned money from Gross Affiliates to IT.[40] The loans have been without interest. These loans are approved. Gross has utilized loans to assist with IT's cash flow. Therefore, in the event Gross loans money to IT through himself or Gross Affiliates for cash flow in the future, those loans shall bear interest at 7.5% and shall be evidenced by a promissory note, and copies of the transaction documents shall be furnished to Mystery Ranch, including a receipt when payments are made on the notes.

**Use of Credit Cards—Rebates and Frequent Flyer Miles.** Mystery Ranch complains about Bob Gross' and Melodie Gross' credit cards being reimbursed by IT.[41] The Arbitrator rules that all personal credit card reimbursements for Bob Gross, Melodie Gross or their affiliates, shall be accompanied by a receipt. IT will not reimburse any credit card payment of Bob Gross, Melodie Gross, or Gross Affiliates, not evidenced by a receipt. In the event any expense is charged and/or reimbursed with a receipt, and that expense is disallowed by the IRS, Bob Gross, Melodie Gross, or any Gross Affiliate, will reimburse IT for the disallowed expense within 30 days. All receipts and payments will be furnished to Mystery Ranch on a monthly basis within 20 days after the last day of the month. All Mystery Ranch claims and future claims against Bob Gross and Melodie Gross for frequent flyer miles and rebates are DENIED.

**Request for Forensic Audit.** Mystery Ranch has requested a forensic audit of all of IT's books and records. This request is DENIED.

**Computer.** A computer was furnished to Cunningham. Cunningham considered the computer as his own. The computer was taken from Cunningham by Gross. The

---

[40] R Book (4), M(70).
[41] Claimants' Exhibit 346, Schedule 11.

computer is not Cunningham's property. It was purchased by Meritage Management[42] and it will remain with IT.[43]

**Claim for Cunningham's—5%.** A claim was made by Mystery Ranch that Jeff Cunningham was entitled to 5% membership interest in IT. This claim is DENIED. The Arbitrator makes no finding as to any claim for Jeff Cunningham as it relates to any other relationship between the parties.[44]

**Claim for Spoliation of Evidence.** Mystery Ranch charged that Gross, by canceling the domain name, deleted a number of the Mystery Ranch emails, or that emails were lost resulting in a spoliation of evidence claim. The cancellation of the domain name was within the Manager's authority. By sending emails by way of a specific domain name, the individual assumes the risk that the domain name will be changed or canceled. Therefore, this claim is DENIED.

**Claims Relating to the Use of IT Space and Park Place.** Mystery Ranch made a claim that the use of the boardroom (1507) was improper and requested damages.[45] The boardroom falls under the business judgment rule, and the Arbitrator will not express any opinion or award any damages regarding a lack of revenue from the use of the boardroom. This claim is DENIED.[46] Mystery Ranch made a claim for damages for the conversion of Room 207 to an exercise room, and the use of Room 307.[47] These issues fall under the business judgment rule and the Arbitrator will not award any damages for the use of these rooms; therefore these claims are DENIED. The claims for lost profits for the parking stalls used by Bob Gross, parking stalls not rented by Bob Gross, storage space not rented by Bob Gross, and estimated incremental utility expense; storage and covered parking space[48] are DENIED. All claims for unjust enrichment[49] and lost profits

---

[42] Claimants' Exhibit 102. The assets of Meritage Management were transferred to IT.
[43] R Book (3), O(4), p.3.
[44] *See* Lis Pendens on the Ogden Property, *infra.*
[45] Claimants' Exhibit 346, Schedule 3.
[46] *Id.*
[47] *Id.*
[48] Claimants' Exhibit 346, Schedules 4, 5a, 5b, 15.
[49] *Id.,* Schedules 6a and 6b.

DECISION AND INTERIM AWARD                                        Page 14 of 17
M3792\65\ORDERS\DECISION

Exhibit ___A___

Exhibit 8 -- Page 106 of 337    Page ___41___ of ___18___ Pages

by Mystery Ranch are DENIED. The contract with Park Place[50] is governed by the business judgment rule and will not be reviewed by the Arbitrator.

**Deposit by IT.** A check for $3,000 to FM2 was deposited to IT's account.[51] This money was not authorized by Barrett to be paid to IT. The Arbitrator interprets the testimony and the exhibit[52] to give Mystery ranch a credit of $1,500 to its capital account and $1,500 to RB's capital account. Therefore, the Arbitrator concludes $1,500 of the $3,000 went to RB and should be repaid by RB. RB will pay $1,500 to FM2 in care of Mystery Ranch, plus interest at 7.5% from November 11, 2018 unless it is shown that the use of the funds had been approved by Mystery Ranch. The parties may file within 30 days of this Decision any evidence to support or rebut this conclusion. This payment shall be made within 120 days of this Decision.

**Holding of Checks.** Gross has a practice of holding back, deferring or not cashing checks from IT payable to Gross. No interest will be paid to Gross for deferring cashing any checks.

**Sale of IT.** Both Mystery Ranch and Gross entertained attempts to sell IT. There will be no attempts to sell, contract for sale of the enterprise, or a member's interest, without notice in writing to the other member in advance of the execution of any confidentiality agreement, letter of intent or offer to sell. The Arbitrator makes no finding as to when this property should be sold.

**Unauthorized Payments and Withdrawals.** Mystery Ranch made a claim for unauthorized payments or transfers in the amounts of $387,897.85 and $188,760.95. Mystery Ranch asked that these funds be reimbursed.[53] These transfers are inter-company transfers or ordinary necessary business expenses.[54] All claims set forth in Schedules 13 and 14[55] are DENIED.

---

[50] This contract has expired.
[51] Claimants' Exhibit 5.
[52] R Book (4), M(30).
[53] Claimants' Exhibit 346, Schedules 13 and 14.
[54] R Book (4), M(01-23).
[55] Id.

**Claim for Audit Fees**. IT made a claim for reimbursement for $153,491 for the cost of two audits.[56] Audited financial statements are required by the AHFC loan documents. Gross believed AHFC might waive the requirement for audited financial statements. The audits may have arisen from Mystery Ranch's questioning AHFC and asking AHFC to remove Gross as manager. Had Gross communicated more effectively with Mystery Ranch, the claim might not have arisen.[57] The claim for $153,491 by IT and RB for the audit cost is DENIED.

**AAA Fees**. Mystery Ranch has paid part of the American Arbitration Association ("AAA") fees necessary to proceed to hearing. The total fees paid to the AAA by Mystery Ranch are $52,282.88. Gross or RB paid AAA fees in the past, totaling $10,213.88. IT is ordered to pay to the AAA the total fees paid by Mystery Ranch and RB in the amount of $72,710.64. IT will pay all present or future fees to the AAA for this dispute not to exceed $100,000.[58] If the fees to the AAA should exceed $100,000, then Mystery Ranch and RB will pay any fees in excess of $100,000 equally. The AAA will refund to Mystery Ranch $52,282.88 in fees. The AAA will refund to RB $10,213.88 in fees. All payments to the AAA for these fees by IT will be made within 30 days of this Decision.

**Lis Pendens on the Ogden Property**. This arbitration decision does not address any of the disputes related to the Ogden Property Lis Pendens filed by Bob Gross (Gross), RB, or any Gross affiliates; or related to the Ogden Property or disputes arising from whether the parties had a partnership concerning the Ogden Property; or whether Gross is entitled to any monies from the Ogden Property; or whether the two Lis Pendens recorded against the Ogden Property are valid; or any damages allegedly due Jack Barrett, Dawn Barrett, or Meritage Management (Meritage) related to the Ogden Property arising from the lis pendens. Judge Miller ordered the parties to proceed

---

[56] R Book (5), V(01)

[57] Audited Financial Statements are required by AHFC's First Loan Agreement. Claimants' Exhibit 9, First Loan Agreement, Section 4.3(a).

[58] Claimants' Exhibit 9, First Loan Agreement, Article V(i). No part of this Decision shall be a default under Article V(i); hence all sums in excess of $100,000 shall be paid equally.

to arbitration. Case No. 3AN-14-08418 CI is set for trial in the Anchorage Superior Court before Judge Miller in January 2019. Both parties attempted to make claims concerning their relationship over a development by Mr. Barrett or his affiliates in Ogden, Utah and whether Gross is entitled to any interest in that enterprise or property. The Arbitrator notified the parties during the hearing that they can put on any such evidence, but the Arbitrator did not, would not, and has not considered or ruled on any of the disputes related to any property development in Ogden, Utah, even if that dispute involves Meritage, or any of its affiliates. Similarly, any dispute between the parties involving or relating to 909, Lakeside, Greystone, Petco, or North Ogden Property are not a part of this Decision and arbitration. All these disputes are before Judge Miller.

All other claims and damages by Mystery Ranch and Meritage Management not specifically addressed in this Decision are DENIED.

All other claims and damages by RB and Gross not specifically addressed in this Decision are DENIED.

Both parties shall submit briefs to the Arbitrator as to who is the prevailing party and make a request for costs and attorney's fees.[59] The parties shall file briefs simultaneously on December 10, 2018 with a reply by January 3, 2019. If the parties need an extension, it will be granted by the Arbitrator, upon request, for good cause shown.

The Arbitrator retains jurisdiction until the matters set forth in this Decision have been decided.

DATED: November 9, 2018

By: _William M. Bankston_

William M. Bankston, Arbitrator
Bankston Gronning Brecht P.C.
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503
Tel. (907) 276-1711    Fax (907) 279-5358
wbankston@bgbalaska.com
Note: NEW EMAIL, ADDRESS, and FIRM NAME

---

[59] Operating Agreement, Claimants' Replacement 3 Section 19.4(c).

**EXHIBIT A**

**MYSTERY RANCH LOAN**

| Date | Description | | | Balance |
|------|-------------|---|---|---------|
| 7/1/14 | Loan [1] | 368,117.40 | | 368,117.40 |
| 7/14/14 | Interest 7.5% 14 days | 1,058.96 | | 369,176.36 |
| 7/14/14 | AMEX Funds [2] | | (196,088.31) | 173,088.05 |
| 11/9/18 | Interest 7.5% 1579 days (7/14/14 to 11/9/18) | 56,149.24 | | 56,149.24 |
| 7/31/14 | Payment Tendered [3] | (1,046.87) | | |
| 9/13/14 | Payment Tendered [3] | (1,046.87) | | |
| 9/30/14 | Payment Tendered [3] | (1,013.10) | | |
| 10/31/14 | Payment Tendered [3] | (1,046.87) | | |
| 11/30/14 | Payment Tendered [3] | (1,013.10) | | |
| 2/25/15 | Payment Tendered [3] | (1,170.00) | | |
| 5/8/15 | Payment Tendered [3] | (788.73) | | |
| 6/30/15 | Payment Tendered [3] | (788.73) | | |
| | Total Payments Tendered | | | 79,14.27 |
| | Interest from 7/14/14 to 11/9/18, less payments tendered | | 48,234.97 | |
| 11/9/18 | Total Principal and Interest | | | 221,323.02 |
| | Daily Rate $35.56 | | | |

[1] Claimants' Exhibit 346, Schedule 22a
[2] R. Book 1, (E)2
[3] *Id*.

Exhibit _A_
Page _18_ of _18_ Pages

Exhibit 8 -- Page 22 of 33

## IN THE MATTER OF THE ARBITRATION OF

| | |
|---|---|
| MYSTERY RANCH, LLC and<br>JACK BARRETT,<br><br>                    Claimants,<br>and<br><br>BOB GROSS and<br>RB ENTERPRISES, LLC,<br><br>                    Respondents. | AAA Case No. 01-15-0005-1171<br><br><br>**MODIFICATION OF DECISION<br>AND INTERIM ORDER** |

The parties to this case have made certain filings since the November 9, 2018 Decision and Interim Award (DIA).

Respondents' November 13, 2018 Motion to Correct Calculations in Exhibit A to the Arbitrator's Decision and Interim Award.

Claimants' November 19, 2018 Proposed Post-Decision Calculations.

Claimants' November 26, 2018 Objection to Respondents' Motion to Correct Calculations in Exhibit A to the Arbitrator's Decision and Interim Award.

Respondents' November 29, 2018 Response to Claimants' Proposed Post-Decision Calculations.

The parties filed objections concerning the amount of the American Express funds that should be credited to the Mystery Ranch loan, and the amount that RB has been ordered to pay Mystery Ranch for the Mystery Ranch loan.

### Beginning Loan Balance Due Mystery Ranch

Respondents argue that $187,479 is what RB borrowed from Mystery Ranch and it is that amount, plus interest, less payments, against which the $196,088.31 AMEX funds



Exhibit __B__
Page __1__ of __8__ Pages

should be credited.[1] Respondents argue that Mystery Ranch had to pay its capital contribution of $187,479 which is not a loan. RB characterized in its exhibits that Mystery Ranch was required to make a capital contribution of $187,479. RB contented that the capital contribution ($187,479) credited to Mystery Ranch was not to be repaid. The Arbitrator concluded that Mystery Ranch was promised that all of the money Mystery Ranch advanced would be repaid. Mystery Ranch loaned money on the premise it would be repaid from IT. The Arbitrator agreed that the amount of money that Mystery Ranch loaned could not be a liability of IT. The conclusion that the initial amended tax return as filed was correct is simply to reflect that IT did not borrow this money, but that Mystery Ranch loaned the money to RB. Mystery Ranch expected to be repaid the money that was used to purchase this property by RB and Mystery Ranch. Therefore, the Arbitrator agreed with Mystery Ranch that the amount of money that it advanced was $374,959.78, which amount is the money that must be repaid. Mystery Ranch was told and relied upon the fact that the money it advanced would be repaid. The money could not be repaid by IT. The Mystery Ranch loan could not be listed on IT's balance sheet. Therefore, the Arbitrator concluded that RB would repay Mystery Ranch $374,959.75.[2]

Respondents raise the issue that the Arrowfish Report compounded the interest.[3] The Arbitrator rejected the compounding of interest. The Arbitrator determined that simple interest of 7.5% will be applied to all sums due Mystery Ranch for the loan to RB.

RB made its distribution of $13,000 and $15,000 from IT to pay down the principal loan. Those $13,000 and $15,000 payments were made on September 7, 2012 and October 1, 2012. Other payments were made and received. These amounts should be

---

[1] Motion to Correct Calculations in Exhibit A to Arbitrator's Decision and Interim Award, at p.1.

[2] Respondents do not appear to object to this number of $374,959.78. Respondents argue that only half that amount was the appropriate starting point. The Arbitrator rejected that contention.

[3] Claimants Exhibit 346, at p.17.

Exhibit B

Exhibit 8 -- Page 24 of 33 Page 2 of 8 Pages

credited to the loan from Mystery Ranch to RB. They will be credited first to interest with the balance to reduce the principal.

American Express Funds. Claimants have argued that only one-half of the AMEX funds should be credited to reduce the loan balance due Mystery Ranch because one-half of these funds belonged to Mystery Ranch.[4] The Arbitrator rejected this argument. The amount of the funds (discussed below) were paid by American Express making IT whole. One-half of these funds, even though they belonged to Mystery Ranch, were taken from IT improperly, by a breach of Mystery Ranch's fiduciary duty to IT, and should never have been taken from IT. There is no basis in law or in fact for Mystery Ranch to have taken these funds. Even though the funds have now been replaced by American Express, Mystery Ranch should not profit from its bad faith conduct. Therefore, the entire balance of the American Express funds will be credited against the sums that are due from RB to Mystery Ranch. Mystery Ranch exercised control of those funds, and spent them as it desired.[5] Mystery Ranch argues RB should not get a double benefit from the payment of the AMEX funds. The Arbitrator rejected this argument for the reasons cited herein. If RB received a benefit, so be it. The issue was raised that the AMEX funds were actually the property of Meritage Management. The assets of Meritage were transferred to IT, therefore this is not an issue.

The Arbitrator found the amount of $196,088.31 as the amount of the AMEX funds to be credited to the Mystery Ranch loan. Mystery Ranch asks that the proper amount be $178,655.90, not $196,088.31. Mystery Ranch argues it only received $178,655.90. The Arbitrator decided that the funds that AMEX actually put back in the IT account of $196,088.31 were proper funds to be credited to the Mystery Ranch loan. The Arbitrator was aware of the difference and rejected the $178,655.90 amount advanced by Mystery Ranch. If Mystery Ranch believes it has been unfairly credited this difference, it may have that belief, but Mystery Ranch did not have to pay any costs, fees,

---

[4] Claimants' November 19, 2018 Proposed Post-Decision Calculations, p.2.
[5] Mystery Ranch had control over only $178,655.90. See below.

or damages to IT for Mystery Ranch's wrongful conduct. The decision for the award of the AMEX credit stands at $196,088.31.

## Balance of the Mystery Ranch Loan

The Arbitrator has determined that Exhibit A to the Decision Interim Award is incorrect. The Arbitrator apologizes to the parties. Exhibit A has been revised. The following principals apply to determine the balance of the Mystery Ranch loan. The beginning balance of this loan should be $100,000, plus interest at the rate of 7.5%. The Arbitrator took as the beginning balance of the loan the date of July 1, 2014, of $368,117.40. The Arbitrator assumed that Arrowfish had calculated these numbers correctly and that the payments set forth on Schedule 22A were correct until July 1, 2014. The Arrowfish report was in error. Arrowfish appears to give double credit for the September 7, 2012 payment of $13,000 and the October 10, 2012 payment of $15,000. The revised Exhibit A makes this correction. The reason the Arbitrator selected that date is because the issues with AMEX arose in July, 2014.

The Arbitrator then credited the AMEX funds of $196,088.31 which left a remaining balance of $204,101.18 as of July 14, 2014. There were no further payments received by Mystery Ranch. The revised Exhibit A credits the payments tendered by RB as if they were received by Mystery Ranch to interest and the principal to reduce the loan balance. Since the first and third tendered payments were greater than the accrued interest on that date, the principal balance of the Promissory Note was reduced. The tendered payments of $7,914.27 were not received by Mystery Ranch. The Arbitrator was incorrect in not requiring these funds to be paid. This sum ($7,914.27) should be added to the sums due November 9, 2018 and that total should bear interest at 7.5%. A revised Exhibit A is attached, with all of the corrections making the Mystery Ranch loan balance $272,189.82, as of November 9, 2018, with a per diem rate of $55.93. This is the sum owed by RB to Mystery Ranch.

## Tax and Accounting Treatment

Claimants have raised the issue of the tax and accounting treatment for the repaid AMEX funds. It is not the Arbitrator's decision to determine the tax treatment of the repaid AMEX funds. The tax and accounting treatment of these funds will remain with IT's accountants.

### Payment of the AAA Fees

Both parties have disputed the balances due from the AAA. The numbers contained in the November 9, 2018 Decision and Interim Award are numbers from the AAA. The AAA staff has provided the Arbitrator additional information concerning the payments.

Exhibit B lists the payments made to the AAA. These payments have been furnished by the AAA. Claimants have paid a total of $73,275.[6] Respondents (Gross and Falconer) have paid $10,225. Total payments to the AAA are $83,500.

IT will pay Claimant within ten (10) days of this Modification of Decision and Interim Order the total amount of $73,275. IT will pay Respondents (Gross and Falconer) within ten (10) days of this Modification of Decision and Interim Order the total amount of $10,225.  IT will provide proof of payment of the sums paid to Claimants and Respondents (Gross and Falconer), to the AAA within ten (10) days of this Modification of Decision and Interim Order. Respondents will pay $10,225 to Claimants within 10 days of the IT payment.

As set forth in the November 9, 2018 Decision and Interim Order, IT will pay all of the AAA costs and fees until they exceed $100,000. The Arbitrator's invoice dated December 19, 2018 in the amount of $13,350.88 will be paid by IT within 10 days of this Modification and Interim Order.  Additionally, IT will pay AAA the outstanding Administrative Final Fee due under the Commercial Fee Schedule for the Counterclaim filed by Respondents in the amount of $3,500.00 within 10 days of this Modification and Interim Order.

---

[6] The AAA has $15,992 on deposit from the Claimants. See Exhibit B.

MODIFICATION OF DECISION AND INTERIM ORDER                    Page 5 of 6
M3792\65\ORDERS\ORDER 16

Exhibit _B_

Exhibit 8 -- Page 27 of 38    Page _5_ of _8_ Pages

As the sum of the Arbitrator's invoice and AAA administrative Final Fee exceeds $100,000.00 by $350.88, after IT has paid the Arbitrator's invoice and the AAA administrative fees, IT will have paid a total of $100,000. The remaining balance due on the Arbitrator's invoice in the amount of $350.88, will be borne 50% by Claimant and 50% by Respondents.

In addition, the AAA will invoice Claimants 50% and Respondents 50% of anticipated arbitrator compensation and expenses. Payment by Claimant and Respondents for their half share of anticipated deposits must be paid within twenty (20) days of receipt of AAA's invoice.

If either Claimants or Respondents do not pay the additional sums above $100,000 ordered within twenty 20 days of this Modification and Interim Order, and one party pays a portion of the entire balance due to AAA, that party will have a judgment against the non-paying party. The sums not paid may be reduced to judgment by application to the Superior Court for the party paying the AAA.

All other issues contained in the filings listed on page 1 are denied. This Modification of Decision and Interim Order does not change or modify the November 9, 2018 Decision and Interim Order except as stated herein. This Modification of Decision and Interim Order does not address the received filings related to the $3,000 or the parties' request for costs and attorney's fees.

DATED: December 21, 2018

By: _____
William M. Bankston, Arbitrator
Bankston Gronning Brecht, P.C.
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503
Tel. 907-276-1711   Fax 907-279-5358
wbankston@bgbalaska.com [NEW EMAIL ADDRESS]

## Exhibit A Revised 12/19/18

**Initial Loan** $ 100,000.00
**Interest Rate**
**(simple)** 0.075
**Initial Per Diem** $ 20.55

| Date | Number of Days | Per Diem | With Accrued Interest | Adjustment to Loan | Current Balance |
|---|---|---|---|---|---|
| 9/7/2011 | 0 | $ - | $ - | $ - | $ 100,000.00 |
| 10/26/2011 | 49 | $ 20.55 | $ 101,006.85 | $ 30,250.00 | $ 131,256.85 |
| 11/17/2011 | 22 | $ 26.97 | $ 131,850.20 | $ 61,555.00 | $ 193,405.20 |
| 12/15/2011 | 28 | $ 39.74 | $ 194,517.94 | $ 183,154.78 | $ 377,672.72 |
| 4/12/2012 | 119 | $ 77.60 | $ 386,907.60 | -$ 3,279.69 | $ 383,627.91 |
| 5/14/2012 | 32 | $ 78.83 | $ 386,150.39 | -$ 1,171.11 | $ 384,979.28 |
| 6/8/2012 | 25 | $ 79.11 | $ 386,956.92 | -$ 889.00 | $ 386,067.92 |
| 9/7/2012 | 91 | $ 79.33 | $ 393,286.86 | -$ 13,000.00 | $ 380,286.86 |
| 10/1/2012 | 24 | $ 78.14 | $ 382,162.25 | -$ 15,000.00 | $ 367,162.25 |
| 11/1/2012 | 31 | $ 75.44 | $ 369,501.02 | -$ 1,171.00 | $ 368,330.02 |
| 7/29/2013 | 270 | $ 75.68 | $ 388,764.77 | -$ 8,116.78 | $ 380,647.99 |
| 11/25/2013 | 119 | $ 78.22 | $ 389,955.61 | -$ 4,154.17 | $ 385,801.44 |
| 4/1/2014 | 127 | $ 79.27 | $ 395,869.27 | -$ 4,052.85 | $ 391,816.42 |
| 7/14/2014 | 104 | $ 80.51 | $ 400,189.49 | -$ 196,088.31 | $ 204,101.18 |
| 7/31/2014 | 17 | $ 41.94 | $ 204,814.13 | -$ 1,046.87 | $ 203,767.26 |
| 9/13/2014 | 44 | $ 41.87 | $ 205,609.54 | -$ 1,046.87 | $ 204,562.67 |
| 9/30/2014 | 17 | $ 42.03 | $ 205,277.24 | -$ 1,013.10 | $ 204,264.14 |
| 10/31/2014 | 31 | $ 41.97 | $ 205,565.28 | -$ 1,046.87 | $ 204,518.41 |
| 11/30/2014 | 30 | $ 42.02 | $ 205,779.14 | -$ 1,013.10 | $ 204,766.04 |
| 2/25/2015 | 87 | $ 42.08 | $ 208,426.58 | -$ 1,170.00 | $ 207,256.58 |
| 5/8/2015 | 72 | $ 42.59 | $ 210,322.84 | -$ 788.73 | $ 209,534.11 |
| 6/30/2015 | 53 | $ 43.05 | $ 211,816.02 | -$ 788.73 | $ 211,027.29 |
| 11/9/2018 | 1228 | $ 43.36 | $ 264,275.55 | | $ 264,275.55 |

| | | |
|---|---|---|
| Tendered Payments $7914.27 (7/31/14 - 6/30/15) | $ | 272,189.82 |
| Per Diem at 11/9/2018 | $ | 55.93 |

**Per Diem** = ((previous "current balance")(.075))/365
**With Accrued Interest** = ("num of days")("per diem") + previous "current balance"
**Current Balance** = "with accrued interest" + "adjustment to loan"

## EXHIBIT B

| PAYMENTS TO AAA | | | | |
|---|---|---|---|---|
| 10/6/15 | Paul Stockler | Claimants | $7,000 | |
| 11/10/15 | Bruce Falconer | Respondents | $2,650 | |
| 12/7/15 | Mystery Ranch | Claimants | $7,575 | |
| 12/14/15 | Bob Gross | Respondents | $7,575 | |
| 4/4/16 | Jack Barrett | Claimants | $11,250 | |
| 5/17/18 | Jack Barrett | Claimants | $10,200 | |
| 6/8/18 | Jack Barrett | Claimants | $10,250 | |
| 6/25/18 | Dawn Barrett | Claimants | $9,000 | |
| 6/28/18 | Dawn Barrett | Claimants | $15,000[1] | |
| 10/22/18 | Dawn Barrett | Claimants | $3,000[2] | |
| | | | | |
| TOTAL IN PAYMENTS TO AAA | | | $83,500 | |
| | | | | |
| PAID BY RESPONDENTS (Gross and Respondents' Attorney) | | | | $10,225 |
| PAID BY CLAIMANTS | | | | $73,275 |
| Amount on Deposit with the AAA paid by Claimants | | | | $15,992 |

| AAA FEES | | |
|---|---|---|
| Administrative Filing Fee | $7,700 | |
| Administrative Fee for Counterclaim | $3,500 | |
| Arbitrator Compensation | $33,075 | |
| | | |
| | $44,275 | |
| | | |
| | | |

---

[1] $12,000 applied to Respondents' share.
[2] $1,500 applied to Respondents' share.

Exhibit _B_
Page _8_ of _8_ Pages

Exhibit 8 -- Page 30 of 33

Paul D. Stockler (Alaska Bar No. 8606032)
**LAW OFFICE OF PAUL D. STOCKLER**
813 W. 3rd Avenue
Anchorage, AK 99501
Email: paulstockler@gmail.com
Ph.: 907-230-1441
Fax: 907-258-8751

*Counsel for Plaintiffs*

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
THIRD JUDICIAL DISTRICT AT ANCHORAGE

| | |
|---|---|
| MYSTERY RANCH, LLC and JACK BARRETT, <br><br> Plaintiffs, <br><br> vs. <br><br> BOB GROSS and RB ENTERPRISES, LLC, <br><br> Defendants. | **ORDER CONFIRMING ARBITRATION AWARD** <br><br><br> Case No. **3AN-14-08418  CI** |

On March 12, 2019, Plaintiffs filed with this Court a Motion to Confirm Arbitration Award. Plaintiffs have conclusively demonstrated that Arbitrator William Bankston issued the award requested. Defendants have not objected to the relief requested, therefore, this Court confirms the forgoing award of the Arbitrator in all respects pursuant to Alaska Revised Statute AS 09.43.110. The Court further finds that a judgment against Defendant RB Enterprises, LLC in the amount of $272,189.82, plus interest at 7.5% per annum until paid in full, shall be entered.

DATED this _____ day of _____, 2019, at Anchorage, Alaska.


_____

GREGORY A. MILLER
Superior Court Judge

Exhibit 8 -- Page 32 of 33

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the ___19th___ day of March, 2019, a true and

correct copy of the foregoing **ORDER CONFIRMING ARBITRATION AWARD** was served

by:

( ) facsimile
(X) hand delivery
( ) first class mail

on the following attorney(s) of record:

Bruce E. Falconer
BOYD, CHANDLER & FALCONER, LLP
911 W. 8th Avenue, Suite 302
Anchorage, Alaska 99501


Lorena Perez-Garcia
AMERICAN ARBITRATION ASSOCIATION
45 E River Park Place West, Suite 308
Fresno, CA 93720


_____
Paul D. Stockler

Exhibit 8 -- Page 33 of 33